**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SARAH VALELLY, Individually and on Behalf of All Other Persons Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br><br> MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, <br><br> Defendant. | Civil Action No.: <br><br><br> **<u>JURY TRIAL DEMANDED</u>** |

### <u>CLASS ACTION COMPLAINT</u>

1.      Plaintiff Sarah Valelly ("Plaintiff") brings this class action on behalf of herself and a Class of similarly situated persons or entities:

a.      Who are or were Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill") brokerage customers beginning March 3, 2014, and who were defaulted by Merrill into a low-interest Merrill Lynch Direct Deposit ("MLDD") "sweep account" (the "Brokerage Subclass").

b.      Who are or were Merrill brokerage customers who maintained "retirement accounts," but were not paid "reasonable rates" on their cash holdings as required by Paragraph 13 of the Merrill Lynch Self-Directed Investing Client Relationship Agreement ("CRA Agreement") (the "Retirement Customer" Subclass); and

c.      Who are or were Merrill customers who were advised by a Merrill account representative to deposit funds in excess of $25,000, and who maintained that deposit for at least 30 days (or such amount and holding period as may be determined by the Court), at Merrill's

affiliated bank (Bank of America, N.A. ("BANA")) in a low-interest paying deposit or checking account (the "BANA Subclass").

2.      Plaintiff asserts these claims (i) on behalf of the Brokerage Subclass under the doctrine of implied contract, unjust enrichment and quasi-contract, since there was no valid bilateral contract between the parties as to the payment of interest on sweep accounts and in the absence of a binding contract Subclass members are entitled to be paid a reasonable, market rate, (ii) on behalf of the Retirement Class for breach of a unilateral contract to pay interest at a "reasonable rate," and (iii) on behalf of the Brokerage Subclass and BANA Subclass for negligence and violation of customer suitability rules.  Claims on behalf of each Subclass are also asserted under the Massachusetts Consumer Protection Law, Mass. Gen. Law Chapter 93A, on behalf of a Massachusetts resident Subclass.

3.      Plaintiff seeks both monetary recovery and declaratory and injunctive relief.

4.      Plaintiff's allegations are made on information and belief, except where the allegations specifically identify documents on which the allegations are based or Plaintiff's personal knowledge of facts.  Plaintiff's information and belief is based on an investigation of materials on Merrill's websites (www.ml.com, www.merrilledge.com, and www.mymerrill.com), historical materials available on the internet, materials provided by Merrill in response to Plaintiff's requests, materials on competitors' websites, media reports, Securities and Exchange Commission ("SEC") releases, rules, and regulations, Financial Industry Regulatory Authority ("FINRA") rules and regulations, and New York Stock Exchange ("NYSE") rules and regulations.

## INTRODUCTION

5.     Merrill's MLDD sweep accounts pay investors a paltry 0.05% to 0.14% annual percentage yield ("APY") notwithstanding the absence of adequate disclosure, contract formation, or customers' "prior written affirmative consent" to be placed into a sweep account, as is required by common law principles, and NYSE and SEC rules and regulations.

6.     Beginning in the late 1990s, brokerage firms like Merrill began "sweeping" customer's cash into bank accounts of affiliated entities that were lawfully able to use that cash to generate profits in their operations.  The movement of that cash frequently came with only minimal disclosure to customers that their cash was being transferred to affiliated entities.  Most times (at least with Merrill) the customer only earned a *de minimus* return on that cash – well below the amounts earned by the affiliated entities and paid to Merrill on the use of the cash.

7.     In 2005, the NYSE, and subsequently, in 2013, the Securities and Exchange Commission, to counter this abuse in the brokerage industry, promulgated regulations establishing specific procedures for brokerage companies to contract with customers to sweep cash to affiliated entities.

8.     The SEC, effective March 3, 2014, adopted a Final Rule amending 17 C.F.R. 240.15c3-3 to add subparagraph (j)(2) requiring that brokerage firms like Merrill first secure a customer's "prior written affirmative consent" in order to form a binding contract with customers for the use of their cash.  *See* SEC Release No. 34-70072 ("Final Financial Responsibility Rules for Broker-Dealers"), 78 Fed. Reg. 51824 (August 21, 2013).

9.     The Final Rule also adopted, as a rule of law, the requirements of Self-Regulatory Organizations ("SROs") for the investment of cash in sweep accounts.

10.     In 2005, the NYSE (an SRO) had adopted Information Memorandum 05-11 establishing detailed disclosure requirements for the sweep of cash to affiliated accounts.

11.     The SEC specifically adopted, in the proposed regulations and the Final Rule, the NYSE Information Memo 05-11.  *See*, *e.g.,* Release No. 34-55431, 72 Fed. Reg. 12862, 12866, n.33 (Mar. 19, 2007):

> the broker-dealer would need to provide the customer with all notices and disclosures regarding the investment and deposit of free credit balances required by the self-regulatory organizations for which the broker-dealer is a member.

*Citing* NYSE Information Memo 05-11 (February 15, 2005).  *See also* the Final Rule, 78 Fed. Reg. at 51837, n.167 *quoted infra* at ¶159.

12.     Thus, in addition to following common law contract principles, Merrill is mandated to comply with both 17 C.F.R. 240.15c3-3(j)(2) and NYSE Info. Mem. 05-11 *before* sweeping cash accounts.

13.     Merrill Edge is an online brokerage service operated by Merrill beginning in 2010.  Merrill has, in its business practices, with regard to Merrill Edge, blatantly failed to secure a customer's "prior written affirmative consent" to sweeping cash to an affiliated entity (as is required by Rule 15c3-3(j)(2)(ii)(A)).  Rather, Merrill employs procedures on its website that intentionally or inadvertently omit and obfuscate disclosures on sweep accounts so that customers do not and cannot give their "prior written affirmative consent" to the investment of their assets at Merrill's paltry interest rates.

14.     Nor do those procedures otherwise satisfy common law principles requiring informed consent to form an online bilateral contract.

15.     Merrill's online account opening procedures currently, and when Ms. Valelly established her account in August 2017, are substantially different than the account opening

procedures in place during the 2000s. During the 2000s, account applicants were required to sign hard copy account documents that described the terms of the sweep accounts on page one of attached disclosures. *See* Code 100296RR-0206.[1]

16.     Since the 2000s, and specifically with respect to the online Merrill Edge accounts, those procedures have been replaced with internet-based account opening procedures and multiple, redundant and voluminous 8-point font PDF files. The key terms of those disclosures and agreements are not visible or hyperlinked on a computer, smartphone or tablet at the point of consent, and the user is not prompted to or required to open or scroll down through those disclosures or agreements before "clicking" their agreement to undisclosed terms.

17.     The specific disclosures on sweep accounts are buried deep within tens of pages of 8-point, two column PDF "agreements," which applicants are discouraged from reading by Merrill's assurance that it "should take less than 10 minutes" or "5 minutes" to scroll through and absorb all the account disclosures and agreements necessary to open an online account.

18.     Investors are not told or asked to confirm their consent to agreements – including the Merrill Edge Self-Directed Cash Management Account (CMA Account) Disclosures and Agreement – that contain terms that are relevant to account opening.

19.     Accordingly, class members do not provide prior written affirmative or informed consent to Merrill's sweep terms prior to opening an account.

20.     As stated by the SEC, account opening procedures that do not comply with SEC regulations are "unlawful." *See* Release No. 34-55431, 72 Fed. Reg. 12862 at 12866. *See also* Final Rule, 78 Fed. Reg. at 51837, n.162 ("Any violation of the rules and regulations

---

[1] When available, Plaintiff identifies documents by the Merrill Lynch Code designation. The first number in the Code identifies the document. The second number identifies when the document was placed in service.

promulgated under the Exchange Act is unlawful and therefore it is unnecessary to use this phrase in the final rule.").

21.     Moreover, Merrill makes available, on certain pages of its website, a PDF rate list of various alternatives for investing cash.  That rate list is not linked to any disclosures on the website.  In any event, the rate list does not identify which types of accounts earn which interest rates, so that the applicant does not know at the point of purported consent what rate will be earned on her account.  Thus, account holders cannot and do not provide prior written affirmative consent to interest rate terms.  Although opaque, the online "Merrill Edge" customers earn the lowest possible interest rate available to Merrill customers ranging from 0.05% to 0.14% -- at a time when market rates on cash investments are approximately 2.0%.

22.     Merrill could have designed a website that was compliant with common law requirements to form an online contract and with SEC and NYSE regulations, but (apparently) choose not to out of concern that requiring customers to open and scroll through PDF files to give their prior written affirmative consent to sweep accounts would deter customers from opening online accounts, and that clear, conspicuous disclosure would alert customers that they were being defaulted into Merrill's lowest-yielding sweep accounts.

23.      In either event, Merrill was financially motivated not to make the mandated disclosures.

24.     With respect to Ms. Valelly specifically, she opened four separate Merrill-related[2] accounts, containing in the aggregate approximately $1.0 million in cash, with the assistance of two different Merrill account executives.  In opening three of her Merrill accounts in August

---

[2] As alleged in ¶¶121-134, one of those accounts was with Bank of America, N.A., a business entity affiliated with Merrill.  Ms. Valelly opened that account with the assistance, recommendation, and encouragement of a Merrill account representative.

2007, Ms. Valelly was encouraged to rapidly browse through the Merrill website without opening or reviewing the ten or more PDF files available on Merrill's website, consisting in the aggregate of over 50 pages of two column, eight-point font documents.

25.     Merrill's procedures for opening new accounts are uniform among all class members.

26.     On March 6, 2014, the SEC issued "Guidance" on compliance with new regulation 15c3-3(j)(2).  The SEC emphasized that broker-dealers such as Merrill have the burden of demonstrating compliance with SEC regulations:  "Broker-dealers are reminded that, consistent with other Commission financial responsibility rules, they will bear the burden of demonstrating compliance with paragraph (j)(2)(i) of Rule 15c3-3."[3]

27.     Merrill however failed to establish procedures to demonstrate compliance with paragraph (j)(2) of Rule 15c3-3.  For example, the reference to Paragraph 13 of the Merrill Lynch Self-Directed Investing Client Relationship Agreement is not in view or required to be viewed before applicants are asked to "click" on a box stating that they "hereby agree to the terms and conditions by checking this box as a symbol of my signature."  *See* ¶¶68-76 (*infra*).

28.     Merrill's procedures violate NYSE Information Memorandum 05-11 and SEC Rule 15c3-3(j)(2) requiring that customers give their prior written affirmative and informed consent to sweep accounts.  Inasmuch as Plaintiff did not give her prior written affirmative and informed consent to the Merrill sweep account, no contract was formed between her and Merrill. Rather, a *quasi* contract was formed by the parties with an open interest rate term.

---

[3] https://www.sec.gov/divisions/marketreg/amendments-to-broker-dealer-financial-responsibility-rule-faq.htm (last viewed August 23, 2019).

29.     In the absence of a binding contract, Merrill is liable to Plaintiff and the other

Members of the Class in quasi contract or unjust enrichment – the difference between the

reasonable interest rates paid by similarly situated brokerage firms (approximately 2.0%) and the

below-market 0.14% rate paid by Merrill (recently reduced to 0.05%).

30.     SEC regulations also require that Merrill make "suitable" investment

recommendations to customers.  Bank of America Corporation ("BAC"), Merrill's parent, in an

August 30, 2010 letter to the SEC emphasized (at 2), among other things, that "Broker-dealers

have a duty to deal fairly with customers, and to act consistently with just and equitable

principles"[4] – a standard clearly violated here.  Recently (June 5, 2019), the SEC promulgated

final rules that require that investment recommendations not only be "suitable," but also in the

customer's "best interest."  *See* SEC Release 34-86031, 84 Fed. Reg. 33318 (July 12, 2019).

31.     Merrill, in May 2018, negligently recommended to Plaintiff in violation of both

the suitability and best interests standards that she invest $675,621 in a BANA deposit account at

0.06% APY -- a rate neither suitable nor in Plaintiff's best interest.

32.     Comparing the amount of interest that Plaintiff was actually paid at .06% and

.14% APY to the amount of interest that Plaintiff should have been paid at a market-based rate of

2.07% APY yields an astonishing underpayment of approximately $22,400.  *See* ¶¶118 and 127-

128, *infra*.

33.     Plaintiff also seeks a declaration that NYSE Information Memo 05-11 and SEC

Rule 15c3-3(j)(2) are binding on Merrill with respect to procedures for sweep accounts, and

---

[4] https://www.sec.gov/comments/4-606/4606-2583.pdf (last viewed August 21, 2019).

injunctive relief compelling Merrill to comply with NYSE Info. Mem. 05-11 and SEC Rule 15c3-3(j)(2).

34.     Last, Merrill's procedures, in certain respects, are sufficient to form a unilateral binding contract. Plaintiff maintained two retirement accounts with Merrill.  Merrill's agreements with customers require that cash in retirement accounts be paid a "reasonable rate." Although "reasonable rate" is not defined in the agreements, the law imposes as a reasonable rate the rate paid by comparable online brokerage companies.  Here, comparable online brokerage companies pay approximately 2.0% on cash accounts – substantially higher than the rates paid by Merrill.  Merrill should be compelled to pay retirement customers reasonable rates.

