USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__6/3/2020__

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
-------------------------------------------------------------X
SARAH VALELLY, on behalf of herself,              :
individually, and on behalf of all others similarly-  :
situated,                                          :
                                                   :
                              Plaintiff,           :          19-CV-7998 (VEC)
                                                   :
             -against-                             :          OPINION AND ORDER
                                                   :
                                                   :
MERRILL LYNCH, PIERCE, FENNER &                    :
SMITH INC.,                                        :
                                                   :
                              Defendant.           :
-------------------------------------------------------------X
```

VALERIE CAPRONI, United States District Judge:

　　This case involves the "sweep" feature of three Merrill Edge Self-Directed Investing
Accounts owned by Plaintiff. The sweep feature allowed Defendant to sweep Plaintiff's
uninvested cash into a Bank of America money market account. Plaintiff alleges that Defendant
failed to adequately disclose the sweep feature of her three accounts, did not obtain her consent
to the sweep program, and failed to inform her of higher-yielding investment options for her
cash. Plaintiff asserts claims for quasi contract, breach of contract, breach of suitability
standards, and breach of the Massachusetts Consumer Protection Law on behalf of herself and
three putative classes. Defendant moves to dismiss the complaint in its entirety for failure to
state a claim. Dkt. 16. For the following reasons, Defendant's motion to dismiss is GRANTED.

## BACKGROUND

　　In August 2017, Plaintiff Sarah Valelly opened three self-directed accounts at Merrill
Lynch: (i) a Cash Management Account ("CMA"); (ii) a Roth Individual Retirement Account
("Roth IRA"); and (iii) a Traditional Individual Retirement Account ("Traditional IRA").
Complaint ("Compl."), Dkt. 1 ¶¶ 24, 43, 108-09. These accounts are "self-directed" accounts,

designed for investors "who wish to make their own investment choices in a [] brokerage account."  Mishkin Declaration, Dkt. 18 ("Mishkin Decl."), Ex. A § 2.  The Client Relationship Agreement ("CRA"), which governs all three accounts, indicated that Defendant would not provide any "investment advice, including any recommendations, or offer any opinion regarding the suitability of any security, order, transaction, or strategy in a [Merrill Edge] account."  *Id.*; *see also* Compl. ¶ 37.

Plaintiff used an iPad, provided by Defendant, to complete the account-opening process for each of her three accounts.  *Id.* ¶¶ 43-44, 108.  The first several steps of the process required Plaintiff to enter basic personal, employment, and financial information.  *See* Mishkin Decl., Ex. E at 9-15.  The final step, which is most relevant to the pending motion, included three pages entitled "Terms & Conditions."  *Id.* at 15-17.

The first page of Defendant's Terms & Conditions instructed Plaintiff to review the Electronic Communications Disclosure, which allows Defendant to provide subsequent disclosures and communications electronically.  *Id.* at 15; Compl. ¶¶ 50-51.  The page included a blue hyperlink prompting Plaintiff to "Download [the] Electronic Communications Disclosure (PDF)" as well as a text window displaying the Disclosure.  *Id.*  The text window included a scroll bar on the right-hand side, indicating that Plaintiff should scroll down for the complete agreement.  *Id.*  At the bottom of the page, before moving on to the next step, Plaintiff was required to click a box indicating that she had reviewed and consented to electronic disclosure. *Id.*  The second page of the Terms & Conditions was a Tax Certification Form; Plaintiff was required to certify that the four tax certification statements displayed in the text box were accurate.  *Id.* at 16; Compl. ¶ 53.

