USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 4/12/2023

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

SARAH VALELLY, on behalf of herself,          :
individually, and on behalf of all others similarly-   :
situated,                                      :
                                               :
                              Plaintiff,       :          19-CV-7998 (VEC)
                                               :
           -against-                           :          OPINION & ORDER[1]
                                               :
                                               :
MERRILL LYNCH, PIERCE, FENNER &                :
SMITH INC.,                                    :
                                               :
                              Defendant.       :
-------------------------------------------------------------X

VALERIE CAPRONI, United States District Judge:

This case involves the "sweep" feature of Merrill Edge Self-Directed Investing Accounts.

The sweep feature allowed Defendant to move automatically (or "sweep") Plaintiff's uninvested

cash into a Bank of America money market account.[2]  Plaintiff sought class certification and, in

support of her motion, proffered the opinion of Dr. Micah Officer ("Dr. Officer").  *See* Dkt. 94-

---

[1]     The Court grants the parties' pending motion to seal at docket entry 138.  This Opinion & Order will be filed entirely under seal with viewing limited to the parties.  The Court notes, however, that although it has previously approved filing certain materials under seal in this case, the redactions applied to material filed in connection with the instant motion appear to have been inconsistently applied.  Moreover, the Court is skeptical that this Opinion & Order contains information that overcomes the presumption of public access.  *See Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 126 (2d Cir. 2006).  Accordingly, Defendant must show cause by no later than **March 31, 2023**, why any portion of this Opinion & Order remains confidential in accordance with *Lugosch*.

[2]     Plaintiff's initial complaint asserted claims for quasi contract, breach of contract, breach of suitability standards, and breach of the Massachusetts Consumer Protection Law on behalf of herself and three putative classes.  Dkt. 1 ("Compl.").  On June 3, 2020, the Court granted Defendant's motion to dismiss the complaint, but allowed Plaintiff to move for leave to amend her breach of contract claim.  Dkt. 31.  On January 25, 2021, the Court granted Plaintiff leave to file her amended complaint, Dkt. 54, which includes additional allegations in support of her claim that Defendant breached the "reasonable rate" provision of the Client Relationship Agreement.  Dkt. 55 (the "FAC") ¶¶ 232–355.  The FAC also alleges a "new claim" regarding the interest rate Defendant paid on Plaintiff's "linked" retirement accounts, *id.* ¶¶ 2, 356–71; and renewed Plaintiff's claim for unfair and deceptive trade practices under the Massachusetts Consumer Protection Law, *id.* ¶¶ 384–93.

26.[3]  Defendant moves to exclude Dr. Officer's opinion and testimony.  *See* Def. Mot., Dkt. 112.

For the following reasons, Defendant's motion is GRANTED.

## BACKGROUND

The Court assumes familiarity with its prior opinions issued over the course of this

litigation and will summarize only the most pertinent facts.  In August 2017, Plaintiff Sarah

Valelly opened three accounts at Merrill Lynch: (i) a Cash Management Account ("CMA"); (ii) a

Roth Individual Retirement Account ("Roth IRA"); and (iii) a Traditional Individual Retirement

Account ("Traditional IRA").  First Amended Complaint ("FAC") ¶¶ 26, 43–45, 112, Dkt. 55.

The Client Relationship Agreement ("CRA"), which governs all three accounts, contained a so-

called "reasonable rate" provision.  Pursuant to the reasonable rate provision, Defendant was

obligated to pay no less than a "reasonable rate" of interest on cash held in Plaintiff's retirement

accounts.  Plaintiff alleges that Defendant breached that contract by failing to pay a "reasonable"

interest rate (the "Reasonable Rate Claim").  *Id.*  ¶¶ 36, 88–89, 226–34.  Plaintiff also alleges

that Defendant breached the implied covenant of good faith and fair dealing by failing to

consider her retirement accounts "linked," which would have resulted in a higher interest rate

being paid on the cash in each of her accounts (the "Statement-Linking Claim").  *Id.* ¶¶ 2, 356–

74.

On March 4, 2022, Plaintiff disclosed to Defendant that she would rely on an expert

report prepared by Dr. Officer (the "Officer Report") in support of her motion for class

certification.  *See* Dkt. 89.  On March 10, 2022, this Court granted an enlargement of the

discovery deadlines to accommodate expert discovery.  *See id.*  On May 10, 2022, Defendant

---

[3]        The Court denied Plaintiff's motion for class certification without prejudice to refiling after the Court's decision on Defendant's motion to exclude Dr. Officer's expert report and testimony.  *See* Dkt. 145.

moved to exclude Dr. Officer as an expert under Fed. R. Evid. 702 and *Daubert*, arguing that Dr. Officer's report fails to provide an admissible expert opinion for how to calculate class-wide damages.  *See* Def. Mot., Dkt. 112.  On July 12, 2022, Plaintiff opposed the motion.  Pl. Opp., Dkt. 131.[4]

## I.   Dr. Officer's Report[5]

Dr. Officer has a bachelor's degree in finance and economics from the University of Auckland, a master's degree in applied economics, and a Ph.D. in finance from the University of Rochester.  Officer Report ¶ 7, Dkt. 94-26.  Dr. Officer has been a full-time professor since 2002; he currently teaches finance at Loyola Marymount University in Los Angeles, California. *Id.* ¶ 6.  Dr. Officer has published more than 20 peer-reviewed articles in various finance journals concerning a wide range of topics including bank lending, *id.* ¶ 9, although he does not claim to have published any articles specifically addressing how banks set interest rates on deposit accounts.  Dr. Officer has also been retained as a consulting expert in other matters to engage in data analysis, write expert reports, and "guid[e] investigations in promising directions."  *Id.* ¶¶ 10, 12.