## PARTIES

35.     Plaintiff, Sarah Valelly, during the relevant time at issue (August 2017 through March 2019), resided in Boston, Massachusetts.  Plaintiff currently resides in Charleston, South Carolina.

36.     Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporation ("Merrill") is a Delaware corporation with its principal executive offices located in New York City, New York. Merrill is a registered broker-dealer, member of the Securities Investor Protection Corporation ("SIPC"), and a wholly owned subsidiary of Bank of America Corp.

37.     Merrill, among other things, operates the "Merrill Edge" investment platform. Merrill Edge, according to Merrill's website, is a "self-directed investing platform that streamlines investing, giving you access to research and insights, step-by-step guidance and flexible tools – all with low, flat-rate pricing."[5]

---

[5] https://www.merrilledge.com/investing/online-trading (last viewed August 21, 2019).

## JURISDICTION AND VENUE

38.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C.

§1332(d)(2).  Plaintiff is diverse from Defendant and the amount in controversy exceeds $5

million.

39.     Venue is properly laid in this District under 28 U.S.C. § 1391(b).  Defendant

maintains its executive office in this District, and many of the acts giving rise to the violations of

law complained of herein occurred in this District.

## SUBSTANTIVE ALLEGATIONS

### Plaintiff's Merrill Accounts

40.     Ms. Valelly was in August 2017 a resident of the Commonwealth of

Massachusetts.  At that time, Ms. Valelly maintained three brokerage accounts at Fidelity

Investments – a fully taxable brokerage account, a Roth IRA, and a regular IRA.

41.     A professional friend recommended to Ms. Valelly at that time that she transfer

her accounts to the Merrill Edge platform at Merrill Lynch.  Ms. Valelly's professional friend, in

August 2007, introduced Ms. Valelly to BB at Merrill's Post Office Square office (100 Federal

Street, Boston, MA).[6]

42.     Ms. Valelly met with BB in August 2017.  At that time, Ms. Valelly maintained

cash balances of approximately $271,000 and equity assets worth approximately $66,000 in her

taxable account, cash balances of approximately $95,000 and other assets worth approximately

$18,000 in her Roth IRA, and cash balances of approximately $114,000 and other assets worth

approximately $125,000 in her regular IRA.

---

[6] Plaintiff throughout the Complaint substitutes initials for names of Merrill employees to protect their privacy.  The names of these employees have already been made available to Merrill, or will be upon request.

43.     After discussing her brokerage account options with BB for approximately ten minutes, Ms. Valelly determined to open a Merrill Edge brokerage account.

44.     BB made a Merrill iPad available to Ms. Valelly and assisted Ms. Valelly in entering personal information and scrolling through the iPad.

45.     Ms. Valelly has no specific recollection of the disclosures on the Merrill iPad at that time but obtained from Merrill on July 23, 2019 copies of two agreements that Merrill represents were available on its website in August 2017, and a summary of terms that Merrill claims Plaintiff is bound to.

46.     Plaintiff's internet research, including a review of historical documents still available online, indicates that Merrill's account opening procedures in 2017 were substantially similar to its current account opening procedures.

47.     The following allegations simulate current account opening procedures on a standard desktop computer.  The account opening procedures are even less transparent on a tablet or smart phone because of the smaller screen size and difficulty (if not impossibility) of downloading separate PDF attachments.

48.     Currently, to open a Merrill Edge brokerage account, an investor goes to the website ml.com, clicks on a large red icon "Open An Account" and then clicks through to select the type of account to open -- for example, an "Individual Investing Account."  The applicant is then met with a screen that reads at the top: "Opening a Merrill Edge self-directed **Individual Cash Management Account** should take less than **10** minutes."  Emphasis in original.

**What you'll need**

Opening a Merrill Edge self-directed **Individual Cash Management Account**® should take less than **10** minutes.

We will ask you to provide some personal information including:

- **Social Security number and date of birth**
- **A valid mailing and email addresses**
- **Employment information** (including company name, address, and start date)
- **General financial information** (such as annual income and household net worth)

If you have this information, or are an existing client with a user ID and Password you can use to pre-fill your application, you're ready to continue.

49.     If the customer already has a Merrill Edge account and is opening a new account, the customer is told that "opening [an account] should take only **5** minutes." Emphasis in original.

**We've given you a head start**

Opening a Merrill Edge self-directed **Individual Cash Management Account**® should take only **5** minutes because we will pre-fill your application with personal information we have on file.

Please ensure that the pre-filled information is accurate, and revise anything outdated including your contact, employment, and financial information.

This new account will be automatically linked to your existing Merrill Lynch User ID.

50.     After entering personal information, the applicant is brought to a screen, identified as "Terms & Conditions (Page 1 of 3)" where she is required to review an "Electronic Communications Disclosure."  Only the first paragraph of the Electronic Communications Disclosure is visible on the website, and the applicant is not required to scroll through the entire Electronic Communications Disclosure before affirming that "I have reviewed and consent to the eCommunications Disclosure."



51.     Also available on the top right of that screen is a hyperlink marked "Download Electronic Communications Disclosure (PDF)."  An applicant need not open or scroll through that PDF disclosure to open an account.  The entire Electronic Communications Disclosure (PDF) (labelled effective date November 4, 2016) is eleven single-spaced 8-point font paragraphs extending onto a third page.[7]

---

[7] Whereas certain Merrill documents in PDF format may be identified by url, other documents require that the applicant first input a username and password.  Those documents can only be reproduced by "screen-shot."

52.     Merrill, given the ten minute estimate of time to open a new account, and five minute estimate to open a second account, does not encourage or expect applicants to read the Electronic Communication Disclosure, or other similar documents available on the website.

53.     The next screen ("Terms & Conditions (Page 2 of 3)") requires the applicant to "certify" their "correct taxpayer identification number," that they are "not subject to backup tax withholding" and that they are a U.S. citizen.

### Terms & conditions (Page 2 of 3)

By agreeing to the Tax Certification Form, you certify that the tax information you are providing is accurate.

### Tax certification form

By checking the box below and selecting the Submit Application button, I certify under penalties of perjury that the following 4 statements are true:

1. The number shown on this form is my correct taxpayer identification number:
   103462373

2. I am not subject to backup tax withholding because:
   • I am exempt from backup tax withholding, or
   • I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup tax withholding as a result of a failure to repo all interest or dividends, or
   • The IRS has notified me that I am no longer subject to backup tax withholding

3. I am a U.S. citizen or other U.S. person (including a U.S. resident alien).

4. The FATCA code entered on this form (if any) indicating that I am exempt from FATCA reporting is correct.

☑ I,  , certify and sign under penalty of perjury that all of the 4 tax certification statements above are true.

54.     The following screen ("Terms & Conditions (Page 3 of 3)") contains this printed disclosure, identifying a total of five specific agreements that account holders are bound to:  (i) The Merrill Edge Self-Directed Investing Client Relationship Agreement, (ii) Merrill Edge Self-Directed [Investing] Terms of Service, (iii) Electronic Communications Disclosure, (iv) Bank of America Privacy Policy for U.S. Consumers, and (v) the Federally Required Affiliate Marketing Notice (identifying the five agreements with bracketed numbers):

14

[1] The Merrill Edge Self-Directed Investing Client Relationship Agreement and
[2] Merrill Edge Self-Directed Investing Terms of Service are the general
agreements governing the Merrill Edge Self-Directed Investing services available
to you. You are also subject to additional agreements and disclosures that cover
other products, services or account features for which you may be enrolled,
including cash management, margin and retirement accounts and services like bill
payment.

You will also be subject to additional agreements and disclosures we may send
you from time to time. If a provision in any additional agreement conflicts or is
inconsistent with the [1] Merrill Edge Self-Directed Investing Client Relationship
Agreement and [2] Merrill Edge Self-Directed Investing Terms of Service, the
provisions of the additional agreement will control for matters and services
covered by that additional agreement.

The following contains your consent to the [following five documents:  [3]
Electronic Communications Disclosure, [1] the Merrill Edge Self-Directed
Investing Client Relationship Agreement, [2] the Merrill Edge Self-Directed
Investing Terms of Service, the agreement applicable to the type of account you
are applying for, [4] the Bank of America Privacy Policy for U.S. Consumers, and
[5] the Federally Required Affiliate Marketing Notice. Consenting to the
Electronic Communications Disclosure allows us to provide you with documents
electronically. Please carefully review these documents. You can also request
printed copies for your records.

55.     None of these five documents are hyperlinked in the above disclosure.

56.     Immediately below this disclosure are four hyperlinked "Brokerage Account

Documents" that although available in PDF are not otherwise described:

- Merrill Edge Self Directed Investing Client Relationship Agreement (PDF) [Code
  422000PM-0619; 6 pages, double columns, 8-point font]
- Cash Management Account Disclosures and Account Agreement (PDF) [Code
  470819PM-0619; 22 pages, double columns, 8-point font]
- Merrill Edge Self Directed Terms of Service (PDF) [Code 422000PM-0619; 7
  pages, double columns, 8-point font]
- Mutual Fund Disclosure Document (PDF) [January, 2019; [Code 351205PM-
  0119; 13 pages, double columns]

57.     Neither the "Cash Management Account Disclosures and Account Agreement,"

nor the "Mutual Fund Disclosure Document," are among the documents referenced on the top

15

half of the page as agreements binding on account holders.  Those two agreements are merely

placed on Page 3 of 3 without any reference to their terms or consequences.

## Terms & conditions (page 3 of 3)

Now, please review important account terms, disclosures, privacy and affiliate marketing notices and account attestations.

Select the links to review each item, or **print** and **save** copies for your records. These documents apply to your new account. To review the documents in PDF format, you must have Adobe Reader 6.0 or higher. You can download it for free at Acrobat Adobe Reader

Download all documents (PDF)

The Merrill Edge Self-Directed Investing Client Relationship Agreement and Merrill Edge Self-Directed Investing Terms of Service are the general agreements governing the Merrill Edge Self-Directed Investing services available to you. You are also subject to additional agreements and disclosures that cover other products, services or account features for which you may be enrolled, including cash management, margin and retirement accounts and services like bill payment.

You will also be subject to additional agreements and disclosures we may send you from time to time. If a provision in any additional agreement conflicts or is inconsistent with the Merrill Edge Self-Directed Investing Client Relationship Agreement and Merrill Edge Self-Directed Investing Terms of Service, the provisions of the additional agreement will control for matters and services covered by that additional agreement.

The following contains your consent to the Electronic Communications Disclosure, the Merrill Edge Self-Directed Investing Client Relationship Agreement, the Merrill Edge Self-Directed Investing Terms of Service, the agreement applicable to the type of account you are applying for, the Bank of America Privacy Policy for U.S. Consumers, and the Federally Required Affiliate Marketing Notice. Consenting to the Electronic Communications Disclosure allows us to provide you with documents electronically. Please carefully review these documents. You can also request printed copies for your records.

### Brokerage Account Documents

Merrill Edge Self Directed Investing Client Relationship Agreement (PDF)
Cash Management Account Disclosures and Account Agreement (PDF)
Merrill Edge Self Directed Terms of Service (PDF)
Mutual Fund Disclosure Document (PDF)

### Privacy Notice and Affiliate Marketing Notice

Privacy Policy for U.S. Customers (PDF)
Affiliate Marketing Notice (PDF)
Business Continuity

58.    At the top half of the screen, the non-hyperlinked document [2] had been called

the "Merrill Edge Self-Directed Investing Terms of Service."  On the bottom half of the screen

the hyperlinked document is called the "Merrill Edge Self-Directed Terms of Service" (with the

word "Investing" omitted).  The difference in description is confusing to the reader, who may

have difficulty discerning whether the document in the hyperlink is the same document she is

elsewhere being asked to consent to.  The difference in documents title is representative of the

sloppiness and indifference to clarity on Merrill's website.

16

59.     The hyperlinked document identified in the PDF as "Cash Management Account Disclosures and Account Agreement" is actually entitled "Merrill Edge Self-Directed Cash Management Account (CMA Account) Disclosures and Agreement" (the "CMA Agreement").[8]

60.     The 22-page CMA Agreement is not referenced as one of the five documents at the top half of Page 3 of 3 that the applicant is being asked to consent to, and is not otherwise referenced on Merrill's account opening website.  Thus, the applicant is not asked to consent to, no less provide their "prior written affirmative consent" to the CMA Agreement.

61.     The disclosures in the CMA Agreement that relate to Merrill's Sweep Program are not emphasized, but rather are scattered and buried within the 22-page, single-spaced 8-point font document.

62.     Although unexplained on the Merrill website, a "sweep program" is a "service provided by a broker or dealer where it offers to its customer the option to automatically transfer free credit balances in the securities account of the customer to either a money market mutual fund product ... or an account at a bank whose deposits are insured by the Federal Deposit Insurance Corporation."  *See* 17 CFR 240.15c3-3(a)(17).  Under SEC Rule 15c3-3, broker-dealers such as Merrill are forbidden from using customer's assets to finance any part of their businesses unrelated to servicing securities customers.  Brokerages, such as Merrill, however, may lawfully avoid these rules by "sweeping" cash balances to affiliated banks, such as Bank of America, N.A., a wholly-owned subsidiary of BAC.  *See* SEC Release No. 34-70072, 78 Fed. Reg. at 51839 ("transferring this excess cash to a bank account or money market fund is an alternative to retaining a credit balance in the customer's securities account.").