The third page of Defendant's Terms & Conditions instructed Plaintiff to "review important account terms, disclosures, [] notices and account attestations."  Mishkin Decl., Ex. E

at 17; Compl. ¶¶ 54-56.  The page directed Plaintiff to "[s]elect the links to review each item, or **print** and **save** copies for your records" and stated that "[t]hese documents apply to your new account."  Mishkin Decl., Ex. E at 17 (emphasis in original).  Directly below those instructions was a heading entitled "Brokerage Account Documents," followed by blue hyperlinks directing Plaintiff to PDFs of the CRA, the Cash Management Account Disclosures and Account Agreement, the Merrill Edge Self-Directed Terms of Service, and a Mutual Fund Disclosure Document.  *Id.*  There was also a hyperlink prompting Plaintiff to download all of the documents at once.  *Id.*  The page indicated that although the CRA and the Terms of Service are the "general agreements governing the Merrill Edge Self-Directed Investing services," users are also "subject to additional agreements and disclosures that cover other products, services or account features for which [they] may be enrolled."  *Id.*

Finally, the page included a text box with twelve, individually numbered additional attestations, instructing Plaintiff in boldfaced type that her signature would manifest agreement to each of the terms.  *Id.*  The text box had a scroll bar on the right-hand side indicating that users should scroll down to read all twelve terms.  *Id.*; Compl. ¶ 68.  Paragraph twelve of the text box stated that Plaintiff "affirmatively consent[s] to having [her] available cash balances deposited or invested through the Sweep Program in accordance with Section 13 of the Merrill Edge Self-Directed Investing Client Relationship Agreement."  Compl. ¶ 72.  As noted *supra*, the CRA is one of the PDFs with a hyperlink on the same page; Section 13 of the CRA explained that cash balances would be automatically deposited in a bank deposit program unless the customer opts out.  *Id.* ¶ 57; Mishkin Decl., Ex. A at 5.  Before Plaintiff could submit her application, she was required to check a box indicating that she "agree[d] to these terms and conditions."  Mishkin Decl., Ex. E at 17.  Plaintiff does not deny that she checked that box, thereby agreeing to the terms and conditions.

Plaintiff asserts claims for (i) quasi contract; (ii) breach of contract; (iii) breach of suitability standards[1] and negligence; and (iv) violation of the Massachusetts Consumer Protection Law.

## DISCUSSION

To survive a motion to dismiss for failure to state a claim upon which relief can be granted, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). On a motion to dismiss, the Court may consider any "written instrument attached to [the complaint] as an exhibit or any statements or documents incorporated in it by reference" as well as materials "integral to plaintiffs' claims." *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47, 48 (2d Cir. 1991).

### A. Plaintiff's Binding Contract with Defendant Bars Her Quasi Contract Claim

Under well-settled New York law, when a valid contract governs the subject matter of a plaintiff's claims, a plaintiff may not recover in quasi contract; a quasi contract claim may only be brought "in the absence of an express agreement." *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 388 (1987); *Gemma Power Sys., LLC v. Exelon W. Medway II, LLC*, No. 19-CV-0705, 2019 WL 3162088, at *5 (S.D.N.Y. July 1, 2019).

---

[1] Specifically, Plaintiff alleges violations of NYSE Information Memo 05-11, SEC Rule 15c3-3(j)(2), and FINRA Rule 2111. *See* Compl. ¶¶ 218-22; 228-36. NYSE Information Memorandum 05-11 requires member organizations to provide "forthright, clear, complete, prominent and unambiguous" disclosures regarding the terms and conditions, risks, and features of their programs, including interest rates and whether funds are being deposited into affiliated bank accounts as opposed to money market funds. Compl. ¶¶ 143–44. SEC Rule 15c3-3(j)(2) requires "prior written affirmative consent" before brokers can sweep client account balances into accounts at affiliated banks. *Id*. ¶¶ 152–57. FINRA Rule 211 establishes a "suitability standard" for a "recommended transaction or investment strategy." *Id*. ¶ 182. The suitability standard requires that a "member or an associated person must have a reasonable basis to believe that a recommended transaction . . . is suitable for the customer[] . . . ." *Id*.