---

[4]     After fully briefing the class certification and *Daubert* motions, the parties jointly requested oral argument. *See* Dkt. 142.  The Court denies that motion with respect to the *Daubert* motion; the parties can re-raise the issue with respect to class certification after it is fully briefed.

[5]     Dr. Officer's report was submitted in connection with Plaintiff's motion for class certification.  *See* Ex. JJ, Dkt. 94-26.  In its opposition to Plaintiff's class certification motion, Defendant submitted a rebuttal report from its expert, Dr. Eisfeldt, whose expert testimony has not been challenged by Plaintiff.  *See* Ex. D, Dkt. 116-1; *see also* Def. Reply at 2, Dkt. 140.  Dr. Officer prepared a "rebuttal" report that was filed in connection with Plaintiff's reply in support of her class certification motion.  *See* Ex. AAA, Dkt. 128-16 ("Officer Rebuttal").  Although Defendant argues that the Court could exclude the supplemental report on the sole grounds that it "constitute[s] work that Dr. Officer could have done in connection with his Initial Report" and thus exceeds the permissible scope of a rebuttal report, Def. Reply at 4 n.2, the Court declines Defendant's invitation.  Although Dr. Officer's "rebuttal," which was purportedly aimed at responding to Defendant's rebuttal expert, included materials that should have been included in his initial report, there is no reason to strike Dr. Officer's rebuttal report because Defendant's motion will be granted.

Plaintiff engaged Dr. Officer as a finance consultant to opine on "two related questions," both of which he answered in the affirmative: (1) whether there is "a valid, common methodology to calculate damages on a class-wide basis," and (2) whether it is "possible to determine a reasonable interest rate that would apply to the uninvested cash in the retirement accounts of the class-members." *Id.* ¶ 2.[6]  Dr. Officer was not asked to provide "the exact reasonable interest rate for estimating damages," but rather "to discuss some of the potential rates that could be used" to calculate damages "for all investors in the proposed class." *Id.* ¶ 26.

Plaintiff's Merrill Lynch brokerage accounts are covered by Defendant's Retirement Asset Savings Program ("RASP"). *See generally* FAC ¶¶ 42–45. "Once a RASP account is opened, uninvested cash is swept into a deposit account" — i.e., a "sweep account" — with Merrill's affiliated bank, Bank of America ("BANA").[7]  Officer Report ¶ 16.  Defendant's "sweep program . . . is a common feature of many retirement accounts and is used as a way to generate extra yield on uninvested cash for investors." *Id.*  The banking institution that holds the sweep account — here, BANA — can use the funds to make loans, just as it does with any other cash on deposit. *Id.*  The interest earned on the bank's loans is used to compensate depositors, including those who are depositors by virtue of a sweep account, for the bank's use of their funds. *See id.*  The difference between the interest earned by the bank on its use of deposited funds and the interest it pays to account holders, including sweep account holders, is called Net Interest Income ("NII"). *Id.*

---

[6]     As posed the second question appears to suggest that there is "a" reasonable interest rate that Defendants should have paid on uninvested cash.  The Court is extremely skeptical that any expert can or will opine that there is, at any given point of time, only one interest rate that is reasonable for uninvested cash.  Certainly Dr. Officer has not offered such an opinion.

[7]     BANA is a wholly owned affiliate and the "lead depository institution" of Bank of America Corporation ("BAC"), a publicly traded bank holding company.  Officer Rebuttal at 2 n.7.  Merrill Lynch is a U.S. broker-dealer subsidiary of BAC, and an indirect affiliate of BANA. *Id.*

Defendant categorized RASP accounts into four tiers based on the account holder's total assets under management ("AUM"). *Id.* ¶ 17. An account holder's AUM reflected the sum of the cash in each of the account holder's "statement-linked" accounts. *Id.* The interest rate paid on cash in the sweep account varied depending on the AUM — the higher the AUM, the higher the interest rate paid to the accountholder. *See id.*

## II.   Dr. Officer's Proposed Common Methodology for Determining Class-Wide Damages

According to Dr. Officer, "[d]amages in this matter can be computed for all Class members using a common methodology that is consistent with the Plaintiff's theory of liability." Officer Report ¶ 14.[8]

Dr. Officer correctly states the measure of damages in a breach of contract case: if Plaintiff can prove liability, the measure of damages will be the difference between what putative class members "actually received and what they should have received." *Id.* ¶¶ 20–21, 25, 36–40. Computing damages for each RASP account would require "the sweep account balances, the assigned tier, the interest received, and the interest rate paid for each month during the Class Period." *Id.* ¶ 23. More specifically:

> [O]ne would need the daily or average weighted monthly balances in the corresponding sweep account. Then, using the amount of cash in the sweep program and the reasonable rate, the value of the initial cash invested is brought forward to the end of the measurement period, adjusting the value of funds as necessary to take into account the changing amount of cash in the sweep program – *e.g.*, cash swept in, cash interest received, or cash outflows. For each RASP account, damages would then be calculated as the difference in the actual value of its cash holdings in the sweep account at the end of the appropriate measurement period and the but-for cash value of the sweep account had the investor been paid

---

[8]      Dr. Officer appears to invoke the Supreme Court's holding in *Comcast Corp. v. Behrend*: "a model purporting to serve as evidence of damages in [a] class action must measure only those damages attributable to plaintiff's theory of liability. 569 U.S. 27, 35 (2013). "If the model does not even attempt to do that, it could not possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3))." *Id.*

> at a reasonable rate.  A Plaintiff's total damages would be the sum of the damages
> in each sweep account.