---

[8] https://olui2.fs ml.com/publish/content/application/pdf/GWMOL/MerrillLynchSelf-DirectedCMAAccountAgreement.pdf (Code 470819PM-06/2019) (last viewed August 23, 2019).

63.     The following three separate "Privacy Notice and Affiliate Marketing Notices" (documents 8 through 10) are also noted as available on Page 3 of 3 in PDF:

- Privacy Policy to U.S. Customers (PDF) [Rev. 01/2018; 3 pages]
- Affiliate Marketing Notice (PDF) [01/2016; 1 page]
- Business Continuity (PDF) [1 page]

64.     The applicant, however, is not required to open or scroll through any of the PDF files to open an account.

65.     Merrill, given the ten minute estimate of time to open an account, does not encourage or expect applicants to read any of these PDF files.

66.     Merrill could require applicants to open and scroll through each of the PDF files to register their consent to the terms of those agreements, but chooses not to.

67.     Although customers have the ability to download these PDF files onto computer hard drives, many applicants open accounts on tablets or smart phones that do not realistically have the ability to download files, and even those applicants who open accounts on desktops are unlikely to download or read PDF files.

68.     To proceed to open an account, the applicant is required to scroll down to the bottom half of this Page 3 of 3, where she is informed: "By signing below, you represent and agree to a variety of terms."  However, only the first seven paragraphs of those terms are visible to the reader on a desktop computer (and fewer if the reader is on a smartphone or tablet). Unless you scroll down those terms, which you are not required to do, you are not aware of the additional terms, and do not read and are not required to read Paragraphs 8-12, prior to registering your consent to those terms.  Moreover, only Paragraph 1 is bolded, providing that "**You agree to attribute all controversies that may arise between you and us, in accordance with the Merrill Lynch Agreements and Disclosures....":**

**By signing below, you represent and agree that:**

1. **You agree to arbitrate all controversies that may arise between you and us, in accordance with the Merrill Lynch Agreements and Disclosures, including Section 11 of the Merrill Edge Self-Directed Investing Client Relationship Agreement.**

2. You are the person(s) named in the "Personal Information" section(s) of this application, you acknowledge that you are of legal age under the laws of your place of residence, and have reviewed all information contained in this application whether prefilled systematically, by a representative, or entered by you and you confirm that all the information is accurate;

3. You agree to receive electronic delivery of all documents related to your accounts (in accordance with Section 3 of the Merrill Edge Self-Directed Investing Terms of Service);

4. You have received, reviewed and agreed to the terms of the:
   - Bank of America Privacy Policy for U.S. Consumers
   - Federally Required Affiliate Marketing Notice
   - Electronic Communications Disclosure (the "eCommunications Disclosure")
   - Merrill Lynch Agreements & Disclosures and that you intend to be bound by them as your legal agreements;

5. Any devices you are using for this application and will use to review subsequent electronic communications meet the Hardware and Software Requirements, as described in the eCommunications Disclosure;

6. You authorize Merrill Lynch and its affiliates to request a consumer report or credit report about you from one or more consumer reporting agencies to verify the information provided in this client relationship agreement and for any other legitimate business purposes;

7. Merrill Lynch has a lien on your accounts and assets in those accounts for any payment obligations you have to Merrill Lynch, in accordance with the Merrill Lynch Agreements and Disclosures, including Section 8 of the Merrill Edge Self-Directed Investing Client Relationship Agreement;

☑ I ▬▬▬▬▬ hereby agree to these terms and conditions by checking this box as a symbol of my signature.

**Submit application**     Save & exit     Cancel

69.     On a smartphone, barely the first three paragraphs are visible:

> **By signing below, you represent and agree that:**
>
> 1. **You agree to arbitrate all controversies that may arise between you and us, in accordance with the Merrill Lynch Agreements and Disclosures, including Section 11 of the Merrill Edge Self-Directed Investing Client Relationship Agreement.**
>
> 2. You are the person(s) named in the "Personal Information" section(s) of this application, you acknowledge that you are of legal age under the laws of your place of residence, and have reviewed all information contained in this application whether prefilled systematically, by a representative, or entered by you and you confirm that all the information is accurate;
>
> 3. You agree to receive electronic delivery of all documents related to your accounts (in accordance with Section 3 of the Merrill
>
> ☑ I, ██████████, hereby agree to these terms and conditions by checking this box as a symbol of my signature.

70.     Paragraph 4 of 12 states in regular print that "You have received, reviewed and agree to the terms of the:"

- Bank of America Privacy Policy for U.S. Consumers
- Federally Required Affiliate Marketing Notice
- Electronic Communications Disclosure (the "eCommunications Disclosure")
- Merrill Lynch Agreements & Disclosures and that you intend to be bound by them as your legal agreements;

71.     Paragraph 4 does not, however, identify or define the "Agreements & Disclosures" that you are purportedly agreeing to be bound by and those "Agreements & Disclosures" are not hyperlinked in Paragraph 4.  Applicants were previously advised at the top of Page 3 of 3 that there are only five documents they need to consent to, and the CMA Agreement is not one of those five documents.  *See* ¶¶54 and 57, *supra.*

72.     Only if the applicant scrolls all the way down to the bottom of this acknowledgement, which she is not required to do to "click" her agreement to its terms, does she

20

learn in regular print in Paragraph 12 (the last paragraph) that "you affirmatively consent to

having your available cash balances deposited or invested through the Sweep Program in

accordance with Section 13 of the Merrill Edge Self-Directed Investing Client Relationship

Agreement."



73.    However, the applicant has no reason to know that Paragraphs 8-12 exist on Page

3 of 3 of the website and is not prompted to scroll down to Paragraph 12.  Thus, an applicant can

open a Merrill Edge account without first reading or having an opportunity to read Paragraph 12.

74.    Moreover, neither Section 13 of the CRA Agreement nor the CRA Agreement

itself is hyperlinked in Paragraph 12, nor is the PDF of the CRA Agreement necessarily still

visible on the screen.  Rather, the reader is required to scroll back up the page and search for the

CRA Agreement and scroll through to page 3, Section 13 to read the referenced disclosure.  Nor

are the interest rates paid on sweep accounts disclosed in the CRA Agreement or otherwise in these twelve terms and conditions that Merrill seeks to bind its customers to.

75.     Merrill has the ability to determine whether the CRA Agreement PDF file or the CMA Agreement PDF file is opened before account formation, and would know that very few account applicants actually open those PDF files before account formation.

76.     Before getting to Paragraph 12 and the one reference to the Sweep Program, the applicant – within its five or ten minute allocation of time to open her account – is expected to read and review all the documents and sections thereof referenced in the first 11 paragraphs, including references concerning "liens" in Section 8 of the CRA Agreement and margin loans in Section 7 of the CRA Agreement.

77.     The more detailed 22-page CMA Agreement is nowhere referenced in these 12 terms and conditions.

78.     Rather than taking five or ten minutes to review all the agreements and disclosures that Merrill seeks to bind customers to, it would take hours, if not days, to do so, and an advanced law degree to understand those terms.

79.     Further complicating the disclosure is that Paragraphs 19-32 at pages 3-4, and Paragraphs 1-44 at pages 14-22 of the CMA Agreement also contain disclosures relating to sweep accounts.  Neither the CMA Agreement nor any of the paragraphs contained therein, are referenced as terms agreed to by the applicant.  Nor are the provisions in the CMA Agreement relating to sweep accounts highlighted in any manner.  The Sweep Program terms contained in the 22-page, single-space, 8-point font CMA Agreement are neither reasonably communicated nor reasonably conspicuous to the applicant.

80.     There is no one document or specific reference to terms that the applicant is asked to "click" that describes the terms of a Sweep Program.  Even the most careful and patient reader cannot determine from Merrill's account opening procedures what provisions govern Merrill's Sweep Program.

81.     Separately, according to the August 2017 disclosures recently made available by Merrill to Plaintiff, those PDF files do not appear to have been clearly hyperlinked on Merrill's website in August 2017.  Rather, the disclosure recently provided by Merrill to Plaintiff states that "[f]or your information, review and records, an email with a list to these Agreements and Disclosures will be sent to you, and you can also request printed copies at our office."

82.     At Plaintiff's request that Merrill provide her with copies of the agreements in place in 2017 through 2019 that Merrill contends she is bound to, Merrill, on July 23, 2019, provided Ms. Valelly with a copy of The Merrill Edge Self-Directed Investing Client Relationship Agreement dated June 2017 (Code 422000PM-*0617*) and The Merrill Edge Self-Directed Cash Management Account – Disclosures and Account Agreement dated July 2017 (Code 470819PM-*0717*).

83.     At that time, the CRA Agreement was a five-page, double column, 8-point font document.  Currently, that same agreement is six-pages, double-column, 8-point font.[9]

84.     The June 2017 CRA Agreement states (on page 4) that an investor has two options – to allow their cash to sweep (*i.e.*, earn interest), or not to sweep (not earn interest):

> The deposit of checks, the sale of securities, and other activity will periodically generate cash in your account. You have the option to have cash balances in your account automatically deposited in a bank deposit program *or invested in a money market mutual fund* ("Sweep Program"). Alternatively, you may elect that cash balances do not sweep. If you choose to not sweep your cash balances, they will not earn interest.  [Emphasis added.]

---

[9] https://olui2.fs ml.com/publish/content/application/pdf/GWMOL/MerrillLynchSelf-DirectedInvestingClientRelationshipAgreement.pdf (Code 422000PM-0619) (last viewed August 23, 2019).

85.     The italicized words appear in the June 2017 Agreement, but not in the June 2019 Agreement.  Beginning in 2018, investors were no longer given the option of having their cash balances automatically invested in a money market mutual fund.

86.     With respect to the amount of interest that is earned on a sweep account, the June 2017 CRA Agreement and current CRA Agreement only state that the interest rates "paid on deposits are determined at the discretion of the Merrill Affiliated Bank based on economic and business conditions.  Rates may change daily."  However, with respect to "retirement account assets," both CRA Agreements state that the "interest rate … will be at no less than a reasonable rate."

87.     The implication, therefore, is that Merrill maintains that it is not required to pay a "reasonable rate" on non-retirement accounts, and that the rate paid on non-retirement assets is not a "reasonable rate."

88.     The disclosures on Page 4, Paragraph 13 of the CRA Agreement, concerning the "Sweep Program" are not highlighted or bolded in any manner, unlike, for example, the arbitration disclosures in the current CRA Agreement in Paragraph 11, "Agreement to arbitrate controversies," which are in bold print.

89.     Applicants are advised on Page 4, Paragraph 13 of the CRA Agreement, in 8-point font, that the "current yield on any deposits held under Merrill Lynch Direct Deposit Program (the 'MLDD' Program) or Retirement Asset Savings Program (the 'RASP Program'), will be included on your account statement" and that "[y]ou can also access current yield information on our website or by contacting Merrill Edge Self-Directed Investing at 877.653.4730."  The actual rates however are not disclosed or hyperlinked.  Applicants are not told where on the website they may access rates.

24

90.     The Merrill Edge Self-Directed Cash Management Account – Disclosures and Account Agreement is a 22-page, two columns, 8-font PDF.  Although the CMA Agreement is available in PDF on Merrill's website, it is not listed among the five agreements that customers are required to consent to and it is not referenced in Paragraph 12 (or otherwise) of the terms agreed to.  You are not required to verify that you had "received, reviewed and agreed to" the CMA Agreement when you open a Merrill Edge account.

91.     Although not highlighted or segregated in any manner, the CMA Agreement (¶¶19-31 at pages 3-4 and ¶¶1-44 at pages 14-22) contain additional disclosures (not contained in the CRA Agreement) concerning Merrill's Sweep Program.  The disclosures concerning the Sweep Program in the CMA Agreement, among 50+ pages of other disclosures, are not highlighted and are neither conspicuous nor reasonably communicated, prior to account opening.

92.     As referenced in Paragraph 30 of the CMA Agreement, but not in Paragraph 13 of the CRA Agreement, at the bottom of certain pages on the Merrill website is a link entitled "Deposit Account & Money Fund Rates."  That link is among eight links at the bottom of the page on the Merrill website.

93.     The "Deposit Account & Money Fraud Rates" document is entitled "Cash Management Solutions."  The document states in the first sentence:

> Merrill Lynch offers access to a variety of investment and bank deposit solutions to provide liquidity, relative safety, and *competitive* yields for your cash holdings. [Emphasis added.]

94.     The document states that "[a]vailability is based on account type and may depend on other eligibility criteria."  Accordingly, the applicant cannot determine from the disclosures themselves what rate she is entitled to.