"While new commerce on the Internet has exposed courts to many new situations, it has not fundamentally changed the principles of contract," *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 403 (2d Cir. 2004); "[m]utual manifestation of assent" remains a touchstone of contract formation. *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 29 (2d Cir. 2002). So-called clickwrap agreements are an increasingly common type of web-based contract; they are formed when a user is presented with "a message on his or her computer screen" and is required to "manifest [] her assent to the terms." *Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829, 837 (S.D.N.Y. 2012). By contrast, "browsewrap" agreements generally do not require the user to expressly assent to the agreement's terms and conditions. *See Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 233 (2d Cir. 2016). The Second Circuit routinely enforces clickwrap agreements as valid and binding contracts, "for the principal reason that the user has affirmatively assented to the terms of agreement by clicking 'I agree.'" *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 75 (2d Cir. 2017); *Fteja.*, 841 F. Supp. 2d at 837 (collecting cases); *Forrest v. Verizon Commc'ns, Inc.*, 805 A.2d 1007, 1011 (D.C. 2002) ("A contract is no less a contract simply because it is entered into via a computer."); *Moore v. Microsoft Corp.*, 741 N.Y.S.2d 91, 92 (1st Dept. 2002).[2]

Mere classification of a web-based contract as a "clickwrap agreement" or a "browsewrap agreement," however, does not necessarily determine the contract's enforceability.[3] *See Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 124 (2d Cir. 2012). Instead, in

---

[2]     *See also Jesmer v. Retail Magic, Inc.*, 863 N.Y.S.2d 737, 745 (1st Dept. 2008); *People ex. rel Spitzer v. Direct Revenue, LLC*, 862 N.Y.S.2d 816, at *4 (N.Y. Sup. Ct. Mar. 12, 2008).

[3]     That being said, Plaintiff's characterization of the agreement as a browsewrap agreement is not accurate. Pl. Opp., Dkt. 21 at 11. Although Plaintiff cites *Berkson v. Gogo LLC*, 97 F. Supp. 3d 359 (E.D.N.Y. 2015), to support this proposition, *Berskon* explicitly defines browsewrap agreements as ones in which "the online host dictates that assent is given merely by using the site," and distinguishes them from clickwrap agreements, defined as ones in which "a user must click 'I agree,' but not necessarily view the contract to which she is assenting." *Berkson*, 97 F. Supp. 3d at 394-95. Based on these definitions, it is clear that the contracts at issue in this case are clickwrap agreements.

the context of clickwrap agreements, in addition to verifying that the user was required to indicate her assent, the court must consider whether the agreement's terms and conditions were "reasonably conspicuous." *Meyer*, 868 F.3d at 76; *Moore*, 741 N.Y.S.2d at 92. Even if there is "no evidence that the offeree had actual notice of the terms of the agreement, the offeree will still be bound by the agreement if a reasonably prudent user would be on inquiry notice of the terms." *Meyer*, 868 F.3d at 74–75. Whether a reasonably prudent user would be on inquiry notice depends on the "[c]larity and conspicuousness" of the terms and conditions; in the context of web-based contracts this is often a function of the "design and content of the relevant interface." *Id.* at 75; *see also Nicosia*, 834 F.3d at 233; *Specht*, 306 F.3d at 30.

Although a clickwrap agreement's terms and conditions must be clear and conspicuous, they need not all be simultaneously and immediately visible; the terms may be binding and enforceable even if they are only accessible through a hyperlink. *Meyer*, 868 F.3d at 75–78 ("That the Terms of Service were available only by hyperlink [did] not preclude a determination of reasonable notice" because "a reasonably prudent [] user knows that text that is highlighted in blue and underlined is hyperlinked to another webpage where additional information will be found."); *Starke v. Gilt Groupe, Inc.*, No. 13-CV-5497, 2014 WL 1652225, at *3 (S.D.N.Y. Apr. 24, 2014) (enforcing an arbitration clause viewable only through a hyperlink); *People ex rel. Spitzer v. Direct Revenue, LLC*, 862 N.Y.S.2d 816, at *4 (N.Y. Sup. Ct. Mar. 12, 2008) ("It is not necessary that it be made impossible for the consumer to signal assent or proceed to installation without being first forced to read the [agreement]; rather, it is sufficient that a separate hyperlink leading to the agreement is available."). Similarly, the fact that a user might need to scroll down the webpage to read all of the terms does not render the agreement unenforceable; the keys to enforceability are a reasonable indication of the existence of the additional terms and the user being required to manifest assent to them. *See Feldman v. Google,*

*Inc.*, 513 F. Supp. 2d 229, 237 (E.D. Pa. 2007) ("That the user would have to scroll through the text box of the Agreement to read it in its entirety does not defeat notice because there was sufficient notice of the Agreement itself and clicking 'Yes' constituted assent to all of the terms.").