*Id.* ¶¶ 21, 36.  Dr. Officer notes that this damages formula would be "common for each self-

directed" retirement savings account and "for the four tiers within each account type because

BANA's methodology in setting interest rates was similarly deficient for each tier," regardless of

the benchmark used to set the interest rate.  *Id.* ¶¶ 22, 37.

In sum, Dr. Officer concludes that a common methodology exists for calculating damages

due to each class member for Defendant's alleged failure to pay a "reasonable" rate of interest on

cash in a sweep account: damages equal "the difference between (i) how much an account holder

was actually paid on their cash in the sweep program, and (ii) how much they should have

received had they been paid a '*reasonable*' rate on their cash that was in the sweep program."

*Id.* ¶ 20 (emphasis in original).

Dr. Officer further opines that ascertaining damages on Plaintiff's Statement-Linking

Claim — i.e., Plaintiff's claim that Defendant should have recognized her accounts as

"statement-linked" and placed those accounts in a higher asset tier, *see* FAC ¶ 370[9] — would

require "a mere arithmetic calculation to determine the higher rate of interest available under

statement-linking for each investor in the class compared to the actual rate of interest paid

without regard to statement-linking."  Officer Report ¶ 38; Officer Rebuttal ¶ 129.

## III.    Dr. Officer's Proposed Methodologies for Determining a Reasonable Rate

To determine the "but-for" value of the sweep account — i.e., "the value the account

holder would have received had [he or she] been paid a reasonable sweep interest rate on [his or

her] uninvested cash" — requires a threshold determination of what constitutes a "reasonable

---

[9]      For accounts to be "linked" for purposes of earning a higher interest rate on the sweep account, customers
were required to enroll in Merrill Lynch's Statement Link Service by "speaking to a financial advisor or by calling
Merrill's toll-free number."  Op. & Order at 4–5, Dkt. 54.

rate." Officer Report ¶ 25. Dr. Officer discussed two potential models for determining a "reasonable" rate of interest.

### A. BANA's "Pass-Through" Model

According to Dr. Officer, "[o]ne proxy for a reasonable rate that the sweep account holders should have received is the rate that Bank of America itself used to model interest rates for the sweep accounts." Officer Report ¶ 27; *see also* Officer Rebuttal ¶ 5. Relying on Defendant's discovery responses and documents,[10] Dr. Officer concluded that, until the fall of 2017, BANA set sweep interest rates using a so-called "pass-through" model, pursuant to which the interest rate paid on sweep accounts was based on a percentage of the ███████████. The percentage that "passed through" varied based on the customer's AUM. Officer Report ¶¶ 17–18; Officer Rebuttal ¶ 49; Pl. Opp. at 14. Dr. Officer contends that BANA's pass-through model yielded reasonable rates, but that "by November 2017, Merrill chose to deviate from, and subsequently in January 2018 to abandon, the pass-through model in order to pay lower than reasonable interest rates and to report higher [NII] and net earnings for" its holding company. Officer Rebuttal ¶ 5; *see also* Officer Report ¶ 29.[11]

### B. BANA's Alternative Market Rates

Dr. Officer suggests that market alternatives could also serve as a benchmark for determining a reasonable rate. Specifically, Dr. Officer cites internal BANA documents to

---

[10]     Dr. Officer noted that the materials he relied on when preparing his report included the Merrill Lynch Self-Directed Investing Client Relationship Agreement ("CRA"); the Merrill Edge Self-Directed Cash Management Account; the ███████████████████████; U.S. Treasury Rates; Federal Deposit Insurance Corporation Rate; and interest rates paid on deposits at other financial institutions. Officer Report ¶ 3.

[11]     After a ██████████ reduction for operating costs, "[a]s of February 13, 2018, the percent of the ██ that was 'passed through' to cash held by sweep account holders was: ██ for Tier 1 accounts, ██ for Tier 2 accounts, ██ for Tier 3 accounts, and ██ for Tier 4 accounts." Officer Report ¶ 18. Dr. Officer's reports are silent on whether the tiered approach that he says Defendant used when they were passing through the ██████ yielded a reasonable rate for all of the four tiers; his report seems to imply, however, that it was not unreasonable for Defendant to vary the interest rate paid based on the AUM.

suggest that BANA "compared the rates paid on [its] sweep accounts to alternative market rate benchmarks." Officer Report ¶ 33. Dr. Officer includes a table extracted from a Bank of America presentation purportedly identifying market and competitive rates, including, specifically, Treasury and Government Money Market Mutual Funds (collectively "Government Money Market Mutual Funds" or "MMFs") that BANA viewed as "highly substitutable with bank deposits as a sweep option" for customers. *Id.* ¶ 34. Dr. Officer concluded that those market alternatives that BANA tracked when setting its own sweep rates "may also be considered reasonable rates." *Id.* ¶ 35.

Officer provided no expert explanation why the ▮▮▮▮▮▮▮ or the alternative market rates on other instruments provide a reasonable starting point (or ending point) for determining a reasonable interest rate to be paid on a deposit account, beyond noting that Defendant previously used the pass-through approach and that Defendant considered the alternative rates when setting the interest rate to be paid on sweep accounts.