95.     According to the disclosures, the Annual Percentage Yield ("APY") for the

Merrill Lynch Bank Deposit Program ("MLBDP") is tiered based on account size.  *E.g.,* Tier 1

(<$250,000) is 0.14% and Tier 2 ($250,000 to $1M) is 0.33%.[10]

***Please note: Availability is based on account type and may depend on other eligibility criteria.***

| | As of 8/1/2019 |
|---|---|
| **Bank Deposits available through Merrill Lynch Accounts** | **Annual Percentage Yield** |
| Merrill Lynch Bank Deposit Program --- Tier 1 (<$250,000) | 0.05% |
| Merrill Lynch Bank Deposit Program --- Tier 2 ($250,000 to <$1M) | 0.10% |
| Merrill Lynch Bank Deposit Program --- Tier 3 ($1M to <$10M) | 0.40% |
| Merrill Lynch Bank Deposit Program --- Tier 4 (>= $10M) | 0.55% |
| Insured Savings Account (ISA®)[1] | 0.60% |
| Preferred Deposit®[2,3] | 1.82% |
| Retirement Asset Savings Program --- Tier 1 (<$250,000) | 0.05% |
| Retirement Asset Savings Program --- Tier 2 ($250,000 to <$1M) | 0.10% |
| Retirement Asset Savings Program --- Tier 3 ($1M to <$10M) | 0.40% |
| Retirement Asset Savings Program --- Tier 4 (>= $10M) | 0.55% |
| Merrill Lynch Direct Deposit Program | 0.05% |
| Merrill Lynch Business Deposit Program ---- Tier 1 (<$250,000) | 0.05% |
| Merrill Lynch Business Deposit Program --- Tier 2 ($250,000 to <$1M) | 0.10% |
| Merrill Lynch Business Deposit Program --- Tier 3 ($1M to <$10M) | 0.40% |
| Merrill Lynch Business Deposit Program --- Tier 4 (>=$10M) | 0.55% |
| Preferred Deposit for Business®[2,3,4] | 1.82% |

[1]$1,000 minimum opening deposit.
[2]$100,000 minimum opening deposit.
[3]This is a non-sweep product - an order must be entered for all transactions (purchases and sales).  Please contact your representative for additional information.
[4]Not available for financial service entities.

96.     The Cash Management Solutions document is ambiguous as to whether the dollar

breaks apply to cash balances or to account assets.  Earlier iterations of the same document

(entitled "Understanding your cash sweep options"; code 471105PM-0914), differentiated

available fund options based on "eligible statement-linked assets."  Any ambiguity with respect

to a contract of adhesion such as Merrill's agreements, should be interpreted against the

draftsperson.  The implication from the table is that dollar breaks would apply to account assets

rather than cash balances.

---

[10] These rates were lowered on August 1, 2019 and are currently 0.05% and 0.10%, respectively.

97.     The Cash Management Solutions Document identifies as the fifth option an "Insured Savings Account (ISA)" with an APY of 0.60% based on a $1,000 minimum opening deposit; and identifies as a sixth option a "Preferred Deposit" account with a 2.07% APY, based on a $100,000 minimum opening deposit (currently 1.82%).

98.     With regard to the Insured Savings Account (ISA) and the "Preferred Deposit," an applicant, by the plain terms of the disclosure, is not required to maintain that minimum deposit in her account ($1,000 or $100,000, respectively), so long as it is her "opening deposit."

99.     Merrill makes it intentionally difficult to benefit from the Preferred Deposit account.  The "Preferred Deposit" is identified as a "non-sweep product," meaning that "an order must be entered for all transactions (purchases and sales)."  An investor who desires the higher yield has to manually transfer cash back to the lower yielding sweep account to cover, for example, checks written on the account or securities investments, and to manually transfer money back to the Preferred Deposit account to benefit from the higher yield.

100.    The seventh through tenth sweep options are different tiers of the Retirement Asset Savings Program, available only to retirement accounts.

101.    The eleventh sweep option is the Merrill Lynch *Direct* Deposit Program. Although substantially identically named as the Merrill Lynch *Bank* Deposit Program, the *Direct* Deposit Program pays a non-tiered 0.14% APY (currently 0.05%) whereas the *Bank* Deposit Program pays tiered rates up to 0.75% (currently 0.55%).

102.    After Plaintiff realized in March 2019 that she had been paid below-market rates on her cash balances, she conducted an investigation into the matter, given that she maintained asset and cash balances exceeding $250,000, and that she had not been paid on her taxable account at least the tiered rates under the Bank Deposit Program.

27

103.    Plaintiff first spoke to an account representative (PM) who informed her that she *was* paid the 0.33% APY Bank Deposit Program tiered rate on her cash balances.

104.    When Plaintiff realized that this was not true, she called back the toll free number and spoke with a second account representative (WW), who could not explain why she was not paid a tiered interest rate.

105.    Only subsequently did the first account representative call back Plaintiff and explain that as an online customer, her sweep account was invested in the Merrill Lynch *Direct* Deposit Program and not the Merrill Lynch *Bank* Deposit Program, and that only full service Merrill customers were entitled to the tiered interest rates of the Merrill Lynch *Bank* Deposit Program.

106.    Only then did Plaintiff realize that she had been placed in the almost identically named eleventh option on the term sheet (Direct Deposit Program) at the lowest possible rate and not the first through fourth option (Bank Deposit Program) at tiered rates.

107.    In any event, given the complexity and opaqueness of the disclosures, Plaintiff was not informed that she could elect the Preferred Deposit interest rate option, and was automatically defaulted into the lowest-paying 0.14% APY, non-tiered interest option.

108.    Ms. Valelly repeated this account opening procedure for both of her IRA and Roth IRA accounts.  In opening those accounts, the Traditional IRA– Disclosure and Custodial Agreement (PDF) [11], and the Roth IRA – Disclosure and Custodial Agreement (PDF)[12], are present on the website but not otherwise referenced.  Plaintiff was able to open her IRA account

---

[11]https://olui2.fs.ml.com/publish/content/application/pdf/GWMOL/TraditionalIRACustodialAgreementDisclosure.pdf (Code 209468PM-0918) (last viewed August 23, 2019).

[12] https://olui2.fs.ml.com/publish/content/application/pdf/GWMOL/RothIRACustodialAgreementDisclosure.pdf (Code 209581PM–0918) (last viewed August 23, 2019).

and Roth IRA Account without opening, reviewing, or agreeing to either of these documents.
The CMA Agreement, with its more detailed disclosures on the Sweep Program, is not available
for review on the account opening website for the Traditional, Rollover, or Roth IRA.

You will also be subject to additional agreements and disclosures we may send you from time to time. If a provision in any additional agreement conflicts or is inconsistent with the Merrill Edge Self-Directed Investing Client Relationship Agreement and Merrill Edge Self-Directed Investing Terms of Service, the provisions of the additional agreement will control for matters and services covered by that additional agreement.

The following contains your consent to the Electronic Communications Disclosure, the Merrill Edge Self-Directed Investing Client Relationship Agreement, the Merrill Edge Self-Directed Investing Terms of Service, the agreement applicable to the type of account you are applying for, the Bank of America Privacy Policy for U.S. Consumers, and the Federally Required Affiliate Marketing Notice. Consenting to the Electronic Communications Disclosure allows us to provide you with documents electronically. Please carefully review these documents. You can also request printed copies for your records.

**Brokerage Account Documents**

Merrill Edge Self Directed Investing Client Relationship Agreement (PDF)
Traditional IRA — Disclosure and Custodial Agreement (PDF)
Merrill Edge Self Directed Terms of Service (PDF)
Mutual Fund Disclosure Document (PDF)

**Privacy Notice and Affiliate Marketing Notice**

Privacy Policy for U.S. Customers (PDF)
Affiliate Marketing Notice (PDF)
Business Continuity

By signing below, you represent and agree that:

1.  **You agree to arbitrate all controversies that may arise between you and us, in accordance with the Merrill Lynch Agreements and Disclosures, including Section 11 of the Merrill Edge Self-Directed Investing Client Relationship Agreement.**

2.  You are the person(s) named in the "Personal Information" section(s) of this application, you acknowledge that you are of legal age under the laws of your place of residence, and have reviewed all information contained in this application whether prefilled systematically, by a representative, or entered by you and you confirm that all the information is accurate;

3.  You agree to receive electronic delivery of all documents related to your accounts (in accordance with Section 3 of the Merrill Edge Self-Directed Investing Terms of Service);

4.  You have received, reviewed and agreed to the terms of the:
    *   Bank of America Privacy Policy for U.S. Consumers

109.    With respect to her IRA and Roth IRA accounts, because Ms. Valelly had already
opened her taxable account, she was advised on Merrill's website that the account opening
would only take five minutes. *See supra* at ¶49.

110.    Ms. Valelly's initial deposits were $271,677 in cash in her Taxable Account,
$113,850 in cash in her IRA, and $95,119 in cash in her Roth IRA.

29

111.    Ms. Valelly was not directed to elect an account-opening sweep account.  Rather, she was automatically defaulted into the 0.14% APY sweep interest rate, rather than, for example, the higher interest rate available under the Insured Savings Account or the Preferred Deposit.  Significantly, the only condition stated for the Insured Savings Account in the Cash Management Solutions document available on the Merrill Edge website (although not prominent) was that there be a "$1,000 minimum deposit."  Moreover, there was no notation next to the Insured Savings Account, such as the notation with respect to the Preferred Deposit account ("Please contact your representative for additional information"), indicating that participation in the Insured Savings Account was automatic so long as there was an initial $1,000 minimum opening deposit.

112.    Nor was Plaintiff given the benefit of the 0.33% APY tiered rate under the *Bank* Deposit Program.

113.    Although the Merrill Edge website prominently displays those aspects of the Merrill Edge account that Merrill considers favorable to investors, there is no conspicuous disclosure of the interest rate paid on sweep accounts.  *E.g.*, "Why Merrill Edge®? You'll get easy-to-use tools, helpful research and simple flat-rate pricing of $6.95 per unlimited online stock and ETF trade -- with no trade or balance minimums."[13]

114.    Upon signing up for a Merrill Edge account, new subscribers receive in hard copy by snail mail a "Welcome" letter enclosing a brochure "highlighting our easy-to-use online tools and resources," "a confirmation of the features you selected," and "information on how to fund your new account."

---

[13] https://www.merrilledge.com/investing (last viewed August 23, 2019).

115.     None of these disclosures address the sweep account, or the very low interest rate that Merrill pays on cash balances.

116.     New subscribers also receive a "Welcome" email hyperlinking to a "Merrill Edge Quick Start Guide."  The "Quick Start Guide" does not contain any disclosures with respect to sweep accounts.  The Welcome email also contains a hyperlink to something called "agreements and disclosures," but that hyperlink merely directs the reader to new account forms, and not disclosures on the "sweep" account.

117.     On October 27, 2017, Ms. Valelly transferred an additional $175,721 in cash into her taxable account.  Although the amount of cash in her taxable account varied each month, it remained at or about $300,000 until March 2019.

118.     The following charts reflect Ms. Valelly's average monthly (through February 2019) and quarterly (through March 2019) cash balances, interest actually paid, and interest that should have been paid on her taxable, IRA and Roth IRA accounts, at the 2.07% Preferred Deposit rate[14]:

---

[14] Plaintiff cannot determine based on currently available information whether the Preferred Deposit rate varied since August 31, 2017.

## TAXABLE ACCOUNT

| Date | Ending Balance | Ending Yield | Interest Earned Taxable | Average Balance | Preferred Deposit | Diff. in Yield | Diff in Int. |
|---|---|---|---|---|---|---|---|
| 8/31/17 | $271,687.21 | 0.14% | $9.00 | $271,687.21 | 2.07% | 1.93% | $126.86 |
| 9/29/17 | $206,963.76 | 0.14% | $24.00 | $205,714.29 | 2.07% | 1.93% | $332.87 |
| 10/31/17 | $352,407.03 | 0.14% | $26.00 | $222,857.14 | 2.07% | 1.93% | $566.79 |
| 11/30/17 | $345,375.09 | 0.14% | $40.00 | $342,857.14 | 2.07% | 1.93% | $555.48 |
| 12/29/17 | $317,283.74 | 0.14% | $36.00 | $308,571.43 | 2.07% | 1.93% | $510.30 |
| 1/31/18 | $372,274.03 | 0.14% | $40.00 | $342,857.14 | 2.07% | 1.93% | $598.74 |
| 2/28/18 | $362,305.35 | 0.14% | $39.00 | $334,285.71 | 2.07% | 1.93% | $582.71 |
| 3/29/18 | $362,217.89 | 0.14% | $40.00 | $342,857.14 | 2.07% | 1.93% | $582.57 |
| 4/30/18 | $347,133.20 | 0.14% | $42.00 | $360,000.00 | 2.07% | 1.93% | $558.31 |
| 5/31/18 | $297,751.41 | 0.14% | $37.00 | $317,142.86 | 2.07% | 1.93% | $478.88 |
| 6/29/18 | $335,643.90 | 0.14% | $33.00 | $282,857.14 | 2.07% | 1.93% | $539.83 |
| 7/31/18 | $335,557.34 | 0.14% | $41.00 | $351,428.57 | 2.07% | 1.93% | $539.69 |
| 8/31/18 | $335,779.00 | 0.14% | $39.00 | $334,285.71 | 2.07% | 1.93% | $540.04 |
| 9/28/18 | $312,866.19 | 0.14% | $35.00 | $300,000.00 | 2.07% | 1.93% | $503.19 |
| 10/31/18 | $254,034.53 | 0.14% | $34.00 | $291,428.57 | 2.07% | 1.93% | $408.57 |
| 11/30/18 | $253,932.01 | 0.14% | $29.00 | $248,571.43 | 2.07% | 1.93% | $408.41 |
| 12/31/18 | $253,969.46 | 0.14% | $30.00 | $257,142.86 | 2.07% | 1.93% | $408.47 |
| 1/31/19 | $251,871.77 | 0.14% | $29.00 | $248,571.43 | 2.07% | 1.93% | $405.09 |
| 2/28/19 | $279,761.56 | 0.14% | $26.00 | $222,857.14 | 2.07% | 1.93% | $449.95 |
| | | | | | | | $9,096.74 |