Here, Plaintiff entered a valid, binding clickwrap agreement; the terms were "reasonably conspicuous," and Plaintiff was required to affirmatively agree to them.  At the outset, the Court notes that the top of the third page of Defendant's Terms & Conditions instructs users to "review important account terms, disclosures, [] notices and account attestations," and directs users to "[s]elect the links to review each item, or **print** and **save** copies for your records."  Mishkin Decl., Ex. E at 17 (emphasis in original); Compl. ¶ 57.  Although not all of the terms are immediately visible on the webpage, the page contains blue hyperlinks that directed Plaintiff to PDFs of the relevant account documents.  *See* Mishkin Decl., Ex. E at 17.  The page also has a blue hyperlink that allowed Plaintiff to "download all [of the] documents" at once.  *Id.*  The page states that "[t]hese documents apply to your new account," indicating that in addition to the general CRA and Terms of Service agreements, Plaintiff would also be "subject to additional agreements and disclosures that cover other products, services or account features for which [she] may be enrolled."  *Id.*

Among the agreements for which there is a hyperlink directly below these disclosures are the Client Relationship Agreement ("CRA") and Cash Management Account Agreement ("CMA").  Both of these agreements include details regarding Defendant's sweep program.  Mishkin Decl., Ex. A at 5; Ex. B at 3, 19.  Specifically, Section 13 of the CRA explains that an account owner may opt out of the sweep program, but that doing so will result in uninvested cash earning zero interest.  Mishkin Decl., Ex. A at 5.  Although Plaintiff argues that Defendant failed to "forcefully draw [her] attention" to the relevant sweep program terms, Pl. Opp., Dkt. 21 at 2,

the terms contained in the hyperlinked agreements, including the sweep provisions, are

enforceable because a "reasonably prudent" user would "have noticed the link and reviewed the

terms before clicking on the acknowledgment icon."[4]   *Fteja*, 841 F. Supp. 2d at 839–41

("[C]licking [a] hyperlinked phrase is the twenty-first century equivalent of turning over the

cruise ticket.  In both cases, the consumer is prompted to examine terms of sale that are located

somewhere else."); *Berkson*, 2015 WL 1600755, at *31–32 (collecting cases for the proposition

that "'terms of use' will be enforced when a user is encouraged by the design and content of the

website and the agreement's webpage to examine the terms clearly available through

hyperlinkage"); *Starke*, 2014 WL 1652225, at *3 (enforcing an arbitration clause viewable only

through a hyperlink because "[r]egardless of whether he actually read the contract's terms, [the

plaintiff] was directed exactly where to click in order to review those terms, and his decision to

click the 'Shop Now' button represents his assent to them").[5]

 The third page of the Terms and Conditions also includes a text box with twelve

individually numbered account attestations.  Paragraph twelve states that Plaintiff "affirmatively

consent[s] to having [her] available cash balances deposited or invested through the Sweep

Program in accordance with Section 13 of the Merrill Edge Self-Directed Investing Client

---

[4]     Plaintiff claims that the sweep provision disclosures were "buried" in the "voluminous" PDF files.  *See*
Compl. ¶¶ 13, 16, 17.  Although the terms are lengthy and must be reached by a hyperlink, once a user clicks the
hyperlink to the CRA, the section detailing the Sweep Program is bolded and in a different-colored font.  Mishkin
Decl., Ex. A at 5.  Accordingly, the information pertaining to the sweep program is sufficiently conspicuous.  *See
Meyer*, 868 F.3d at 79 ("Although the contract terms are lengthy and must be reached by a hyperlink, the
instructions are clear and reasonably conspicuous.  Once a user clicks through to the Terms of Service, the section
heading ('Dispute Resolution') and the sentence waiving the user's right to a jury trial on relevant claims are both
bolded.").