## DISCUSSION

### I.   The *Daubert* Standard

Federal Rule of Evidence 702 governs expert testimony. It provides that a person "qualified as an expert by knowledge, skill, experience, training, or education" may offer opinion testimony if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

"It is a well-accepted principle that Rule 702 embodies a liberal standard of admissibility for expert opinions . . . ." *Nimely v. City of New York,* 414 F.3d 381, 395 (2d Cir. 2005). The

proffering party bears the burden of establishing admissibility under Rule 702 by showing that (1) the expert is qualified; (2) the proposed opinion is based on reliable data and methodology; and (3) the proposed testimony would be helpful to the trier of fact, but it is the district court that serves as the "ultimate gatekeeper" against unreliable expert testimony.  *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007).

Ultimately, the threshold question is whether the "proffered expert testimony is relevant." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002).  An expert's opinion is relevant if it will "help the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702(a).  Proffered testimony is not helpful to the jury if it "usurp[s] either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it."  *Nimely*, 414 F.3d at 397 (citation omitted).  An expert's opinion will be precluded if it "undertakes to tell the jury what result to reach" and "attempts to substitute the expert's judgment for the jury's."  *Id.* (citing *United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994)).  "While an expert may opine on an issue of fact within the jury's province, an expert may not give testimony stating ultimate legal conclusions based on those facts."  *Snyder v. Wells Fargo Bank, N.A.*, 2012 WL 4876938, at *5 (S.D.N.Y. Oct. 15, 2012) (cleaned up).

Although "[t]he Supreme Court has not definitively ruled on the extent to which a district court must undertake a *Daubert* analysis at the class certification stage," it has "offered limited dicta suggesting that a *Daubert* analysis may be required at least in some circumstances."  *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 129 (2d Cir. 2013) (citations omitted); *see also Royal Park Invs. SA/NV v. U.S. Bank Nat'l Ass'n*, 324 F. Supp. 3d 387, 393 (S.D.N.Y. 2018) ("[T]he Second Circuit has not resolved whether and to what extent *Daubert* applies at the class certification stage.").  Nonetheless, "courts in the Second Circuit regularly 'subject expert

testimony to *Daubert*'s rigorous standards insofar as that testimony is relevant to the Rule 23 class certification analysis.'" *Bowling v. Johnson & Johnson*, 2019 WL 1760162, at *7 (S.D.N.Y. Apr. 22, 2019) (quoting *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 55 (S.D.N.Y. 2016)); *see also In re Aluminum Warehousing Antitrust Lit.*, 336 F.R.D. 5, 29 (S.D.N.Y. 2020) (collecting cases).[12]  It is Plaintiff's burden at this stage "to present a damages model that can be used on a class-wide basis based on common proof."  *In re Aluminum*, 336 F.R.D. at 29 (citation omitted).

Thus, although this Opinion does not address Plaintiff's pending class certification motion, this Court must still serve a gate-keeping function to determine whether Dr. Officer's proposed methodology for calculating damages is reliable under *Daubert*.

## II.    Defendant's *Daubert* Motion

Defendant does not challenge Dr. Officer's experience or qualifications for offering a class-wide damages methodology.  Nor do the parties dispute that any methodology for calculating class-wide damages "must be constructed by first determining what constitutes a 'reasonable rate' of interest."  Def. Mem. at 6; *see also* Officer Report ¶ 25.  Defendant argues, however, that Dr. Officer's testimony and report are inadmissible because he fails to provide any expert analysis for how to determine a "reasonable" rate.[13]  *See* Def. Mem. at 7–8.

---

[12]    Indeed, in the antitrust context, a court in this district recently opined that "a complete *Daubert* inquiry is necessary to analyzing a motion to exclude at the class-certification stage, and that only expert reports that would otherwise be admissible at trial under *Daubert* can be considered in support of class certification."  *In re Namenda Indirect Purchaser Antitrust Lit.*, 2021 WL 100489, at *7 (S.D.N.Y. Jan. 12, 2021).

[13]    Specifically, Defendant argues that Dr. Officer failed to: "actually test or implement any of his suggested potential 'methodologies' for calculating a reasonable rate;" "conduct any analysis of any of the benchmark rates he suggests might be competitive;" "perform any comparison of RASP to other market rates;" "inquire into what market survey data might exist on sweep programs or what the market survey data would show;" "compare any outputs from the proposed pass-through model to rates actually offered on sweep programs;" "review any information or testimony that indicated that the pass-through model was not used or intended to be used to actually set rates in real time;" and "investigate the extent to which sweep accounts offer distinct features and benefit[s] in comparison to other types of products, including money market mutual funds."  Def. Mem. at 7–8.

Plaintiff argues that Dr. Officer's proposed testimony satisfies the *Daubert* standard at this stage of the litigation: specifically, Plaintiff argues that concerns over the appropriate methodology for setting a reasonable rate are premature and, in any event, go to the weight to be afforded his opinion, not to its admissibility.  *See* Pl. Opp. at 9–12.