**IRA ACCOUNT**

| Date | Ending Balance | Yield | Interest Earned | Average Balance | Preferred Deposit | Diff. in Yield | Diff in Int. |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| 8/31/17 | $114,267.57 | 0.33% | $8.24 | $29,963.64 | 2.07% | 1.74% | $43.45 |
| 9/29/17 | $114,604.03 | 0.14% | $13.60 | $116,571.43 | 2.07% | 1.93% | $187.49 |
| 12/29/17 | $1,959.76 | 0.14% | $29.40 | $84,000.00 | 2.07% | 1.93% | $405.30 |
| 3/29/18 | $29,105.91 | 0.14% | $12.79 | $36,542.86 | 2.07% | 1.93% | $176.32 |
| 6/29/18 | $2,247.08 | 0.14% | $9.45 | $27,000.00 | 2.07% | 1.93% | $130.28 |
| 9/28/18 | $3,306.95 | 0.14% | $0.90 | $2,571.43 | 2.07% | 1.93% | $12.41 |
| 12/31/18 | $4,023.38 | 0.14% | $1.43 | $4,085.71 | 2.07% | 1.93% | $19.71 |
| 3/29/19 | $32,888.10 | 0.14% | $4.06 | $11,600.00 | 2.07% | 1.93% | $55.97 |
| | | | | | | | $1,030.92 |

**ROTH IRA ACCOUNT**

| Date | Ending Balance | Yield | Interest Earned | Average Balance | Preferred Deposit | Diff. in Yield | Diff in Int. |
|---|---|---|---|---|---|---|---|
| 8/31/17 | $95,126.39 | 0.33% | $6.87 | $24,981.82 | 2.07% | 1.7400% | $36.22 |
| 9/29/17 | $95,176.39 | 0.14% | $11.07 | $94,885.71 | 2.07% | 1.7400% | $137.58 |
| 12/29/17 | $95,551.18 | 0.14% | $33.67 | $96,200.00 | 2.07% | 1.7400% | $418.47 |
| 3/29/18 | $8,441.38 | 0.14% | $14.08 | $40,228.57 | 2.07% | 1.7400% | $174.99 |
| 6/29/18 | $8,083.97 | 0.14% | $3.07 | $8,771.43 | 2.07% | 1.7400% | $38.16 |
| 9/28/18 | $36,672.55 | 0.14% | $3.85 | $11,000.00 | 2.07% | 1.7400% | $47.85 |
| 12/31/18 | $10,009.78 | 0.14% | $4.43 | $12,657.14 | 2.07% | 1.7400% | $55.06 |
| 3/29/19 | $38,430.42 | 0.14% | $5.07 | $14,485.71 | 2.07% | 1.7400% | $63.01 |
| | | | | | | | $971.35 |

119.    With respect to her retirement accounts, according to Paragraph 13 of the CRA Agreement, Ms. Valelly was contractually entitled to a "reasonable rate" – such as the rate available on the Preferred Deposit.  Plaintiff was not paid a reasonable rate on any of her cash balances.

120.    Merrill is financially motivated to default its customers into its low-paying cash alternatives.  Merrill maintains in its Merrill Edge brokerage accounts hundreds of millions if not billions of dollars in cash.  Merrill and its affiliated companies (BAC and BANA), benefit from

the spread between the rate Merrill pays its Merrill Edge customers and the rate at which BANA can lend to borrowers.

**Plaintiff's Subsequent Cash Investments**

121.    Subsequently, in May 2018, Ms. Valelly received from the sale of her parents' home approximately $675,621 in cash.  Because she already had a Merrill Edge account she arranged to meet with JC, a Merrill Financial Solutions Advisor, at Merrill's shared location with BANA at 630 Washington Street, in Boston.[15]  Among other things, JC had a Merrill email address and he attached to his email correspondence with Plaintiff a Merrill business card.  Ms. Valelly advised JC that she had no immediate need for that money but wanted to preserve it in a safe investment and was considering purchasing an apartment in Boston.  JC reviewed Ms. Valelly's Merrill Edge account during this meeting and was aware that Ms. Valelly had at that time approximately $350,000 in cash deposited in three Merrill accounts yielding 0.14% APY.

122.    In fact, in an email to a third party, dated October 22, 2018, JC, using his Merrill email address, acknowledged that Plaintiff "has a liquid asset of over 800k in various accounts that she has with my institution."

123.    Rather than recommend that Ms. Valelly consolidate the $675,621 into her Merrill account and obtain the higher 2.07% APY on her cash balances in a Preferred Deposit account, JC recommended that she open a new BANA checking account on which she would earn 0.06% APY – a yield even lower than the 0.14% yield on her CMA account.

124.    Again, Ms. Valelly was not advised of alternatives for investing her cash.

125.    Ms. Valelly accepted JC's recommendation and deposited the collective sum of $675,621 in cash with BANA at a 0.06% interest rate on May 8, 2018 and May 16, 2018.

---

[15] *See* https://brokercheck.finra.org/individual/summary/5424924 (last viewed August 23, 2019).

126.    Ms. Valelly maintained those accounts at Merrill Lynch and BANA until March 8, 2019, when she was alerted by a Merrill Assistant Vice President ("AVP") in Philadelphia, Pennsylvania (JP) that her accounts were being maintained at substantially below market interest rates.  This AVP wrote Plaintiff on March 8, 2019 questioning "why the rep in Boston did not recommend our Preferred Deposit...."

127.    Ms. Valelly's $675,621 cash deposit with BANA from May 2018 to March 2019 earned only $329 in interest at a .06% APY compared to an estimated $11,654 in interest that would have been earned in a Preferred Deposit account at 2.07% APY – a difference equivalent to 34.5 times the interest that had been earned on the account.

128.    The total difference between the interest that was earned on the four Merrill/BANA accounts and the amount of interest that should have been earned on the four accounts at market rates from August 2017 through March 2019 is approximately $22,400.  *See* ¶118, *supra*.

129.    On March 7, 2019, Plaintiff wrote JC an email inquiring as to why JC had placed Plaintiff's $675,621 cash in an account earning 0.06% APY:

> I had a question regarding my savings account - May 17 2018 a transfer of 675,621.51 was received as you know and I came in to discuss with you and you suggested we leave it in a savings account that would earn me interest. I had assumed you were informing me of the best savings account available given I cannot see any other reason for there to be not to do that?

> I was in an office today at Merrill Lynch and they told me that i should have been earning a 2.07% interest with preferred deposit as long as it was over 100k- can you please tell me why this was not suggested at that time? Was there any reason for you to have suggested leaving it in the other savings account? It seems to be a difference of 13.5K that I have missed by not doing this....

130.    JC responded to Plaintiff on March 8, 2019 as follows:

> You are right. On 5/8/2018, we were able to set up a saving account and the proceeds came from a house you sold recently. During that time, we had a

conversation of what your goals were with the funds and we also discussed about earning potential by keeping funds in this account. I still remember we were joking about the saving rates were so low and since your goal was to buy another property within a short period of time with the proceeds in your savings account, you said you want to keep it as liquid as possible since you will need the money at any time. This is the main reason no specific recommendation were offered to you. I also mentioned to you that even though you have set up three (3) self-direct accounts, I strongly recommended that you set up an appointment with one of my Merrill Lynch partner[s] to go over your life priorities and also making sure you are not missing any earning potential opportunity when it comes to your investment and savings accounts. I recommended this meeting with my partner mainly due to your savings/asset level and I totally believe this meeting will be advantageous to you even though you are managing well all your assets.

In hindsight, if knowing that it will take quite some time before you purchase your dream house, I will certainly have a holistic conversation and go over all different products we provide at the Merrill Edge side so you can earn more.

131.    JC's response was a *non sequitur* in that Plaintiff had only expressed interest in purchasing an apartment at some time in the future, had met with various Merrill account advisers who had not advised her of the higher yielding cash options, and placing Plaintiff's funds in a Preferred Deposit account at 2.07% would have clearly best suited her interests.

132.    Plaintiff responded promptly again to JC on March 8, 2019, stating that "any client" would have preferred investing in the higher yield Preferred Deposit account, and that emphasis on any "liquidity" issues was misplaced:

My confusion is that i have understood that putting me in a preferred savings account would have had the same liquidity essentially as putting me in the savings account you told me about- i'm just confused as to why I wasn't told about this preferred savings account? I don't think it would have required meeting with a specialist to know about it?  It is a big difference and I'm not sure why anyone would opt for a lower savings account with a lower rate than they would if they had the option to get a higher rate even if it was just for a week or two? I did say I was going to potentially buy a place, but purchasing a piece of property can be very time consuming so even if I had had it for a month or two I still would have preferred a higher savings rate- *i think that would make sense to any client?*

I appreciate that you got back to me Joseph, and that you have been so attentive to my client needs in the last year, but I am so very upset to see that I could have made $13,500 on this money.  [Emphasis added.]

133.     In response, JC acknowledged on March 8, 2019 that he had been remiss in investing Plaintiff's $675,621 in cash in an account yielding 0.06% APY when higher yielding accounts were available and more suitable to Plaintiff's financial interests:

> You are right and sorry to hear about the potential interest that could have been made. Buying a house is a long process and I just want to make client's life easier since I felt you have gone thru a lot during that time. Fast forward to today, in case your life priority has changed and buying a house is not a priority, we can definitely consider Preferred Deposit (like you mentioned) and I will be happy to go over the details if it's needed.

134.     JC's email occasioned a further response from Plaintiff:

> I hate to have to discuss this with customer service but i do feel it is very important that clients know all their options when it comes to savings given especially this difficult market that is going to likely be flat for the forseeable future! I find it somewhat vexing that ML and boa use the term "preferred" - an irony given this was a preferred interest rate and I knew nothing about it until having been notified yesterday by a ML employee in Philadelphia who was shocked to find out that I had my cash sitting in the lowest interest bearing account you offer.

135.     Ms. Valelly at that time moved promptly to bring this matter to the attention of senior Merrill personnel and to cause her taxable investment funds to be maintained in the Preferred Deposit account at 2.07% and her retirement investment funds to be maintained in Blackrock Liquidity Fund at a comparable rate.

136.     Since that time, Ms. Valelly has been informed by a Merrill Financial Solutions Advisor (KC) that both BB and JC knew or should have known that higher yielding investments were available and that it is part of Merrill and BAC corporate policy to discourage investors from availing themselves of those higher interest rate alternatives.

137.     In fact, internet research establishes that in August 2018 Merrill moved to prohibit advisors from paying higher money market interest rates on cash deposits by making those money market rates "non-sweep" alternatives.  In a *Wall Street Journal* article dated August 21,

2018, Jason Zweig wrote that "Starting Sept. 4, [BAC]'s Merrill Lynch brokerage unit will no longer sweep its customers' cash into money-market mutual funds, moving it instead into deposits at affiliated banks." Zweig wrote that according to publicly available data at that time, the "yield on 100 large money-market funds average 1.77%....  Bank sweep accounts at brokerage firms tend to pay about 0.25% on average." Zweig also noted that paying low interest rates on sweep accounts is a big business, and that brokerage firms like Merrill have "indicated that as much as 25% of their gross profit came from what they earned off their customers' cash."

138.     A Merrill spokesperson was quoted in the August 21, 2018 *Wall Street Journal* article, in an effort to justify limiting customers' choice of investments for sweep accounts to low-interest bank accounts, as stating that only "approximately 4% of Merrill Lynch accounts eligible to use a money-market mutual-fund sweep option do so." Merrill customers (including Plaintiff) had apparently not been made aware of the higher yielding money-market option for sweep accounts.

139.     Commentators on the public website "advisorhub" were unyielding in their criticism of Merrill Lynch:[16]

> Merrill advisors are not going to appreciate being forced to push their clients' cash accounts into lower yielding BofA ones. You know who are going to appreciate it even less? The clients. ML advisors, don't be sheeple!
>
> *         *         *
>
> The irony of preaching the fiduciary standard while at the same time mandating bank products that pay the client less than they deserve…
>
> *         *         *
>
> The most profitable product for Bank of America is bank deposits. They pay the advisors peanuts for deposits, pay their customers less interest and make a ton of money while holding those deposits. The clients and customers interests are not

---

[16] https://advisorhub.com/merrill-to-shift-client-cash-into-bofa-accounts-and-away-from-cash/ (last viewed August 23, 2019).

being put first. It's a great place to get started but once you have a client base, get the F out!

\*  \*  \*

Today's ML rates are .33% for under a million and .13% for under $250k. Vanguard paying 2.07%. Many others approaching 2.0% or are north of it. Outside money markets not an option for clients. No open architecture at all. A fiduciary doesn't pay .13% while raising rates on loans and [loan management accounts].

\*  \*  \*

Bank of America's motto: The client must come first right after Bank of America. A culture of dishonesty.

## MERRILL'S DISCLOSURES VIOLATE NYSE INFORMATION MEMO NUMBER 05-11, DATED FEBRUARY 15, 2005

### NYSE Information Memorandum 05-11

140.    The NYSE is a self-regulatory organization of its brokerage members.  Merrill is a member of the NYSE and is subject to its regulatory supervision.  *See* https://www.nyse.com/markets/nyse/membership at 9.