[5]     *See also Bassett v. Elec. Arts Inc.,* No. 13-CV-4208, 2015 WL 1298644, at *4 (E.D.N.Y. Feb. 9,
2015) (collecting cases for the proposition that federal courts have "consistently enforced clauses contained in
clickwrap agreements" that could be viewed only by following a conspicuous hyperlink); *5381 Partners LLC v.
Shareasale.com, Inc.*, No. 12-CV-4263, 2013 WL 5328324, at *6 (E.D.N.Y. Sept. 23, 2013) ("Several courts have
enforced [] agreements where the circumstances indicated that website users must have had actual or constructive
notice of the site's terms, and have manifested their assent to them, *i.e.,* [where] the hyperlink to the terms and
conditions of use was made apparent to the average user." (citation and internal quotation marks omitted)).

Relationship Agreement."  Compl. ¶ 72.  As noted *supra*, the CRA is one of the PDFs hyperlinked on the same page.  The text box has a visible scroll bar, indicating that Plaintiff should scroll down to read all twelve terms.  The text box also instructs Plaintiff in boldfaced type that her signature manifests agreement to each paragraph.  Plaintiff's argument that she did not have constructive knowledge of these twelve additional terms because they were not all simultaneously visible on the screen, Pl. Opp., Dkt. 21 at 12-13, is silly.  The fact that a user might need to scroll down to read all of the attestations terms does not render them unenforceable any more than the fact that a paper contract has more than one page renders it unenforceable.  *See Feldman*, 513 F. Supp. 2d at 237 ("That the user would have to scroll through the text box of the Agreement to read it in its entirety does not defeat notice because there was sufficient notice of the Agreement itself and clicking 'Yes' constituted assent to all of the terms.").  In fact, Plaintiff's own opposition attaches as exhibits cases in which clickwrap agreements that displayed terms in a text box with a scroll bar were enforced.  *See* Finkel Decl., Dkt. 22 Ex. K at 2 (*Feldman v. Google*, 513 F. Supp. 2d 229 (E.D. Pa. 2007)); Ex. M at 1 (*Hancock v. AT&T*, 701 F.3d 1248 (10th Cir. 2012)); Ex. N at 1 (*Whitt v. Prosper Fund LLC*, 2015 WL 4254062, at *4 (S.D.N.Y. July 14, 2015)).  Because the text box included individually numbered paragraphs, a visible scroll bar, and a bolded instruction that, by indicating assent, Plaintiff was agreeing to the listed terms, the attestations are binding.  *See Meyer*, 868 F.3d at 80 (upholding an online contract where "the text on the [] [s]creen not only included a hyperlink to the Terms of Service, but expressly warned the user that by creating an [] account, the user was agreeing to be bound by the linked terms").

9

Finally, the webpage included a box at the bottom of the page requiring Plaintiff to indicate affirmatively her assent to the terms and conditions before submitting her application.[6] *See id.* at 79 (holding that "the language '[b]y creating an Uber account, you agree' is a clear prompt directing users to read the Terms and Conditions and signaling that their acceptance of the benefit of registration would be subject to contractual terms"). Moreover, the hyperlinks to the relevant agreements are included on the same page as the box requiring Plaintiff to indicate her assent and to submit her application, "thereby connecting the contractual terms to the services to which they apply." *Id.* at 78. Finally, the language "I [] agree to these terms and conditions," Mishkin Decl., Ex. 5 at 17, is a "clear prompt directing users to read the Terms and Conditions and signaling that their acceptance of the benefit of registration would be subject to contractual terms." *Meyer*, 868 F.3d at 79. The combination of the conspicuous hyperlinks, the text box with individually numbered attestations and a visible scroll bar, and the box at the bottom of the page requiring the user to click "I Agree," provided sufficiently clear notice of the terms of the agreement, including the sweep provision, and formed a binding agreement.[7] *See id.* at 75–78; *Centrifugal Force v. Softnet Commc'n, Inc.*, No. 08-CV-5463, 2011 WL 744732, at *7 (S.D.N.Y. Mar. 1, 2011).