## A. Dr. Officer Fails to Provide an Admissible Opinion That Would Be Helpful to a Trier of Fact in Considering Plaintiff's Reasonable Rate Claim or to the Court in Considering a Motion for Class Certification

Defendant does not dispute that if liability is proven, damages will be equal to the difference between what putative class members received and what they should have received. Def. Mem. at 1–2.  Defendant's overarching criticism is that Dr. Officer's formula is "decidedly non-expert" because it fails to provide any expert analysis for determining a reasonable rate of interest, a critical input into the damages formula.  *See id.*  Indeed, Dr. Officer admits that he has no opinion on what "the exact reasonable interest rate for estimating damages is," Officer Report ¶ 26, and that determining a reasonable rate is necessary to computing damages if Plaintiff prevails on liability, *id.* ¶ 25 ("To compute what a RASP account holder should have received, one needs to calculate the but-for value of the sweep account," which is "the value the account holder would have received had [he or she] been paid a reasonable sweep interest rate on [his or her] uninvested cash").

Plaintiff insists, however, that Dr. Officer need only set forth "a valid methodology to determine whether common issues of law or fact predominate" on damages, thereby "[s]atisfying the threshold test of admissibility."  Pl. Opp. at 8.  Plaintiff argues that Dr. Officer has done just

that, and that Defendant's criticisms over "the appropriate methodology to set a reasonable rate" are "premature." *Id.* at 9–10.  The Court disagrees that Dr. Officer's testimony is admissible.[14]

There is no dispute that Dr. Officer's proposed, relatively straightforward damages formula can serve as a common class-wide damages methodology on the Reasonable Rate Claim.  The problem, however, is that, even assuming Plaintiff has admissible evidence to prove that the interest rates Defendant paid were unreasonably low, Dr. Officer's damages formula cannot actually be used absent admissible evidence of how to set a reasonable interest rate on a sweep account.  *See* Def. Mem. at 6.  Because Dr. Officer offers no admissible expert opinion on that point, as detailed below, his opinions fail to satisfy the rigors of a *Daubert* analysis.[15]

       1.   *Dr. Officer Provides No Admissible Opinion for How to Determine a "Reasonable Rate" of Interest on Money Market Deposit Accounts*

Long before determining any class-wide entitlement to damages, Plaintiff must prove (1) that the interest rate Defendant paid on sweep accounts was not a "reasonable" rate and (2) what a "reasonable" rate would have been.  *See* Op. & Order, Dkt. 54; *see also* Def. Mem. at 6; Officer Report ¶¶ 2, 25.  Dr. Officer's report, however, reflects no specialized knowledge and articulates no principles that would help the trier of fact determine what factors should be considered when setting a "reasonable" rate.  That absence is remarkable given Dr. Officer's

---

[14]     The Court expresses no opinion on whether granting Defendant's Daubert motion is fatal to Plaintiff's motion to certify a class.  The Court notes, however, that the complexity that would have been involved in ascertaining damages in *Comcast Corp. v. Behrend,* 569 U.S. 27 (2013), on which Defendant heavily relies, is simply absent here.  The Court anticipates that proving that the interest rate Defendant paid was not reasonable and then proving what would have been a reasonable rate will be complicated but in ways that go to substantive liability and not to class certification.

[15]     Dr. Officer's rebuttal spills a lot of ink quarreling with Defendant's rebuttal expert, Dr. Eisfeldt.  Dr. Officer's (and Plaintiff's) quarrels with Dr. Eisfeldt's report are irrelevant for purposes of Defendant's *Daubert* motion — Plaintiff has not challenged Dr. Eisfeldt's report or testimony, and Dr. Eisfeldt's task was necessarily limited to criticizing Dr. Officer's damages methodologies, not for coming up with a damages methodology herself.  *See In re Digital Music Antitrust Litig.*, 321 F.R.D. 64, 78 (S.D.N.Y. 2017) ("Rebuttal experts, on the other hand, have a less demanding task because they have no burden to produce models or methods of their own; they need only attack those of plaintiffs' expert." (cleaned up)).

assertion that "what constitutes a reasonable rate . . . including the basis for the recommendation, is squarely within the realm of financial economics and consequently within [his] area of expertise and the purview of a finance expert."  Officer Report ¶ 2, n. 4; Officer Rebuttal ¶ 31.

Instead of explaining what factors and data a financial institution should consider and why when setting interest rates on deposit accounts, Dr. Officer implies, but does not actually state, that BANA's prior "pass-through" model yielded a reasonable interest rate. *See* Officer Report ¶¶ 27–28. But Dr. Officer provides no expert explanation for that opinion.  The closest Dr. Officer comes is his statement that at some point BANA executives decided to utilize the pass-through model which "consequently" yielded a reasonable rate.  *See id.* ¶ 31 ("[I]t was noted in a [BANA] internal presentation that rates such as the ████████, before any reductions caused by the application of pass-through percentages, were conservative because there was no credit risk associated with comparable money market investments, which historically had passed-through increases in the ████████ at ████.").  Dr. Officer's conclusory, circular opinion that BANA's purported previous methodology yielded a reasonable interest rate because BANA once used that methodology to set interest rates is a far cry from expert analysis.[16]

Plaintiff argues that using BANA's pass-through model as a proxy for a reasonable rate is appropriate because it was based on a rate that itself reflects economic and business conditions. Pl. Opp. at 13–14.  "Inasmuch as BANA makes more money when the FFs rate increase [sic], it was reasonable for BANA to pass-through those increased profits (after adjusting for ████

---

[16]     Indeed, if that is his rationale, it could be fatal to Plaintiff's claim.  A logical leap from that opinion would be that the interest rate paid during the class period was also reasonable because it, too, was based on a model adopted by BANA.