141.    Broker-dealers are required, when making a recommendation, to disclose material conflicts of interest to their customers.

142.    On February 15, 2005, the NYSE issued Information Memorandum ("IM") 05-11 addressing "Customer Account Sweeps to Banks," requiring brokerage firms to provide their customers with detailed disclosures prior to sweeping cash accounts to affiliated banks.  IM 05-11 states under an all caps bolded heading "**CONFLICTS OF INTEREST**" as follows:

Rule 472(i) ("General Standards For All Communications") provides, in pertinent part: "No member or member organization shall utilize any communication which contains (i) any untrue statement or omission of a material fact or is otherwise false or misleading".  Member organizations … must include in their agreements or disclosure documents any conflicts of interest in connection with the cash sweep program, including whether the member organization receives compensation or other benefits for customer balances maintained at the bank, and if so the expected range of such compensation, as well as a disclosure of the

difference, if any, between the rates of return at the existing money market fund
and the proposed bank sweep fund.  A change from a money market mutual fund
to a bank sweep fund may be inconsistent with the customer's reasonable
expectations with regard to money market rates. While a registered investment
company, such as a money market mutual fund, is bound by fiduciary obligations
to its shareholders (customers of the member organization) to seek the highest
rates prudently available (less disclosed fees and expenses), when customer funds
are swept to an affiliated bank it is in the interest of the member organization and
its affiliates to pay as low a rate as possible, consistent with their views of
competitive necessities. There may be no necessary linkage with rates prevailing
in the market, and these funds are not being managed, in this instance, under the
same fiduciary obligations.

143.    Given the significance of these disclosures, the NYSE directed that:

[M]ember organizations must disclose the terms and conditions, risks and features
of their programs, conflict of interest, *current interest rates,* the manner by which
future interest rates will be determined, as well as the nature and extent of SIPC
and FDIC insurance, available ...   *All such disclosures should be forthright, clear,
complete, prominent and unambiguous.* Given the complicated nature of these
disclosures, these points should also be summarized in a *concise document,
preferably on one or two pages, written in plain English* and referring customers
to places where additional and more detailed disclosure is available.

*        *        *

Disclosures must address conflicts of interest, the method or basis for setting
interest rates, the risks and features of the sweep program and applicable
insurance coverage.  [Emphasis added.]

144.    With respect to deposits in sweep accounts in excess of FDIC insurance limits,

Information Memo 05-11 requires:

The Exchange would regard the placement of customer funds by member
organizations with banks in excess of the insured limits of the FDIC as requiring
either *specific* notice and agreement at the time of the signature of the customer
agreement being relied upon for the prior or negative consent or effective
subsequent disclosure. In the absence of effective contemporary or subsequent
disclosure and the prominent placement of the clause in question, prior or
negative consent may not be relied upon for the investment of customer funds in
amounts in excess of the applicable FDIC limit in new programs going forward.
Similarly, appropriate disclosure *must be made* and consents obtained for new
customers in existing bank sweep programs where funds may be placed in banks
in amounts exceeding FDIC limits. [Emphasis added].

40

145.     Merrill did not make the disclosures to Ms. Valelly required by IM 05-11.
Significantly, Ms. Valelly's sweep accounts and BANA deposit each exceeded the $250,000 in
insurance with the FDIC.

146.     Merrill failed to make "forthright, clear, complete, prominent and unambiguous"
or "specific" disclosures and failed to obtain "agreement" from Ms. Valelly, with respect to
Merrill's Sweep Program.  Merrill failed to make "concise" disclosures in a "document,
preferably on one or two pages, written in plain English."  Merrill failed to disclose "current
interest rates."

147.     With respect to the posting of interest rates, Information Memo 05-11 states that
member organizations maintaining sweep accounts "are expected to post applicable bank and
money market mutual fund interest rates and information regarding conflicts of interest on their
website, if they have one, with *prominent* notice of the availability of such information."
Emphasis added.

148.     Merrill failed to make "prominent notice" of pricing available to Ms. Valelly
anywhere, including on its website.

149.     With respect to the "training and due diligence of registered representations"
Information Memo 05-11 requires:

> In order to satisfy the requirements of Rule 405, member organizations should
> conduct appropriate training of registered representatives to assure that they are
> familiar with the characteristics and risks of the available choices as they relate to
> the needs of their customers.

150.     Information Memo 05-11 adds that registered representatives should
"memorialize" their customer's utilization of a sweep option that "substantially disadvantage
them vis a vis other investment alternatives":

it would be expected that registered representatives would work with their customers to determine the appropriate money market choices and seek to maximize their return within the context of their investment objectives and risk tolerance. Consistent with the application of Rules 405 and 401 ["Business Conduct"], where customers affirmatively choose to utilize sweep options which substantially disadvantage them vis a vis other investment alternatives, that choice should be memorialized.

151.    Merrill failed to conduct that training or to "memorialize" Plaintiff's purported consent to the sweep terms, notwithstanding that those terms "substantially disadvantaged" Plaintiff.

## SEC Rule 15c3-3(j)(2)

152.    On March 9, 2007, the SEC proposed regulations to establish disclosure standards to customers *before* a broker-dealer may sweep cash balances.  *See* Release No. 34-55431, 72 Fed. Reg. 12862, at 12866 ("we are proposing to amend Rule 15c3-3 by adding a new paragraph (j) that would make it unlawful for a broker-dealer to convert, invest or otherwise transfer free credit balances except under three circumstances.").

153.    Section 15c3-3 was formally amended by the SEC in 2013 to address the abuse of brokerage firms "sweeping" customers cash accounts into low-yielding investments at affiliated banks.  *See* SEC Release No. 34-70072 ("Final Financial Responsibility Rules for Broker-Dealers"), which amended SEC Rule 15c3-3 to add subsection (j)(2).  78 Fed. Reg. at 51837, 51839 ("[T]here may be consequences to moving a customer's free credit balances from one product to another, and, accordingly, customers should have sufficient opportunity to make an informed decision….  Commenters generally agreed with the fundamental principle embodied in the proposal – that customer free credit balances should not be transferred from an obligation of the broker-dealer to an obligation of another entity without the customer's authorization.").

154.     Subparagraph (j)(2) (effective March 3, 2014) requires that "a broker … must not convert, invest, or transfer to another account or institution, credit balances held in a customer's account except as provided in paragraphs (j)(2)(i) and (ii) of this section."

155.     Subparagraph (ii) states that for all accounts opened on or after the effective date of the regulation (March 3, 2014) the broker may sweep the customer's credit balances only if "the customer gives prior written affirmative consent to having free credit balances in the customer's securities account included in the Sweep Program":

> (ii) A broker or dealer is permitted to transfer free credit balances held in a customer's securities account to a product in its Sweep Program or to transfer a customer's interest in one product in a Sweep Program to another product in a Sweep Program, provided:

> (A) For an account opened on or after the effective date of this paragraph (j)(2)(ii), the customer gives prior written affirmative consent to having free credit balances in the customer's securities account included in the Sweep Program after being notified:

> (1) Of the general terms and conditions of the products available through the Sweep Program; and

> (2) That the broker or dealer may change the products available under the Sweep Program.

156.     The SEC emphasized that "[n]ew paragraph (j)(2) should serve to enhance customer protection by prohibiting a broker-dealer from transforming the credit risk faced by a customer through transfer of the broker-dealer's obligation to another entity without the required notice to, or approval from, the customer" (id.  at 51879) and that "the customer must give prior written affirmative consent to having free credit balances in the customer's securities account included in the Sweep Program…" (*id.* at 51840).  The "prior written affirmative consent" requirement "will provide new customers with the opportunity to evaluate the broker-dealer's Sweep Program before consenting to the transfer of the customer's fee credit balances into such program…."  Id. at 51880.  *See also* Release No. 34-55431, 72 Fed. Reg. at 12882 (referring to "meaningful notice").

157.     Subparagraph (j)(2)(ii)(B)(1) separately requires that for "any" sweep account, the broker must also "provide[ ] the customer with the disclosures and notices regarding the Sweep Program required by each self-regulatory organization of which the broker … is a member."

158.     Both FINRA and the NYSE are registered national securities associations under Section 15A(b) of the Exchange Act, 15 U.S.C. §78o-3(b), and therefore qualify as SROs pursuant to Section 3(a)(26), 15 U.S.C. §78c(a)(26).

159.     Information Memo 05-11 was referenced with approval by the SEC in the Final Rule (78 Fed. Reg. at 51837, n. 167):

> In 2005, the NYSE addressed the issue of disclosure in a sweep program context by issuing an information memo to its members discussing, among other things, the disclosure responsibilities of a broker-dealer offering a sweep program to its customers. See Information Memo 05-11 (Feb. 15, 2005). The memo stated that broker-dealers should disclose material differences in interest rates between the different sweep products and, with respect to the bank sweep program, further disclose the terms and conditions, risks and features, conflicts of interest, current interest rates, manner by which future interest rates will be determined, and the nature and extent of FDIC and SIPC protection.

*See also* Proposed Regulations, 72 Fed. Reg. at 12866, n.33 (*quoted supra* at ¶11).

160.     Information Memo 05-11 accordingly has the force of an SEC Rule.

161.     Merrill has the burden of demonstrating compliance with Information Memo 05-11 and SEC Rule 15c3-3(j)(2).  *See* ¶26, *supra*.

162.     Merrill has failed to comply with Information Memo 05-11 or SEC Rule 15c3-3(j)(2).

163.     Merrill's web-based procedures did not provide Plaintiff "meaningful notice" or "an opportunity to evaluate" the sweep terms or secure Plaintiff's "prior written affirmative consent" to the sweep terms.  *See* ¶156, *supra*.

164.     The only disclosure of sweep terms was limited to a reference in Paragraph 11 or

12, in a list of terms, to Section 13 of the CRA Agreement, which was hidden from view when

consent was solicited.  There was no reference to the sweep account provisions of the CMA

Agreement.  There was no disclosure of current interest rates.  Certainly, there is no document

that memorializes an investor's selection of a sweep option, even though Merrill's "option" to

place customers' cash in low-yielding bank accounts "substantially disadvantages" those

customers.  *See* ¶150, *supra*.

<u>**Comparable Disclosures**</u>

165.     An analysis of Merrill's online competitors shows how opaque Merrill's business

practices are.

<u>**Fidelity Investments**</u>

166.     Fidelity Investments transparently gives investors a selection of three funds for its

"core" account (equivalent to a sweep account), and defaults brokerage customers into its

SPAXX election at a current 7-day yield of 1.81% (as of August 20, 2019).  Even the lowest

yielding current cash option (FCASH) pays interest of 1.07% (effective August 6, 2019).

**Core Position**

Your core position is where the money in your account is held until you invest it. You'll need to select an option below now, but you
can change it anytime after your account is open.

Select Core Position    ● Fidelity® Government Money Market Fund (SPAXX)
                         Your cash is invested in a mutual fund and earns daily dividends, which are paid to you monthly. SPAXX
                         prospectus ☐

                         ○ Fidelity® Treasury Money Market Fund (FZFXX)
                         Your cash is invested in a mutual fund and earns daily dividends, which are paid to you monthly. FZFXX
                         prospectus ☐

                         ○ Fidelity® Interest-Bearing Option (FCASH)
                         Your cash is held at Fidelity as a free credit balance and earns daily interest, which is paid to you monthly.

167.     On August 7, 2019, Fidelity issued a press releases announcing that "it has

challenged conventional industry practices by automatically directing investors' cash into higher

yielding options available for brokerage and retirement accounts as well as providing product choice – all without any minimum requirements."[17]

168.    Fidelity emphasized that Plaintiff's circumstances are representative of customers who choose to do business with broker-dealers such as Merrill, who refuse to be transparent as to the amount of interest they pay customers.  The Fidelity press release stated, "Recent customer research shows that many investors don't focus on the rate paid on their cash when they open an account and, too often, they don't take action later.  Fidelity has made it easy for customers by automatically giving them the higher yielding option at account opening, while also providing other investment options for those customers who prefer it."

169.    The press release added that Fidelity's approach in offering high yields on cash balances "is contrary to typical industry practices of defaulting customers' cash into a low-yielding product – often at an affiliated bank – with no other option in what the industry calls a 'cash sweep.'"

170.    Fidelity contains disclosures on its website[18] stating that if a customer is currently invested in FCASH, she can earn a higher rate of interest on her cash by investing in SPAXX or FZFXX:  "Your uninvested cash is in a core position called FCASH. With rates at a 5-year high, you have the option to change your core position to one of our money market funds, which are currently yielding a higher return. Switching will cost you nothing and will not affect how you currently use your account."  Fidelity has other prompts on its website with respect to cash investments.

---

[17] https://www.fidelity.com/bin-public/060_www_fidelity_com/documents/press-release/fidelity-breaks-status-quo-080719.pdf (last viewed August 23, 2019).

[18] https://www.fidelity.com/mutual-funds/fidelity-funds/money-market-funds-fcash (last viewed August 23, 2019).

**Vanguard Investments**

171.     Vanguard Investments does not sweep customers' cash into sweep accounts.

Vanguard invests customer cash directly into the Federal Money Market account at rates as of

August 22, 2019 of 2.13% (SEC yield).[19]

**E-Trade Investments**

172.     E-Trade customers are not told that it takes five or ten minutes to open an

account.