---

[6]    In addition, the first text box at the top of the third page of the Terms & Conditions noted that completing the application represented the user's "consent" to the terms and conditions contained on the page and in hyperlinks. *See* Mishkin Decl., Ex. E at 17 ("The following contains your consent to the Merrill Edge Self-Directed Investing Client Relationship Agreement, the Merrill Edge Self-Directed Investing Terms of Service, [and] the agreement applicable to the type of account you are applying for . . . .").

[7]    Plaintiff argues that the sweep program terms are also unenforceable "on public policy grounds" because of alleged non-compliance with the SEC Release and NYSE Memo. Pl. Opp., Dkt. 21 at 15-18. The Court disagrees. First, as discussed above, Defendant did comply with the SEC Release and NYSE Memo; its disclosures were sufficiently clear, and it obtained Plaintiff's affirmative consent to the sweep program. Moreover, "a party may not seek to have a contractual provision declared void as against public policy based on the theory that it runs contrary" to a statute that lacks a private right of action; to allow that would create "a backdoor private cause of action to enforce that statute." *Schlessinger v. Valspar Corp.*, 723 F.3d 396, 399 (2d Cir. 2013).

Plaintiff makes much of the fact that Defendant's advertising estimates that opening a self-directed account can be accomplished in only ten minutes; she argues that this estimate suggests that Defendant does not encourage or expect applicants to read its disclosures in their entirety.  Compl. ¶ 52; Pl. Opp., Dkt. 21 at 8.  Plaintiff also argues that discovery would reveal that applicants do not "actually open any of the PDF files" on the website.  Pl. Opp., Dkt. 21 at 10.  These arguments are unavailing; an individual's failure to read the terms of a clickwrap agreement, even if they are only available through a hyperlink, does not render the agreement unenforceable.  *Meyer*, 868 F.3d at 79 ("While it may be the case that many users will not bother reading the additional terms, that is the choice the user makes; the user is still on inquiry notice."); *Centrifugal Force*, 2011 WL 744732, at *7 ("Failure to read a contract before agreeing to its terms does not relieve a party of its obligations under the contract."); *Spitzer*, 862 N.Y.S.2d at *4 (a binding click-wrap agreement is enforceable "so long as the consumer is given a sufficient opportunity to read the [agreement], and assents thereto after being provided with an unambiguous method of accepting or declining the offer. . . . Claims that a consumer was not aware of the agreement or did not actually read it must be disregarded where . . . the agreement was acknowledged and accepted by clicking on the relevant icon . . .").  Moreover, the third page of the Terms & Conditions instructs users to "carefully review [the] documents" and has an option to "Save and Exit" rather than submitting the application, suggesting that users can take their time reading the terms.  *See* Mishkin Decl., Ex. E at 17.  As such, there is no evidence that Defendant put time constraints on Plaintiff's ability to read the relevant account documents before submitting her application.

In sum, because the Court finds that Plaintiff entered into a binding clickwrap agreement, Plaintiff's quasi contract claim is dismissed.  *Gemma Power Sys., LLC*, 2019 WL 3162088, at *5

("Under New York law, where a valid contract governs the subject matter of a plaintiff's claims . . . it is appropriate to dismiss the claims sounding in quasi contract.").