██████ of operating costs[17]) to investors." *Id.* at 15.  Plaintiff may be correct that the ██████ ███████ should have been part of Defendant's analysis when setting the interest rate on sweep accounts, but neither of Dr. Officer's reports provides any specialized knowledge or a reliable foundation for the analytical leap that the ████████ (less ██████████ for operating costs) is *the* appropriate benchmark.[18]

Plaintiff argues that Dr. Officer "construed 'reasonableness' in light of 'economic and business conditions,'" and "advocate[d] for the use of both 'objective' rates and 'objective' fact and 'non-conflicted' transactions."  *Id.* at 13.  But Plaintiff exaggerates the lengths to which Dr. Officer's reports went: rather than providing an analytical framework for determining what a banker should consider in setting a reasonable interest rate for this particular type of account and why, Dr. Officer merely pointed to purported definitions of reasonableness supplied elsewhere. *See* Officer Rebuttal ¶ 34–37 (citing the FAC, the IRA Agreements, and a 2003 ruling by the U.S. Department of Labor to explain his belief that "the purpose of the 'reasonable rate' provisions in the IRA Agreements . . . is to approximate an arm's length transaction between two independent parties subject to the discipline of market conditions, neither of whom is required to engage in the transaction at issue").  Nowhere in Dr. Officer's reports does he actually opine whether BANA's pass-through model met those criteria and, if so, why.  *See S.E.C. v. Tourre*, 950 F. Supp. 2d 666, 675 (S.D.N.Y. 2013) ("Acting simply as a narrator of the facts does not

---

[17] Dr. Officer never opines whether the purported ██████████ deduction for operating costs was reasonable nor whether larger or smaller deductions from the ████████ would also have yielded a reasonable interest rate.

[18] Dr. Officer insinuated that the sweep interest rates paid by Defendant were unreasonable when he proclaimed that BANA's shift away from the pass-through model "suggests the abdication of BANA's obligation to pay an objectively reasonable rate."  Officer Report ¶¶ 18–19, 30; Officer Rebuttal ¶¶ 48–49; Pl. Opp. at 14–15.  But beyond the *ipse dixit* in his reports, Dr. Officer provides no explanation for how he arrived at that conclusion, let alone his implicit assumption that the ████████ is the only appropriate benchmark against which to set a reasonable interest rate for sweep accounts in the first place. *See Riegel v. Medtronic, Inc.*, 451 F.3d 104, 127 (2d Cir. 2006) ("An expert opinion requires some explanation as to how the expert came to his conclusion and what methodologies or evidence substantiate that conclusion.").

convey opinions based on an expert's knowledge and expertise; nor is such a narration traceable to a reliable methodology.").

Plaintiff's other attempts to dress up Dr. Officer's reports as independent opinions are unpersuasive.  For example, Plaintiff attributes a quote from the record to Dr. Officer as though he concluded independently that the pass-through model produces a reasonable rate because "comparable money market instruments" passed through ███ of increases in the ███████ ███ to customers, and "such rates were comparable, in terms of risk, to those payable to RASP account holders."  Pl. Opp. at 15.  But Dr. Officer did not actually so opine.  Dr. Officer merely quoted from an internal BANA presentation to suggest that was the conclusion BANA executives themselves reached.  *See* Officer Report ¶ 31 ("[I]t was noted in a Bank of America internal presentation that rates…").[19]  Dr. Officer's interpretation of the evidentiary record provides no utility to a factfinder in determining how a reasonable rate is (or should be) set, let alone whether Defendant's rate was reasonable or unreasonable.  *See In re Rezulin Prods. Liab. Lit.*, 309 F. Supp. 2d 531, 551 (S.D.N.Y. 2004) (experts may not "invade the province of the jury

---

[19]     The excerpt from which Dr. Officer continues to quote in his report reveals another flaw in Plaintiff's argument: the "comparable money market investments" to which the presentation was purportedly referring were government and treasury mutual funds.  Officer Report ¶ 31.  As has been discussed previously and will be discussed below, those investment vehicles differ from FDIC-insured deposit accounts, albeit with a similar risk profile from the perspective of the customer.  The rates paid on such funds are not dispositive of the question whether the interest rate Defendant paid on sweep accounts was reasonable.  *See* Dkt. 31 at 13; Dkt. 54 at 4.

by presenting a narrative that advocates plaintiffs' version of the facts" and they are prohibited from "propound[ing] a particular interpretation of defendant's conduct").[20]

In short, Dr. Officer's reports lack any basis whatsoever for his implied conclusion that BANA's previous pass-through model yielded a reasonable interest rate. Dr. Officer is therefore precluded from testifying that BANA's pass-through model yielded a reasonable rate. Because that conclusion lacks any independent analysis, it is entirely unhelpful and therefore not admissible.