173.     After an E-Trade customer enters personal information, she is told prominently

under the heading "Uninvested cash program" that:

> At the end of each business day, your uninvested cash will be automatically swept into an
> interest-bearing vehicle….
>
> | E*TRADE Financial Extended Insurance Sweep Deposit Account ▾ | Your cash balance is
> swept into bank account(s) at our affiliate, E*TRADE Bank, and other banks. Please note
> this account is not a money market mutual fund.

174.     E-Trade customers are informed by virtue of a drop down menu reflecting that

they have three "Options for Uninvested Cash" and are provided with detailed information on

those three options.

175.     A hyperlink labelled "compare my choices" allows customers to compare the

three options for the sweep program.

176.     The subsequent page labelled "Review your application" identifies the

"uninvested cash program" that had been selected from the prior page's dropdown menu.

177.     The final page before account opening labelled "Review your application" lists

seven hyperlinked PDF files including one hyperlinked "E*TRADE Customer Agreement," and

---

[19] https://personal.vanguard.com/us/funds/snapshot?TTVETF=VETFCNTRL&FundId=0033&FundIntExt=INT (last
viewed August 23, 2019).

two hyperlinked documents under the subheading "Uninvested Cash Management Options" – "ESDA Program Customer Agreement" and "Sweep Rate Schedule."

178.    Customers are advised that by clicking the red button labelled "Open My Account," that they are certifying that they have read the foregoing seven documents.

**Charles Schwab & Co.**

179.    Charles Schwab & Co. customers are required to specifically affirm:  "By checking this box, I consent to participate in Schwab's Cash Feature Program and to having the Schwab One Interest feature as my designated Cash Feature."



180.    Schwab's disclosure also specifically links to its "Cash Features Disclosure Statements," which advises customers of the interest rate on sweep accounts.

181.    Schwab's rates are both higher and easier to access than Merrill's rates.[20]

---

[20] *See* https://www.schwab.com/public/schwab/investing/accounts_products/investment/cash_solutions (last viewed August 23, 2019).

**FINRA's Suitability Requirements**

182.    FINRA (the Financial Industry Regulatory Authority) is a self-regulating organization of which Merrill is a member.  FINRA Rule 2111 establishes a suitability standard for "a recommended transaction or investment strategy."  Rule 2111(a) requires that a "member or an associated person must have a reasonable basis to believe that a recommended transaction … is suitable for the customer, based on the information obtained through the reasonable diligence of the member or associated person to ascertain the customer's investment profile."

183.    Rule 2111(a) directs that "[a] customer's investment profile includes, but is not limited to, the customer's age, other investments, financial situation and needs, tax status, investment objectives, investment experience, investment time horizon, liquidity needs, risk tolerance, and any other information the customer may disclose to the member or associated person in connection with such recommendation."

184.    Although a sweep account is not considered a security, Rule 2111 was intended to apply broadly to any "recommended transaction or investment strategy" involving a customer's brokerage account.  *See*, *e.g.*, FINRA Rule 2111, Supplementary Materials: .03 Recommended Strategies ("The phrase 'investment strategy or securities' used in this Rule is to be interpreted broadly.").

185.    According to FINRA, "Suitability obligations are critical to ensuring investor protection and promoting fair dealings with customers and ethical sales practices."[21]

186.    General Principles .01 adds to Rule 2111 the following:

> Implicit in all member and associate person relationships with customers and others is the fundamental responsibility for fair dealing.  Sales efforts must therefore be undertaken only on a basis that can be judged as being within the ethical standards of FINRA rules, with particular emphasis on the requirements to deal fairly with the public.  The suitability rule is fundamental to fair dealing and

---

[21] https://www.finra.org/industry/suitability (last viewed August 23, 2019).

is intended to promote ethical sales practices and high standards of professional conduct.

187.    Merrill's recommendations that Plaintiff maintain cash balances in excess of $1,000,000 in accounts yielding 0.14% and 0.06%, at a time when other Merrill-sponsored accounts yielded as high as $2.07%, was not suitable for Ms. Valelly.  BB and JC knew or were recklessly indifferent to the fact that Ms. Valelly's cash investments were not suitable.  Their knowledge and reckless indifference were within the scope of their duties and is attributable to Merrill.

188.    Merrill's account representatives also owe Plaintiff and other members of the class a duty of due care.  Merrill's account representative violated that duty of due care by recommending that Plaintiff maintain cash balances in excess of $1,000,000 in accounts yielding 0.06% to 0.14%, at a time when Merrill-sponsored accounts yielded as high as 2.07%.  Their lack of due care was within the scope of their duties and is attributable to Merrill.

**The Court Should Apply An Enhanced Standard of Suitability in this Case**

189.    On July 15, 2010, Congress enacted the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank") in response to abuses within the investment community that contributed to the financial crisis in the late 2000s.

190.    Section 913b(1) of Dodd-Frank directed the SEC to "conduct a study to evaluate the effectiveness of existing legal or regulatory standards of care for brokers … for providing personalized investment advice and recommendations about securities to retail customers…." *See* 124 Stat. 1376, *codified* at 15 U.S.C. Section 78o (notes).

50

191.    In January 2011, the Staff of the SEC published its Study on Investment Advisors and Broker-Dealers.[22]  The Study stated as fact (at page 1) that "[r]etail investors seek guidance from broker-dealers and investment advisors to manage their investments and to meet their own and their families' financial goals.  These investors rely on broker-dealers and investment advisors for *investment advice and expect that advice to be given in the investors' best interest*."  Emphasis added.

192.    BAC, in correspondence to the SEC dated August 30, 2010 (at 2), acknowledged that "fiduciary standard[s] of care should be applied in a manner that both enhances investor protection and preserves the availability of choices for clients.  Informed client choice is *critical* to ensuring that investment objectives are attained."  Emphasis added.  *See also* ¶30.

193.    In that same letter, Bank of America stated its belief that "there is a real opportunity to eliminate investor confusion and enhance investor protection by subjecting all financial professionals to a fiduciary duty requiring them to act in an individual investor's best interest when providing personalized investment advice."  *Id.* at 2-3.

194.    As the SEC has stated: "Broker-dealers play an important role in helping Americans organize their finances, accumulate and manage investment savings, and invest toward other important long terms goals, such as buying a house or funding a child's college education."  *See* Regulation Best Interest, 84 Fed. Reg. at 33320.[23]  Accordingly, broker-dealers should be and are held to a high standard of conduct.

195.    The Offer of a sweep program that pays 0.14% on cash assets is an implicit (if not explicit) recommendation that such a rate is "suitable" and in the "best interest" of investors.

---

[22] https://www.sec.gov/news/studies/2011/913studyfinal.pdf?n=35616 (last viewed August 23, 2019).

[23] https://www.sec.gov/rules/final/2019/34-86031.pdf (last viewed August 23, 2019).

196.    On June 5, 2019, the SEC issued (Release No. 34-86031, 84 Fed. Reg. 33318) its

"Final Rule" entitled "Regulation Best Interest: The Broker-Dealer Standard of Conduct."  The

"Summary" of the Rule explained that "Regulation Best Interest enhances the broker-dealer

standard of conduct beyond existing suitability obligations, *and aligns the standard of conduct*

*with retail customers' reasonable expectations* [emphasis added] by requiring broker-dealers,

among other things, to:

> 1) act in the best interest of the retail customer at the time the recommendation is
> made, without placing the financial or other interest of the broker-dealer ahead of
> the interests of the retail customer; and 2) address conflicts of interest by
> establishing, maintaining, and enforcing policies and procedures reasonably
> designed to identify and fully and fairly disclose material facts about conflicts of
> interest, and in instances where we have determined that disclosure is insufficient
> to reasonably address the conflict, to mitigate or, in certain instances, eliminate
> the conflict.  [*Id.* at 33319.]

* * *

> When making a recommendation a broker-dealer must act in the retail customer's best
> interest and cannot place its own interest ahead of the customer's interests (hereinafter,
> "General Obligation").  [Footnote omitted.]  The General Obligation is satisfied only if
> the broker-dealer complies with four specified component obligations. The obligations
> are: (1) Providing certain prescribed disclosure before or at the time of the
> recommendation, about the recommendation and the relationship between the retail
> customer and the broker-dealer ("Disclosure Obligation"); (2) exercising reasonable
> diligence, care, and skill in making the recommendation ("Care Obligation"); (3)
> establishing, maintaining, and enforcing policies and procedures reasonably designed to
> address conflicts of interest ("Conflict of Interest Obligation"), and (4) establishing,
> maintaining, and enforcing policies and procedures reasonably designed to achieve
> compliance with Regulation Best Interest ("Compliance Obligation").[16]

> [16] As discussed in further detail below, although Regulation Best Interest
> identifies specified obligations with which a broker-dealer must comply in order
> to meet its General Obligation, compliance with each of the component
> obligations of Regulation Best Interest will be principles-based. In other words,
> whether a broker-dealer has acted in the retail customer's best interest will turn on
> an objective assessment of the facts and circumstances of whether the specific
> components of Regulation Best Interest are satisfied at the time that the
> recommendation is made. [*Id.* at 33320.]

* * *

[A broker-dealer is required to] have a reasonable basis to believe that the recommendation does not place the financial or other interest of the broker-dealer ahead of the interest of the retail customer. [*Id.* at 33322.]

197.    Although a cash sweep account is not a security it is an "investment strategy including securities," and, in any event, is a product or service sold by broker-dealers and should be held to the same standard as the sale of a security.  *See* Regulation Best Interest at 33320 ("[SEC regulation of broker-dealer conduct] includes recommendations of account types.").  *See also id.* at 33325 ("We are modifying Regulation Best Interest to expressly apply to account recommendations....").

198.    In adopting the Best Interest standard, the SEC incorporated the same general principles of disclosure that it and the NYSE had previously adopted with respect to standards for sweep accounts in 2005 and 2013.

199.    Merrill, in the sweep terms it offers customers, violates each of the four component obligations of the General Obligation – the Disclosure Obligation, the Care Obligation, the Conflict of Interest Obligation, and the Compliance Obligation.

## CLASS ACTION ALLEGATIONS

200.    Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a), (b)(2) and (b)(3) on behalf of persons or entities:

a.    Who are or were Merrill brokerage customers beginning March 3, 2014, and who were defaulted by Merrill into a low-interest Merrill Lynch Direct Deposit ("MLDD") "sweep account" (the "Brokerage Subclass").

b.    Who are or were Merrill brokerage customers who maintained retirement accounts, but were not paid "reasonable rates" on their cash holdings as required by Paragraph

13 of the Merrill Lynch Self-Directed Investing Client Relationship Agreement ("CRA Agreement") (the "Retirement Customer" Subclass); and

      c.    Who are or were Merrill customers beginning March 3, 2014 who were advised by a Merrill account representative to deposit funds in excess of $25,000, and who maintained that deposit for at least 30 days (or such amount and holding period as may be determined by the Court), at Merrill's affiliated bank (Bank of America, N.A.), in a low-interest paying deposit or checking account (the "BANA Subclass").

201.    Excluded from the Subclasses are Defendant, any subsidiaries of affiliates of the Defendant, officers and directors of Defendant, and any of the heirs, successors, assigns, or spouses of the officers or directors of Defendant.

202.    Each of the elements of Fed. R. Civ. P. 23(a), 23(b)(2) and 23(b)(3) are established.

      a.    The members of each Subclass are so numerous that joinder of all members is impracticable.

      b.    While the exact number of members of the Class is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Merrill maintained billions of dollars of cash balances nationwide. Plaintiff concludes that there are hundreds if not thousands of members of the Class located in Massachusetts alone. Record owners and other members of the Class may be identified from records maintained by Defendant and may be notified of the pendency of this action by mail or email.

c.      Plaintiff's claims are typical of the claims of the members of the

Class, as all members of the Class are similarly affected by Defendant's wrongful

conduct complained of herein.

d.      Plaintiff will fairly and adequately protect the interests of the

members of the Class and has retained counsel competent and experienced in class

litigation.

e.      Merrill has acted or refused to act on grounds that apply generally to each

Subclass, so that final injunctive relief or corresponding declaratory relief is appropriate

respecting each Subclass as a whole.

f.      Common issues of law or fact exist as to all members of the Class

and predominate over any questions solely affecting individual members of the Class.

Among the common issues of law or fact that will predominate are:

i.      Whether the procedures Merrill required applicants to

follow on its website were sufficient to form a contract with respect to sweep

accounts, and, if not, whether principles of unjust enrichment, quasi contract, or

implied contract should prevail and whether Plaintiff and other members of the

Brokerage Subclass should be paid reasonable, market rates of interest on their

cash balances.

ii.      Whether NYSE Information Memorandum 05-11 applies to

Merrill's sweep accounts.

iii.      Whether Merrill complies with NYSE Memorandum 05-

11.

iv.      Whether Merrill's failure to comply with NYSE Rule 05-11 bars enforcement of agreements, if any, with Plaintiff and class members, requiring under the doctrine of implied or quasi contract and unjust enrichment that Merrill pay its account holders a reasonable rate of interest on cash deposits.

v.       Whether Merrill complies with SEC Rule 15c3-3(j)(2).

vi.      Whether Merrill's failure to comply with SEC Rule 15c3-3(j)(2) voids its agreements, if any, with Plaintiff and class members, requiring under the doctrine of implied or quasi contract and unjust enrichment that Merrill pay its account holders a reasonable rate of interest on cash deposits.

vii.     Whether Merrill is contractually obligated to pay depositors a "reasonable rate" of interest on cash balances maintained in retirement brokerage accounts.

viii.    Whether Merrill fails to pay depositors a "reasonable rate" of interest on cash balances maintained in retirement brokerage accounts.

ix.      Whether Merrill was negligent or violated regulations on suitability in allowing Plaintiff and other BANA Subclass Members to deposit cash in excess of $25,000 into a BANA bank account, that was maintained for at least 30 days at 0.06% APY.

x.       Whether Merrill's conduct violated a common-law, regulatory, or other established concept of fairness and was unethical or unscrupulous in violation of the Massachusetts Consumer Protection Law.