### B. Plaintiff Fails to Allege a Violation of the "Reasonable Rate" Provision

To allege breach of contract under New York law, a complaint must allege (1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages. *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004). Here, the third element is in dispute.[8]

Plaintiff alleges that Defendant breached the "reasonable rate" provision of the CRA by failing to provide a reasonable rate of interest on the uninvested cash in her retirement accounts. Mishkin Decl., Ex. A at 5 ("The interest paid on retirement account assets will be at no less than a reasonable rate."); Compl. ¶¶ 86, 200, 215, 226. The Roth IRA Agreement, which governs Plaintiff's retirement accounts, states that uninvested cash in retirement accounts will be swept into a "money market deposit account" with Bank of America. Mishkin Decl., Ex. C at 36; Ex. D at 10, 32. Defendant argues that Plaintiff fails to allege adequately that the interest rate paid on swept cash in her retirement accounts was, in fact, unreasonable for a money market deposit account. Def. Mem. of Law, Dkt. 17 at 21. The Court agrees.

The crux of Plaintiff's argument that Defendant violated the "reasonable rate" provision is that "comparable online brokerage companies" pay "substantially higher" rates than Defendant. Compl. ¶ 34. Plaintiff's complaint, however, only alleges rates that were paid on

---

[8]     Plaintiff does not challenge the existence of an agreement in this claim; Plaintiff may plead a quasi-contract claim and, in the alternative, a breach of contract claim. *See, e.g.*, *Randolph Equities, LLC v. Carbon Capital, Inc.*, No. 05-CV-10889, 2007 WL 914234, at *6 (S.D.N.Y. Mar. 26, 2007) ("A plaintiff is not barred from pleading both a contract claim, and in the alternative, a quasi-contract or equitable estoppel claim."); *Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 754 F. Supp. 37, 39–40 (S.D.N.Y. 1991) ("Both Fed. R. Civ P. 8(e)(2) and the pleading rules of New York State law permit the pleading of contradictory claims alleging both breach of a contract or, in the alternative, a quasi contract. Dismissal of plaintiff's alternative theories at this stage would violate the liberal policy of Rule 8(e)(2) which allows plaintiffs wide 'latitude' in framing their right to recover."). Nevertheless, the Court finds that Plaintiff has failed to assert a claim for either quasi contract or breach of contract.

products other than money market deposit accounts, which is the type of account into which Plaintiff's cash was swept. *See* Compl. ¶ 166. For example, two of the Fidelity options that Plaintiff alleges are comparable to the account used by Defendant are money market *mutual funds*, which is an entirely distinct investment option. *Id.* ("Your cash is invested in a mutual fund and earns daily dividends . . . ."); *see Welch v. TD Ameritrade Holding Corp.*, No. 07-CV-6904, 2009 WL 2356131, at *8 (S.D.N.Y. July 27, 2009) ("Plaintiff has not provided any factual basis supporting his implicit assumption that a brokerage service labeled as a 'Money Market Deposit Account' could somehow be mistaken by a reasonable investor as an investment in a mutual fund."). The complaint alleges no facts to support Plaintiff's contention that the interest rate she earned was unreasonable for a money market deposit account. Moreover, Plaintiff's opposition does not contest that the only factual allegations in the complaint regarding interest rates paid by other institutions are for different types of accounts. In sum, because Plaintiff fails to plead any facts supporting her claim that the interest rates paid were unreasonable for a money market deposit account, her breach of contract claim fails.

### C. Plaintiff's Breach of Suitability Standards and Negligence Claims Are Dismissed

Plaintiff asserts claims for breach of suitability standards and negligence, allegedly arising out of violations of NYSE Information Memo 05-11, SEC Rule 15c3-3(j)(2), and FINRA Rule 2111.[9] *See* Compl. ¶¶ 218-22; 228-36. Specifically, Plaintiff argues that Defendant caused her to deposit $675,000 into an "unsuitable, low-interest bearing" Bank of America Account. Pl. Opp., Dkt. 21 at 3. While Defendant is subject to the requirements set by the NYSE, SEC, and FINRA, there is no private right of action for alleged violations of industry rules. *See, e.g.*, *Harris v. TD Ameritrade, Inc.*, 805 F.3d 664, 666 (6th Cir. 2015) ("SEC Rule 15c3-3 . . . does

---

[9]      *See* note 1 *supra* for the substance of these provisions.