> ### 2. Dr. Officer's Opinion that a Reasonable Interest Rate Should Consider the Rates of "Comparable" Financial Products Is Inadmissible

Dr. Officer's alternative for determining a reasonable rate is to rely on competitive and benchmark rates that BANA purportedly considered "when setting the interest rate for sweep accounts." Officer Report ¶ 35. Defendant argues that Dr. Officer fails to provide any analysis

---

[20]    To the extent Plaintiff attempts to proffer Dr. Officer's testimony on whether it was improper for Defendant to consider profits when setting RASP interest rates, that would be a wasted effort: Dr. Officer does not provide any independent analysis whatsoever to support that contention. *See supra*, n.19. Instead, Dr. Officer relies exclusively on Defendant's documents and emails to advocate Plaintiff's factual position that Defendant's profit considerations outweighed all other considerations of reasonableness when setting sweep interest rates. *See, e.g.*, Officer Rebuttal ¶ 68 ("The rate insensitivity of customers should not dictate what is considered reasonable for a RASP sweep rate."); *id.* ¶ 69 ("The evidence establishes that BANA understood that many RASP sweep account holders were sweep rate insensitive, thereby allowing BANA to maximize profits by paying the lowest rate possible."); *id.* ¶ 70 ("[R]oadblocks BANA and Merrill constructed to avoid investors' switching out of the sweep rates . . . enabled BANA to maintain rates on the RASP below reasonable rates."). That is not expert analysis. And while it may be true that BANA "abandoned" the pass-through model "under pressure to report higher profits," *id.* ¶ 126, that assertion says nothing about whether the pass-through model yielded a "reasonable" rate to begin with. Nor does Dr. Officer's assertion that BANA deviated from the pass-through model (for profit considerations or otherwise) necessarily mean that the later-adopted model for setting the interest rate yielded an *unreasonable* interest rate. *See* Def. Mot. at 12 ("Dr. Officer could not articulate any 'relationship between a consideration of profitability and whether the rate is reasonable'" at his deposition). While profit incentives may bear some relationship to reasonableness, Dr. Officer has not provided any expert analysis to support that conclusion.

Banks are, after all, profit-making enterprises. One would expect an expert to lay out the factors that should be considered in determining whether the bank's profit motive was weighted so heavily in setting interest rates that it yielded an unreasonable rate. What one would not expect is what Dr. Officer delivered: the banal observation that the bank considered profit with absolutely no analysis of why or to what extent that consideration must be absent when setting a reasonable interest rate.

"of whether any of the market rates that Bank of America actually relied upon as comparators when setting RASP rates were reasonable or unreasonable."  Def. Mem. at 13.

The only support Dr. Officer provides for this proposed "methodology" is an internal BANA document that purportedly lists an array of rates that BANA considered when setting interest rates on sweep accounts.  *See* Officer Report ¶¶ 33–35.  Dr. Officer notes that BANA executives believed that customers would view Government Money Market Mutual Funds as "highly substitutable with bank deposits as a sweep option."  *Id.* ¶ 34.  He then concludes, with no explanation, that customers would view Government MMFs as substitutes for bank deposits, thereby making interest rates payable on the former "potential reasonable alternative rates" for the latter.  *Id*.

The closest Dr. Officer comes to offering an expert opinion is his lengthy discussion of the similarities, from a risk-to-the-customer perspective, between money market deposit accounts and Government MMFs.  Dr. Officer asserts that "so-called government money market mutual fund investments are economically equivalent to FD[I]C-insured deposit accounts," Officer Rebuttal ¶ 128, apparently to defend his reliance on the BANA presentation depicted in his report, which included rates for products other than FDIC-insured bank deposit accounts, *see* Officer Report ¶ 34.[21]  The Court does not dispute that, from the *customer's* perspective, Government Money Market Mutual Funds are likely viewed as economically similar in terms of risk of default to FDIC-insured deposit accounts.  But nowhere does Dr. Officer explain why risk

---

[21]     The Court originally granted Defendant's motion to dismiss when it found that Plaintiff's complaint failed to allege adequately that the interest rate she received in her sweep account was *un*reasonable; in so doing, the Court rejected Plaintiff's comparisons to interest rates paid on entirely distinct products, such as Government Money Market Mutual Funds.  *See* Op. & Order, Dkt. 31.  The Court subsequently granted Plaintiff's motion to amend her complaint to include comparisons to rates paid by FDIC-insured online U.S. banks on deposits over $50,000, *see* Op. & Order, Dkt. 54 at 3–4, but denied as futile Plaintiff's proposed amendment that included allegations based on comparisons to mutual funds, stable value funds, or treasury bills, *see id.* at 6.

to the customer is dispositive (or even relevant) to the reasonable interest rate to be paid on a bank deposit account.

The bottom line remains that Government MMFs and bank deposit accounts are not the same.  Fund managers must use funds invested in Government MMFs to purchase instruments as reflected in the Fund's prospectus; as noted by Dr. Officer, 99.5% of the investors' funds must be invested in government securities or repurchase agreements that are fully collateralized. Officer Rebuttal ¶¶ 22, 83 (quoting 17 C.F.R. § 270.2a-7(a)(14)).  The interest paid on the MMF is determined by the interest rate paid on those securities, less the Fund's operating expenses.  By contrast, a bank does not invest 99.5% of customer deposits in government securities.  As Dr. Officer recognizes, the bank uses cash, subject to its capital requirements, to make loans.  *See* Officer Report ¶ 16.  To state the obvious: while the risk of default to the customer may be roughly the same, the factors that determine the interest rate paid on MMFs and the factors banks must consider when setting interest rates to be paid on deposit accounts are different.  It is not surprising then, that at the end of the day, the resulting interest rates paid diverge.[22] Notwithstanding those very fundamental differences between the two products, Dr. Officer fails to provide *any* analysis explaining why Defendant should have been bound by, or necessarily even have considered, the rates paid on purportedly "comparable" financial products when setting the interest rate to be paid on bank deposit accounts.