## CAUSES OF ACTION

**FIRST CAUSE OF ACTION ON BEHALF OF ALL BROKERAGE SUBCLASS MEMBERS FOR QUASI-CONTRACT OR IMPLIED CONTRACT**

203.    Plaintiff repeats and realleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

204.    Reasonably conspicuous notice of the existence of contract terms and unambiguous manifestation of assent to those terms by consumers are essential to the formation of an electronic contract.

205.    The burden to show that the terms of an electronic contract of adhesion were reasonably communicated and accepted by Plaintiff and members of the Brokerage Subclass lies with Merrill.

206.    Here, the terms concerning the interest rates and Merrill's purported discretion in determining those rates were not reasonably communicated to Plaintiff and members of the Brokerage Subclass.  Only Paragraphs 1-7 of those terms are visible to Merrill customers on a computer screen, and fewer paragraphs are visible on a tablet or smartphone.

207.    Plaintiff and other Brokerage Subclass members were not required to review Paragraphs 11 or 12 of those terms, relating to the sweep account, in order to open a Merrill brokerage account.  There is nothing to alert class members that they were assenting to more than the terms visible on the computer screen.

208.    Furthermore, applicants were encouraged to complete the account process in five or ten minutes.  Merrill does not hyperlink the CRA or Section 13 thereof to Paragraph 11 or 12.

209.    The terms of Merrill's sweep agreement were neither clear nor conspicuous.

210.    Conspicuous means that a term is so written, displayed or presented that a reasonable person against whom it is to operate ought to have noticed it.

211.    Because Plaintiff and other members of the Brokerage Subclass were not reasonably notified of the terms of the CRA or CMA Agreement, they did not provide their prior written affirmative agreement to those terms.

212.    Because Plaintiff and the Brokerage Subclass members did not give prior written affirmative consent to Merrill to sweep their cash balances, the provision purportedly entitling Merrill to determine interest rates at its "discretion" is "unlawful" and does not govern the parties' conduct.

213.    As a result, the relationship between Merrill and the Brokerage Subclass members is subject to a contract implied-in-law (also referred to as a quasi-contract) or a contract implied-in-fact with an omitted essential term (*i.e.*, the rate of interest on deposits).  Pursuant to a contract implied-in-law or a contract implied-in-fact with an omitted essential term, Merrill is obligated to provide Brokerage Subclass members with interest rates that are reasonable market rates, comparable to what other institutions pay their depositors.  Or, put another way, Merrill is prohibited from setting unreasonably low interest rates.

214.    Plaintiff and other Brokerage Subclass members have performed their end of the bargain, by, among other things, depositing their funds with Merrill and its affiliates.  As discussed earlier, Merrill maintains in its Merrill Edge brokerages accounts hundreds of millions if not billions of dollars in cash.  Merrill benefits from the spread between the rate Merrill pays its customers and the rate at which Merrill and its affiliates can lend to borrowers.

215.    Merrill has breached its obligations to Plaintiff and other Brokerage Subclass members by failing to provide them with a reasonable interest rate on their cash investments, instead providing rates of 0.05% to 0.14% APY.  Such rates are greatly, and unjustifiably, lower than what Merrill's competitors offer.   For example, Fidelity currently provides brokerage

customers with yields of approximately 1.81% on cash balances and Vanguard similarly provides yields of 2.13% on cash balances.  In contrast, the yields paid by Merrill, ranging during the Class Period from 0.05% to 0.14% on account balances are not "reasonable."

216.    Plaintiff and other members of the Brokerage Subclass have been and continue to be injured from Merrill's breaches.

217.    Merrill's receipt of billions of dollars in customer assets and its payment of low, unreasonable, interest rates to Plaintiff and other Brokerage Subclass members has unjustly enriched Merrill.

**SECOND CAUSE OF ACTION ON BEHALF OF ALL
BROKERAGE ACCOUNT CLASS MEMBERS FOR
NEGLIGENCE AND BREACH OF SUITABILITY STANDARDS**

218.    Plaintiff repeats and realleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

219.    Merrill has a duty to its customers to exercise reasonable care and to place customers into investments that are suitable and in their best interest.

220.    Merrill breached its obligations to Plaintiff and other Brokerage Subclass members by failing to exercise reasonable care by placing customers by default into sweep accounts at .05% or .14% APY.  These sweep accounts pay interest at approximately 2.5% to 7% of reasonable market-based yields of approximately 2.0% APY.

221.    Plaintiff and the BANA Subclass members have performed their contractual obligations.

222.    Plaintiff and the other BANA Subclass members have been and continue to be injured from Merrill's negligence and breach of the suitability standards discussed herein.

### THIRD CAUSE OF ACTION ON BEHALF OF ALL RETIREMENT
### ACCOUNT CLASS MEMBERS FOR BREACH OF CONTRACT

223.    Plaintiff repeats and realleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

224.    Merrill, by virtue of contract, was and continues to be contractually obligated to provide Plaintiff and Retirement Account Class Members with "no less than a reasonable rate" on cash assets.

225.    Plaintiff and the Retirement Account Class members have performed their contractual obligations.

226.    Merrill, in breach of its contractual obligations, fails to provide Plaintiff and the Retirement Account Class members with a "reasonable rate" on cash assets.

227.    Plaintiff and other Retirement Account Class members have been and continue to be injured from Merrill's breach of the provision requiring it to provide a "reasonable rate" on cash assets.

### FOURTH CAUSE OF ACTION ON BEHALF OF ALL BANA SUBCLASS
### MEMBERS FOR NEGLIGENCE AND BREACH OF SUITABILITY STANDARDS

228.    Plaintiff repeats and realleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

229.    Merrill maintains account representatives in certain BANA branches to advise clients with greater than average account complexity.

230.    Merrill has a duty to its customers to exercise reasonable care and to place customers into investments that are suitable and in their best interest.

231.    Merrill breached its obligations to Plaintiff and other Brokerage Subclass members by failing to exercise reasonable care by placing customers into accounts at .06% APY.

These accounts pay interest at approximately 3% of reasonable market-based yields of approximately 2.0% APY.

232.    Also, BANA deposits in excess of $250,000 are not protected by FDIC insurance.

233.    Merrill subverts the provisions and principles of NYSE Information Memo 05-11 and SEC Rule 15c3-3(j)(2) by encouraging customers to deposit cash directly into low-yielding BANA accounts, rather than deposit that cash with Merrill and have the cash swept to BANA (with the various disclosure safeguards).  Accordingly, the same principles of the NYSE and SEC rules should apply to direct deposits by Merrill customers into BANA accounts as applies to sweep accounts.

234.    Plaintiff and the BANA Subclass members have performed their contractual obligations.

235.    Merrill breached its duty of care to Plaintiff and other BANA Subclass members to offer clients only suitable investments or investments in their best interest by recommending to them that they deposit with BANA more than $25,000 in cash, and at times more than $250,000 in cash.

236.    Plaintiff and the other BANA Subclass members have been and continue to be injured from Merrill's negligence and breach of the suitability standards discussed herein.

**FIFTH CAUSE OF ACTION ON BEHALF OF
ALL SUBCLASS MEMBERS FOR BREACH OF THE
MASSACHUSETTS CONSUMER PROTECTION LAW**

237.    Plaintiff repeats and realleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

238.    Both Plaintiff and Merrill are "persons" as defined in Mass. Gen. Laws ch. 93A, § 1(a).

239.     Merrill's dealings with Subclass members, as described herein, constitute "trade" and "commerce" under Mass. Gen. Laws ch. 93A, § 1(b).

240.     Section 2(a) of Mass. Gen. Laws ch. 93A (the "Massachusetts Consumer Protection Law") proscribes "unfair or deceptive acts or practices in the conduct of trade or commerce."

241.     Under Mass. Gen. Laws ch. 93A §2(c), the Massachusetts Attorney General is empowered to make rules and regulations defining the "unfair or deceptive acts or practices" that violate §2(a).  One such regulation, among others, provides that an "act or practice is a violation of [ch. 93A] if … [a]ny person or other legal entity subject to this act fails to disclose to a buyer or prospective buyer any fact, the disclosure of which may have influenced the buyer or prospective buyer not to enter into the transaction."

242.     Ch.93A, §11 provides a right of action to any person engaged in trade or commerce who suffers a loss of money or property from another person's use, in trade or commerce, of an unfair method of competition or an unfair or deceptive act or practice.

243.     Merrill's acts and practices, as alleged herein, are unfair and deceptive.  Among other things: (i) the Merrill Edge application process does not require that Brokerage Subclass members give prior written affirmative consent to Merrill's sweep practices, in violation of the common law as well as SEC and NYSE rules and regulations; (ii) Merrill fails to make effective disclosure of interest rates paid on sweep accounts; (iii) Merrill defaults customers into interest rates that are thirteen or more times below market interest rates; (iv) Merrill fails to make effective disclosure of other interest rates that are payable on other accounts, including the Preferred Deposit account; (v) Merrill falsely assures customers that completing the application process will take only five or ten minutes and then seeks to bind customers to those agreements

that the customer was encouraged not to read and to which the customer does not receive effective notice; (vi) Merrill falsely claims that it offers "competitive" yields; (vii) Merrill provides unreasonably low and unfair interest rates, considerably lower than the comparable accounts offered by its competitors, (viii) Merrill with respect to retirement accounts, pays a rate of interest that is less than a "reasonable rate"; and (viii) Merrill places customers into BANA accounts at paltry interest rates that are neither suitable nor in the customers' best interest, all without providing effective notice of competitive interest rates and without making effective disclosure of Merrill and BANA's conflicts of interest in encouraging deposits into low interest paying accounts.[24]  Merrill's conduct violated a common-law, regulatory, or other established concept of fairness and was unethical or unscrupulous.  Among the specific regulations violated include 15c3-3(j)(2) and NYSE Information Memorandum 05-11.

244.    Plaintiff and other members of the Brokerage Subclass have been and continue to be injured as a direct and proximate result of Merrill's violations of the Massachusetts Consumer Protection Law.

245.    Merrill knew or should have known that its conduct violated the Massachusetts Consumer Protection Law.

246.    In accordance with Mass. Gen. Laws ch. 93A, § 9(3), Plaintiff, more than thirty days prior to the filing of this Complaint, delivered a written demand for relief upon Merrill, describing Merrill's unfair and deceptive acts, the injury she and other Merrill customers have suffered, and demanding that Merrill cease its unlawful conduct.  Merrill has failed to remedy its unlawful conduct within the requisite time period.

---

[24] https://www.sec.gov/news/studies/2011/913studyfinal.pdf?n=35616 (last viewed August 23, 2019).

WHEREFORE, Plaintiff demands judgment on behalf of herself and other members of the Class as follows:

1.     On Causes of Action One through Five, damages reflecting, the difference between interest actually earned on cash accounts and the rate of interest (i) on deposit accounts with cash balances at any time of $100,000 or greater:  the greater of a reasonable market rate to be determined by the trier of fact and the Preferred Deposit rate, or (ii) on deposit accounts with cash balances of less than $100,000:  a reasonable market rate to be determined by the trier of fact.

2.     A declaration that Merrill's procedures fail to comply with Information Memo 05-11.

3.     A declaration that Merrill's procedures fail to comply with 17 C.F.R. 240.15c3-3(j)(2).

4.     A declaration that in the absence of Merrill's compliance with NYSE Information Memo 05-11, Merrill is obligated to pay Plaintiff and members of the Brokerage Subclass a reasonable rate of interest on cash balances.

5.     A declaration that in the absence of Merrill's compliance with 17 C.F.R. 240. 15c3-(j)(2), that Merrill is obligated to pay Plaintiff and members of the Brokerage Subclass a reasonable rate of interest on cash balances.

6.     A declaration that the SEC's suitability and best interest standards apply with respect to recommendations of cash deposits by Merrill account representatives into BANA accounts.

7.      Injunctive relief barring Merrill from continuing its unfair and deceptive acts and practices, and requiring Merrill to comply with the NYSE Information Memo 05-11, 17 C.F.R. 240.15c3-3(j)(2) and the Massachusetts Consumer Protection Law.

8.      Double or treble damages, attorneys' fees and costs, and any and all other relief available under the Massachusetts Consumer Protection Law.

Dated:  August 27, 2019

**WOLF POPPER LLP**

By: */s/ Robert C. Finkel*
    Robert C. Finkel
    Adam J. Blander
    845 Third Avenue
    New York, NY 10022
    Tel: 212-759-4600

*Counsel for Plaintiff and the Putative Classes*