not create a private right of action."); *Hauptman v. Interactive Brokers, LLC*, 349 F. Supp. 3d 292, 295–96 (S.D.N.Y. 2018) (no private right of action for violations of FINRA rules); *Brady v. Calyon Sec. (USA)*, 406 F. Supp. 2d 307, 312 (S.D.N.Y. 2005) (NYSE rules do not create private rights of action).  Accordingly, Plaintiff's claim for "breach of suitability standards" stemming from alleged violations of industry rules fails.

Plaintiff also purports to assert a separate common law negligence claim, alleging that Defendant violated its duty to act "reasonably and recommend suitable investments to customers."  Pl. Opp., Dkt. 21 at 22; *see* Compl. ¶ 235.  This claim, however, is derivative and duplicative of her breach of suitability standards claim; the complaint's references to a duty of care and negligence are coupled with, or virtually identical to, the allegations regarding alleged violations of industry rules.  Compl. ¶¶ 2, 31, 187–88, 202(f)(ix), 218–222, 228–36.  Plaintiff cannot circumvent the lack of a private right of action for violations of industry rules merely by recasting her claim as a violation of a common law duty.  *See In re Series 7 Broker Qualification Exam Scoring Litig.*, 510 F. Supp. 2d 35, 47 (D.D.C. 2007), *aff'd*, 548 F.3d 110 (D.C. Cir. 2008) (rejecting Plaintiffs' argument that their claims were "distinctly derived from duties created at common law" because "courts have logically concluded that the Exchange Act preempts common-law claims that are nothing more than disguised actions to enforce regulatory duties").

Separately, Plaintiff fails to allege adequately that there is a common law duty to recommend suitable investments for self-directed accounts.  The express terms of the CRA explain that self-directed accounts are designed for investors "who wish to make their own investment choices" and indicate that Defendant will, in fact, *not* provide investment advice; the CRA states that Defendant will not make "any recommendations, or offer any opinion regarding the suitability of any security, order, transaction, or strategy in a [] Self-Directed Investing Account, or monitor your investment or the appropriateness of your account or service level, or

14

alert you to any recommended change to your investments, investment accounts, or services."
Mishkin Decl., Ex. A § 2.

### D.  Plaintiff's Massachusetts Consumer Protection Law Claim is Dismissed

Section 93A of the Massachusetts Consumer Protection Law ("MCPL") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce."  Mass. Gen. Laws. ch. 93A, § 2(c).  Plaintiff's MCPL claim is entirely derivative of Plaintiff's quasi-contract, breach of contract, and breach of suitability standards claims, which, for the reasons explained *supra*, are themselves insufficient.  *See* Compl. ¶ 243; Def. Mem. of Law at 24–25.  Accordingly, Plaintiff's MCPL claim is dismissed.  *Kearney v. Phillip Morris, Inc.*, 916 F. Supp. 61, 64 (D. Mass. 1996) (holding that because plaintiff's "claim of an alleged violation of [93A] is based on the same breach of warranty and negligence claims . . . if plaintiff's claims of breach of warranty and negligence fail, plaintiff's [93A] claim also fails"); *Kirin Produce Co. v. Lun Fat Produce, Inc.*, 93 Mass. App. Ct. 1106 (2018) (dismissing 93A claim "grounded wholly on the breach of contract claim").

### CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss is GRANTED.  Plaintiff's complaint is DISMISSED without prejudice.  Because Plaintiff requested an "opportunity to address what concerns the Court may have with the initial complaint," Pl. Opp., Dkt. 21 at 25 n.28, Plaintiff may move for leave to amend Count Three of the complaint no later than **June 29, 2020**; leave to amend the other counts is denied as futile.  If Plaintiff chooses to move for leave

to amend, she must include a redlined version of her proposed amended complaint.  The Clerk of

Court is respectfully directed to close the open motion at docket entry 16.


**SO ORDERED.**

Date:  **June 3, 2020**                                    **VALERIE CAPRONI**
          **New York, New York**                          **United States District Judge**