---

[22]     Likewise, even from the customer's perspective, while money market funds and money market savings accounts are "similar" in terms of risk, that characteristic does not necessarily make them comparable products. There are a host of other distinctions between MMFs and deposit accounts: money market deposit accounts typically earn interest like savings accounts and offer debit card and check-writing privileges but may also come with transaction limits and higher opening balance requirements.  By contrast, investors in Government MMFs "don't have access to funds through debit cards or check-writing privileges."  *See Money Market Account vs. Money Market Fund: What's the Difference?*, Forbes Advisor, https://www.forbes.com/advisor/banking/money-market-account-vs-money-market-fund (last updated Jan. 18, 2023).

This Court has twice made clear that Plaintiff cannot proceed on a theory that purports to prove her breach of contract case by comparing the interest rate she earned on a bank deposit account to the interest rate she could have earned had she invested her available cash in a Government Money Market Mutual Fund.  *See* Op. & Order at 13, Dkt. 31 (rejecting Plaintiff's comparisons to rates paid on mutual funds because mutual funds are an "entirely distinct investment option"); Op. & Order at 4, Dkt. 54 ("[C]omparisons to interest rates paid on entirely distinct investment products . . . such as mutual funds, stable value funds, or treasury bills are irrelevant to whether the rate paid on Plaintiff's money market deposit account was reasonable.").  Without any expert analysis explaining why the purported equivalence between the two products' risk of default to the customer should have caused Defendant to use the interest paid on Government MMFs as the starting point (or ending point, or any point in between) in setting the interest rate it would pay on sweep accounts, Dr. Officer's conclusion is not helpful and therefore is not admissible.

### B.  Dr. Officer's Opinion Regarding the Formula to Calculate Damages on Plaintiff's Statement-Linking Claim Is Not Admissible

Dr. Officer's opinion relative to the ease of calculating class-wide damages with respect to Plaintiff's Statement-Linking Claim fares no better.  Defendant argues, and Dr. Officer himself concedes, that Dr. Officer's damages methodology does not address causation.  *See* Def. Reply at 14–15; Officer Rebuttal ¶ 128 ("I do not have an opinion about whether individual issues cloud the liability picture.").  That Dr. Officer has failed to grapple with causation at this

stage is not fatal:[23] the Court need not decide whether Dr. Officer's formula properly embraces

Plaintiff's Statement-Linking Claim (which can only proceed on a theory of breach of the

implied covenant and fair dealing, *see* Op. & Order, Dkt. 54).  What is fatal, however, is that Dr.

Officer's "robust methodology that can be applied" for all individual class members ("the

difference between (i) the interest [class members] received on their swept cash in the tier they

were inappropriately placed in by Merrill, and (ii) the interest they should have received in the

appropriate tier that their aggregate balances would have qualified them for") is not helpful.  *See*

Officer Rebuttal ¶ 129; *see also* Officer Report ¶ 38.

Plaintiff herself admits that Dr. Officer's formula is "simple" such that expert testimony

is not required.  *See* Pl. Opp. at 22–23.  The Court agrees.  *See FPP, LLC v. Xaxis US, LLC*, 2017

WL 11456572, at *2 (S.D.N.Y. Feb. 13, 2017) ("By drawing solely on figures that would be in

evidence before the trier of fact and then performing simple arithmetic on those figures, [the

proposed expert] is not deploying 'specialized knowledge' to 'help the trier of fact' in any

way."); *see also Schwartz v. Fortune Mag.*, 193 F.R.D. 144, 147 (S.D.N.Y. 2000) (exclusion of

damages testimony at trial was proper where the "court recognized that this testimony was not

generated based on any specialized knowledge, but rather involved basic calculations," and was

therefore "unhelpful" under Rule 702).

In short, Dr. Officer's damages methodology for Plaintiff's Statement-Linking Claim is

precluded because it is unhelpful.

---

[23]     Defendant argues that Plaintiff's Statement-Linking Claim is less straightforward than her reasonable rate
claim because the former requires proving that "Defendant's conduct led" each individual member of the putative
class "to reasonably believe [his or her] accounts were linked" and that Defendant's conduct "interfered with [his or
her] ability to earn the higher interest rate offered under the Agreement."  *See* Def. Reply at 15 (citing Op. & Order,
Dkt. 54).  Although Plaintiff does not address this point in her opposition to Defendant's *Daubert* motion, she does
not have to.  The question whether predominance under Rule 23(b)(3) is satisfied as to damages has been deferred.
*See* Dkt. 145 (dismissing Plaintiff's class certification motion without prejudice to refiling after a decision on
Defendant's *Daubert* motion).

## CONCLUSION

For the foregoing reasons, Defendant's motion to preclude Dr. Officer's opinion and testimony is GRANTED.  The parties are directed to meet and confer and, by no later than **March 24, 2023**, submit a joint letter proposing a briefing schedule on Plaintiff's class certification motion and Defendant's motion for summary judgment.  The parties must appear for a status conference on **Friday, March 31, 2023, at 10:00 a.m.**, in Courtroom 443 of the Thurgood Marshall Courthouse, 40 Foley Square, New York, New York, 10007.

IT IS FURTHER ORDERED that this Opinion and Order shall remain under seal with viewing privileges only to the parties.  The Clerk of Court is respectfully directed to restrict the viewing of this Opinion & Order to the parties in this case.  As noted above, *supra* n.1, Defendant must show cause why any portion of this Opinion & Order should remain under seal by no later than **March 31, 2023**.

The Clerk of Court is respectfully directed to close the open motions at docket entries 112, 138, and 142.

**SO ORDERED.**

Date:  **March 21, 2023**
       **New York, New York**

**VALERIE CAPRONI**
**United States District Judge**