USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 8/5/25

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X
SARAH VALELLY, individually and on behalf of :
all others similarly situated,                                 :
                                                               :
                                            Plaintiff,         :    19-CV-7998 (VEC)
                                                               :
                    -against-                                  :    OPINION & ORDER[1]
                                                               :
                                                               :
MERRILL LYNCH, PIERCE, FENNER &                                :
SMITH INC.,                                                    :
                                                               :
                                            Defendant.         :
-------------------------------------------------------------- X

VALERIE CAPRONI, United States District Judge:

This case involves the "sweep" feature of Merrill Edge Self-Directed Investing Accounts. The sweep feature allows Defendant automatically to move or "sweep" Plaintiff's uninvested cash into a money market account at Bank of America, an affiliated bank.[2] Over the past five plus years, the case has been whittled down to two remaining claims: the reasonable rate claim (Count III) and the statement link claim (Count V). Defendant moved for summary judgment,

---

[1] This Opinion & Order will be filed entirely under seal with viewing limited to the parties. The Court notes, however, that although it has previously approved filing certain materials under seal in this case, the redactions applied to material filed in connection with the instant motion appear to have been inconsistently applied. Moreover, the Court is skeptical that this Opinion & Order contains information that overcomes the presumption of public access. *See Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 126 (2d Cir. 2006). Accordingly, Defendant must show cause by no later than August 1, 2025, why any portion of this Opinion & Order should be sealed given the *Lugosch* presumption of access.

[2] Plaintiff's initial complaint asserted claims for quasi contract, breach of contract, negligence and breach of suitability standards, and breach of the Massachusetts Consumer Protection Law on behalf of herself and three putative classes. Compl., Dkt. 1. On January 25, 2021, the Court granted Plaintiff leave to file an amended complaint, January 25, 2021 Opinion & Order, Dkt. 54, which included additional allegations in support of her claim that Defendant breached the "reasonable rate" provision of the Client Relationship Agreement. First Am. Compl. (the "FAC") ¶¶ 232–355, Dkt. 55. The FAC also alleges a "new claim" regarding the interest rate Defendant paid on Plaintiff's "linked" retirement accounts, *id.* ¶¶ 2, 356–71, and renewed Plaintiff's claim for unfair and deceptive trade practices under the Massachusetts Consumer Protection Law, *id.* ¶¶ 384–93.

*see* Dkt. 267; and Plaintiff opposed the motion, *see* Dkt. 280.  For the following reasons, the Court GRANTS in part and DENIES in part Defendant's motion.

I.   BACKGROUND[3]

A. Sweep Programs

Sweep programs are services offered by numerous institutions, including Defendant, that automatically "transfer free credit balances in the securities account of the customer to either a money market mutual fund product" or to "an account at a bank whose deposits are insured by the Federal Deposit Insurance Corporation."  56.1 Stmt. ¶¶ 1–2, Dkt. 290 (citing 17 C.F.R. § 240.15c3–3(a)(17)).[4]  These programs provide a return on cash held in a brokerage account.  *Id.*

---

[3] The facts are gathered from the parties' 56.1 statement, the exhibits attached to the parties' submissions, and the parties' summary judgment briefs.  The facts are construed in the light most favorable to the non-moving party.  *See Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 30 (2d Cir. 2018).  All facts are undisputed unless otherwise indicated.  The Court will refer to the relevant submissions as follows: Defendant's memorandum of law in support of its motion, Dkt. 268, as "Def. Mem."; Plaintiff's memorandum in opposition to Defendant's motion, Dkt. 279, as "Pl. Opp."; Defendant's Reply memorandum, Dkt. 287, as "Def. Reply."  The parties' 56.1 Statement, Dkt. 289, is cited as "56.1 Stmt."  Citations to alphabetical exhibits (*e.g.*, Ex. A) refer to the exhibits attached to the Declaration of Lara Samet Buchwald, Dkt. 272.  Citations to numerical exhibits (*e.g.*, Ex. 1) refer to the exhibits attached to the Declaration of Emer Burke, Dkt. 283.

[4] Pursuant to Local Civil Rule 56.1(a), a party seeking summary judgment must file "a separate, short, and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried."  The function of a Rule 56.1 Statement is to require the parties to clarify the elements of the various claims that are and that are not at issue and to clearly identify any facts that are contested.  *See Monahan v. N.Y.C. Dep't of Corr.*, 214 F.3d 275, 292 (2d Cir. 2000).  Plaintiff failed to abide by the local rules, adding substantially to the length of the 56.1 Statement, due to her insistence on challenging assertions set forth by Defendant, even where the parties do not actually dispute the assertion's veracity.  This resulted in an unwieldy document in which Plaintiff rehashes her legal arguments rather than assist the Court with navigating the factual record.  *See, e.g.*, 56.1 Stmt. ¶ 6–8, 12, 19–22, 26, 28, 53–54, 57, 62, 66–67 (noting Plaintiff's responses as "undisputed, but misleading with an explanation", "Undisputed but misleading", "Undisputed but immaterial", "Undisputed, with the clarification", and "Undisputed with an explanation").  Courts in this District have instructed parties many times not to use the 56.1 Statement in this way.  *See, e.g., Toussaint v. NY Dialysis Servs., Inc.*, 230 F. Supp. 3d 198, 201 n.1 (S.D.N.Y. 2017), *aff'd*, 706 F. App'x 44 (2d Cir. 2017) ("The Court finds unhelpful Plaintiff's insistence on 'denying' or qualifying facts alleged to be undisputed by Defendant merely because he disagrees with their significance in the case or finds other facts more relevant."); *Tripathy v. McCloskey*, No. 21-CV-6584, 2024 WL 2135623, at *2 (May 13, 2024) ("[T]he purpose of a [Rule] 56.1 response is simply to advise the Court as to whether the specific fact asserted by the moving party is or is not disputed, and if it is disputed, to provide the Court with the evidence on which the non-moving party relies to dispute that particular fact. It presents no occasion for context, argument, semantic quibbles, opinions or conclusions.").  As to the portions of Plaintiff's 56.1 statement that do not cite to admissible evidence to bolster her denial, the Court will "disregard those portions" and deem the factual statements "admitted."  *Mangahas v. Eight Oranges Inc.*, 754 F. Supp. 3d 468, 483 (S.D.N.Y. 2024) (citation omitted).

¶ 3.  FDIC-insured sweep accounts have close to no risk, and they generally do not require customers to take any action to deposit money into the sweep account or to withdraw funds from the sweep account to purchase securities in the brokerage account.  *Id.* ¶¶ 5–6.  This easy access to the swept funds enables customers to purchase and trade securities quickly.  *Id.* ¶¶ 7–8.  Transfers of funds from a retirement brokerage account into or out of a sweep account are typically not subject to restrictions and do not trigger withdrawal penalties or result in taxable events.  *Id.* ¶ 12.

### B. Defendant's Retirement Asset Savings Program

Defendant offers Merrill Edge Self-Directed Investing ("Merrill Edge"), which includes certain brokerage services for investors who want to make their own investment decisions in a Merrill brokerage account.  *Id.* ¶ 18.  To open a Merrill Edge Account, customers must sign the Merrill Edge Self-Directed Investing Client Relationship Agreement ("Client Relationship Agreement").  *Id.* ¶ 19.  The Client Relationship Agreement provides clients with access to a range of accounts, products, and services.  *Id.* ¶ 20.  It states:

> [n]either Merrill Lynch, nor [Merrill Edge], nor any Merrill Lynch or [Merrill Edge] representative, will provide [the client] with investment advice, including any recommendations, or offer any opinion regarding the suitability of any security, order, transaction, or strategy in a [Merrill Edge] Account, or monitor [the client's] investment or the appropriateness of [the client's] account or service level, or alert [the client] to any recommended change to [the client's] investments, investment accounts, or services.  Neither Merrill Lynch nor [Merrill Edge], nor any Merrill Lynch or [Merrill Edge] representative, will provide any tax or legal advice.

*Id.* ¶ 21.  Additionally, it states:

> [b]y entering into this Agreement, [the client] agree[s] that any transactions executed through [the client's] [Merrill Edge] Account, whether based on information obtained from Merrill Lynch or elsewhere, will be solely [the

3

> client's] own decision and based on [the client's] own evaluation of [the client's] personal financial situation, needs, and investment objective(s).

*Id.* ¶ 22.

Defendant offers a sweep program called the Retirement Asset Savings Program ("RASP"), by which cash balances in retirement accounts are automatically deposited into a Merrill-affiliated bank. *Id.* ¶ 24. RASP provides a return on uninvested cash that would otherwise be idle. *Id.* ¶¶ 3, 25. Customers may opt out of the sweep program; if they do so, cash that is not invested will earn no interest and will not be FDIC-insured. *Id.* ¶ 27.

Bank of America, N.A. ("BANA"), an affiliate of Defendant, is the depository institution into which RASP funds are swept. *Id.* ¶ 30. The Client Relationship Agreement discloses that swept funds deposited at BANA are financially beneficial to Defendant and its affiliates. *Id.* ¶ 26. It also states that interest rates paid on deposits "are determined at the discretion of [BANA] based on economic and business conditions" and that the rate "paid on retirement account assets will be at no less than a reasonable rate." *Id.* ¶ 29.

RASP is available for both Traditional and Roth IRAs. *Id.* ¶ 33. When a client opens either type of IRA with Defendant, the client must agree to the Traditional IRA Disclosure and Custodial Agreement ("Traditional IRA Disclosure") or the Roth IRA Disclosure and Custodial Agreement ("Roth IRA Disclosure"). *Id.* ¶ 32. Both Disclosure statements provide that cash balances of $1 or more in retirement accounts are swept to a "money market deposit account" until the customer makes a securities purchase or withdrawal. *Id.* ¶ 34. Both Disclosure statements note that RASP offers FDIC insurance for balances of up to $250,000. *Id.* ¶ 35. For both types of IRAs, RASP offers four interest rate tiers that correspond to the total "asset tier" to which an account belongs. *Id.* ¶ 36. An asset tier is calculated by adding the total assets in the sweep account and the value of the investments in other eligible accounts of the customer that

have been linked through Defendant's Statement Link Service. *Id.* ¶ 37.

RASP rates are set by BANA's Global Wealth and Investment Management ("GWIM") Deposit Pricing Working Group (the "Working Group"), which also determines rates on other BANA programs and products. *Id.* ¶ 38.[5] When setting interest rates, the Working Group evaluates relevant market conditions, the competitive landscape, "balance change(s)," client behavior, sweep activity, and other external market developments, such as actual or anticipated adjustments to the federal funds rate. *Id.* ¶ 39. Plaintiff purports to dispute that statement. She asserts that: BANA has a "master plan" to adjust sweep rates based on changes in the federal funds rate; the Working Group's primary goal is to maximize net interest income; and the Working Group considers the impact that rate changes will have on Bank of America Corp.'s ("BAC") profits. *Id.* ¶ 39(b)–(f). None of Plaintiff's "disputes" contradicts Defendant's statement; because Defendant is a publicly held company, one would certainly expect that profitability would be a factor that the Working Group considers.

The Working Group regularly monitors the interest rates of similar sweep programs at peer institutions. *Id.* ¶ 40.[6] During the relevant period, the Working Group considered three full-service brokerage houses that offer comparable bank deposit sweep programs to be the most relevant when analyzing competitive sweep rates. *Id.* ¶ 41. Plaintiff says she partially disputes

---

[5] Plaintiff says that she disputes Defendant's 56.1 statements regarding its rate setting process. 56.1 Stmt. ¶ 38 Response. It is not entirely clear what Plaintiff disputes, however, as her response is a recitation of various steps in the process that does not actually contradict Defendant's statement. The only conceivable statement that tends to dispute Defendant's assertion that the Working Group is the committee responsible for setting rates is that the Working Group's recommendations can be overruled by senior management "when it suits them, in order to generate additional revenue." *Id.* ¶ 38 (f). As to that statement, Plaintiff does not cite any admissible evidence in support. That said, the fact that the Working Group can be overruled, either to generate additional revenue or for other reasons, does not contradict Defendant's statement that the Working Group sets the rates.

[6] Plaintiff says she disputes this statement in part and, yet again, it is not entirely clear what Plaintiff disputes. She acknowledges in her ten-part response that she "does not dispute that among the rates the Working Group monitors, some are the rates of what the Working Group considers 'peer institutions.' ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉" *Id.* ¶ 40(a).

5

that statement, noting that the Working Group failed to consider whether there were other peer institutions that would have been "more relevant" when analyzing competitive sweep rates. *Id.* ¶ 41(a). She asserts, with no citation to the record, that the three brokerage houses that were considered were examined "primarily because [they] also paid low sweep rates." *Id.* ¶ 41(c). Defendant asserts that the "guiding criteria or the driving factor" of evaluating interest rates is "ensur[ing] the depositor rates are at or above competitors to make sure [its] products are competitive." *Id.* ¶ 42. Plaintiff disputes that, contending that the guiding factor in setting rates was "increasing net interest income and keeping rates as low as possible on consumers that BANA identified as 'rate insensitive.'" *Id.* ¶ 42(a).

### C. Industry Comparisons

The Crane Brokerage Sweep Index ("Crane Index") tracks sweep rates offered by 11 institutions, including Defendant. *Id.* ¶ 43.[7] The parties dispute whether the Crane Index is a reputable source for evaluating sweep rates that has been frequently cited in the press and peer-reviewed journals. *Id.* ¶ 44. Defendant's expert, Professor Andrea Eisfeldt, Ph.D., used the Crane Index to evaluate RASP interest rates. *Id.* ¶ 45. Dr. Eisfeldt conducted comparative analyses of RASP rates and concluded that RASP rates are in line with the industry as reflected by the Crane Index. *Id.* ¶ 47. Dr. Eisfeldt did not compare RASP rates to rates paid on products not reflected in the Crane Index, having concluded that such other products differ from RASP in their function and purpose; Plaintiff asserts that Dr. Eisfeldt's methodology was "defective." *Id.* ¶ 48. At base, Plaintiff contends that there are other products that are sufficiently similar to RASP that a reasonable fact finder could find that those rates should also be considered when determining whether the interest rates paid by Defendant were reasonable.

---

[7] Plaintiff disputes that there is one Crane Brokerage Sweep Index, as Crane publishes a "Brokerage Sweep Intelligence" weekly. *Id.* ¶ 43(a), (b).

From December 2016 through December 2022, across all asset tiers, Dr. Eisfeldt concluded that RASP rates were in line with the sweep rates of the institutions to which Defendant compared itself. *Id.* ¶ 49.[8] Dr. Eisfeldt considered 292 tier-month combinations covering the period from December 2016 to December 2022. *Id.* ¶ 50.[9] When compared to the interest rates offered by other sweep programs in the Crane Index, RASP was greater than or equal to the median rate of other comparable sweep programs for 195 of the 292 tier-month combinations. *Id.* ¶ 51(a).[10] An equally-weighted average of RASP rates was 0.009 percentage points lower than the median rate of other comparable programs, *id.* ¶ 51(b), and was 0.043 percentage points higher than the 25th percentile of other comparable programs, *id.* ¶ 51(c).[11] The parties dispute whether Defendant's rates are outliers among brokerage sweep programs; Defendant states that its rates are not outliers, whereas Plaintiff claims that Defendant's sweep rates are at the low end of the industry. *Id.* ¶ 52.

### D. Defendant's Statement Link Service

Defendant offers a Statement Link service for customers with multiple accounts. *Id.* ¶ 53. This service permits customers to "link" eligible accounts to receive a single statement for all linked accounts. *Id.* ¶ 54. A customer's asset tier for RASP is determined by the total assets

---

[8]   Plaintiff says she disputes this, but, once again, her purportedly contrary statement does not contradict Defendant's statement. Instead, Plaintiff uses her response to Defendant's 56.1 Statement on this point to argue that all of the rates to which Defendant compared its rates were "unreasonably low." *Id.* ¶ 49(a).

[9]   Dr. Eisfeldt's calculation considers each asset tier in each calendar month, e.g., January 2017 is counted as four months, one for each tier. Def. Mem. at 9 n.5, Dkt. 268.

[10]  Plaintiff says she partially disputes that claim, noting that between June 2020 and May 2022, all interest rates in RASP and the Crane Index were 0.01% due to the Covid-19 pandemic; according to Plaintiff, it is "meaningless" that RASP rates were on par with other comparable programs during that period. 56.1 Stmt. ¶ 51(a) Response (b)–(c).

[11]  Plaintiff does not dispute those statistics but quarrels with Dr. Eisfeldt's decision to use the 25th percentile as the data point to which she compared average RASP rates. *Id.* ¶ 51(c) Response (a)–(e). Plaintiff also disputes the reasonableness of equally-weighting RASP rates given the substantial variability of the total balances in each tier. *Id.* ¶ 51(c) Response (c)–(e).

in all eligible statement-linked accounts, as opposed to the assets in a single brokerage account. *Id.* ¶ 55. As a result, if the total assets held in all statement-linked accounts pushes a customer into a higher tier, the customer will receive a higher RASP rate only if the customer statement-links all of the accounts. *Id.* ¶ 56. Defendant discloses in the Traditional IRA Disclosure and the Roth IRA Disclosure that the Statement Link Service may result in a customer receiving a higher sweep rate. *Id.* ¶ 57. Although the parties dispute whether any customer would rationally choose not to have his or her accounts statement-linked, *id.* ¶¶ 59–60, there is no dispute that the Traditional IRA Disclosure and the Roth IRA Disclosure state that a customer "may elect to enroll in [Defendant's] Statement Link service," Ex. B at 44, Dkt. 272–2; Ex. C at 40, Dkt. 272–3, clearly implying that enrollment is not automatic, 56.1 Stmt. ¶ 61,[12] and inform customers to call Defendant if they wish to enroll, *id.* ¶ 62.

### E. Plaintiff's Accounts with Defendant

In August 2017, Plaintiff Sarah Valelly opened three accounts at Defendant: (1) a Cash Management Account ("CMA"); (2) a Roth Individual Retirement Account ("Roth IRA"); and (3) a Traditional Individual Retirement Account ("Traditional IRA"). *Id.* ¶¶ 63–64. Plaintiff agreed to be bound by the Traditional IRA Disclosure, the Roth IRA Disclosure, and the Client Relationship Agreement. *Id.* ¶ 65. When opening her accounts, Plaintiff did not ask for any investment advice. *Id.* ¶ 66. Defendant requires customers to "review [] and consent to" the account agreement and associated disclosures. *Id.* ¶ 68.[13] Although Plaintiff consented to these agreements and disclosures, she admitted that when she opened the accounts, she did not actually

---

[12] Although Plaintiff disputes that the disclosures "explain" that enrollment in the Statement Link Service is not automatic, *id.* ¶ 61(a), there is no dispute that the disclosures state that a customer "may elect" to enroll and that, to do so, the customer must call Defendant.

[13] Plaintiff says that she disputes this but provides only the argumentative statement that no one can review the required documents within the time Defendant states it will take the average user to do so in support of her dispute. *Id.* ¶ 68(a).

8

read either of the Disclosures or the Client Relationship Agreement. *Id.* ¶ 67. Defendant claims that Plaintiff declined to receive any investment advice when Defendant offered to connect her with a representative to discuss investment options; Plaintiff says she disputes this, noting only that she does not recall receiving the emails making such an offer but acknowledging that a representative of Defendant recommended on one occasion that she meet with "one of [his] Merrill Lynch partners" about her accounts. *Id.* ¶ 70. Plaintiff never attempted to enroll herself in the Statement Link service, nor was she aware prior to filing this lawsuit that she could earn a higher interest rate if her accounts were statement-linked. *Id.* ¶¶ 71–72.

## II.  DISCUSSION

### A. Legal Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Scott v. Harris,* 550 U.S. 372, 380 (2007) (internal quotation marks and citation omitted). Although the Court must construe the facts in the light most favorable to the non-moving party, "a party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Fed. Trade Comm'n v. Moses*, 913 F.3d 297, 305 (2d Cir. 2019) (internal quotation marks and citation omitted). Accordingly, to defeat a motion for summary judgment, the nonmoving party must produce "specific facts showing that there is a genuine issue for trial," *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006); a "scintilla of evidence" is not enough, *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 726 (2d Cir. 2010) (internal quotation marks and citation omitted). *See also D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998) (a party "must offer some

9

hard evidence showing that [her] version of the events is not wholly fanciful"); *Baity v. Kralik*, 51 F. Supp. 3d 414, 417–18 (S.D.N.Y. 2014) (internal quotation marks and citation omitted) (a party opposing summary judgment must "specifically respond to the assertion of each purported undisputed fact . . . and, if controverting any such fact, [must] support its position by citing to admissible evidence in the record").

### B. Defendant's Motion for Summary Judgment is Denied in Part and Granted in Part

Plaintiff has two remaining claims: the reasonable rate claim (Count III) and the statement link claim (Count V).  FAC ¶¶ 225–374, 384–93.

#### 1) Plaintiff's Reasonable Rate Claim

Plaintiff's reasonable rate claim stems from her allegation that Defendant breached the Client Relationship Agreement by failing to pay a "reasonable rate" of interest on her retirement accounts.  To prevail on this claim, Plaintiff must prove: (1) a valid contract existed between the parties; (2) Defendant breached the contract; (3) Plaintiff performed her obligations under the contract; and (4) Plaintiff was damaged as a result of the breach.  *Mohegan Lake Motors, Inc. v. Maoli*, 559 F. Supp. 3d 323, 345–46 (S.D.N.Y. 2021) (citation omitted).  There is no dispute that there was a valid contract and that Plaintiff performed her obligations.  There is also no dispute that if Defendant breached the contract, Plaintiff was damaged.  The element as to which there is a dispute is whether a trier of fact could conclude that the interest rate paid by Defendant during some or all of the putative class period was not reasonable.

After briefing was complete, Plaintiff filed a notice of supplemental authority, alerting the Court to the Supreme Court's decision in *Cunningham v. Cornell University*, 145 S. Ct. 1020, 1024 (2025), in which the Court held that to state a claim for a violation of Section 1106 of the Employee Retirement Income Security Act ("ERISA"), which prohibits an ERISA fiduciary

from engaging in "prohibited transactions," a plaintiff need only plausibly allege the elements of a violation; the defendant fiduciary bears the burden of proving that an exemption applies to an otherwise prohibited transaction. *See* Not. of Supp. Authority, Dkt. 295. Plaintiff claims that the contractual provision[14] at issue in the Client Relationship Agreement emanates from the ERISA provisions at issue in *Cunningham*, and, as such, it is Defendant's burden to prove that its rates were reasonable. *Id.* Contrary to Plaintiff's contention, it will not be Defendant's burden to prove that its rates were reasonable. In *Cunningham*, the plaintiffs sued Cornell and its appointed fiduciaries for violating ERISA by, *inter alia*, engaging in prohibited transactions in violation of Section 1106. 145 S. Ct. at 1026. Here, Plaintiff's reasonable rate claim is for breach of contract; she did not bring an ERISA claim. Accordingly, Plaintiff will bear the burden at trial of proving the elements of her claim — namely, that Defendant breached the Client Relationship Agreement by not paying a "reasonable" rate of interest on her retirement accounts. That said, Defendant moved for summary judgment. In this posture, it is Defendant's burden to demonstrate that no reasonable fact finder could find that the rates it paid were not reasonable.

Defendant argues that because the RASP rates were in line with the rates paid by peer financial institutions on comparable types of accounts, no reasonable juror could conclude that its RASP rates were not reasonable. Def. Mem. at 14–18, Dkt. 268. Plaintiff argues that Defendant is using inappropriate comparators to argue that its rates were reasonable because the comparators Defendant uses all sweep their customers' cash to affiliated banks. Pl. Opp. at 11–

---

[14] Although ERISA generally prohibits an ERISA fiduciary from engaging in a transaction where there is a conflict of interest (*e.g.*, a broker sweeping cash to an affiliated bank), ERISA allows such prohibited transactions provided that the transaction, *inter alia*, "bear[s] a reasonable rate of interest." 29 U.S.C. § 1108(b); 29 C.F.R. § 2550.408b-1(a)(iv). The provision of the Client Relationship Agreement that gave rise to this litigation is paragraph 13, "Sweep Program," which states that "[t]he interest paid on retirement account assets will be at no less than a reasonable rate." Ex. A at 5, Dkt. 272–1.

11

12, Dkt. 279. Moreover, even within that set of comparators, RASP rates were lower than other affiliated sweep products. Plaintiff argues that Defendant arrived at rates that were not reasonable because Defendant's internal process for setting the RASP rates was "motivated primarily to maximize net interest income at depositors' expense." *Id.* at 5–6.

In addition to arguing that Defendant's comparators are unduly limited, Plaintiff also argues that Defendant's motion is premised on an improper reasonableness standard. Pl. Opp. at 10–15. Plaintiff points out that Defendant did not propose a legal definition[15] of "reasonable" and instead cites caselaw that suggests that reasonableness is determined based on a comparison of "like products in similar markets and contexts." Pl. Opp. at 10 (citing Def. Mem. at 14). Although Plaintiff disputes Defendant's definition, even if Defendant's definition is correct, she asserts that it is a question of fact, as to which there is serious dispute, what constitutes "like products." *Id.* Given all of these disputes, she argues that this case not appropriate for summary judgment. *Id.* at 11–12 (citing *Wood v. Prudential Ret. Ins.*, No. 15-CV-1785, 2016 WL 5940946, at *4 (D. Conn. Sep. 19, 2016) ("[T]he benchmark and methodology used to set the interest rate, the prevailing rates for comparable investments, and other factors bearing on the reasonableness of the interest rate . . . are fact specific[.]"). The Court agrees.

---

[15] It is premature to decide at this point precisely how the jury will be charged with respect to how it should decide whether Defendant paid a "reasonable" rate of interest. Pl. Opp. at 10. The Court notes, however, that it disagrees with Plaintiff that the Court must look to ERISA and the tax code to define "reasonableness." Although the "reasonable rate" provision in the contract at issue may derive from ERISA, as the Court noted *supra*, Plaintiff did not bring an ERISA claim; she brought a breach of contract claim.

Nor does the Court agree that "a reasonable rate of interest" in the context of a contract claim is "the rate that would result in a competitive market under fair market valuation conditions, *i.e.* a rate parties would agree to in an arm's length transaction where neither party was able to exert market power over the other." Pl. Opp. at 12 (citing Ex. G (Palia Report) ¶ 106, Dkt. 272–7).

In the Court's view, the jury will determine what is a "reasonable" rate by looking at rates paid by similar programs within the banking industry. The parties dispute which programs are similar to RASP; a jury will have to determine which party has the more persuasive argument.

Defendant's expert examined ten sweep programs that appear in the Crane Index and concluded that "RASP is in line with the industry." 56.1 Stmt. ¶ 47. Plaintiff points out that nine of those institutions sweep to affiliated institutions. Pl. Opp. at 12. Looking beyond the institutions included in the Crane Index, Plaintiff's expert, Professor Darius Palia, Ph.D., compared RASP rates to rates paid by four online banks on their online savings accounts ("OSAs") and to rates paid on non-sweep money market deposit accounts ("MMDAs"). Palia Rebuttal Report, Ex. H, Dkt. 272–8. Dr. Palia also compared the interest rates paid on RASP to the interest rates Defendant paid on its Preferred Deposit ("PD") accounts. *Id.* ¶¶ 81, 90, 92. The RASP rates were generally lower than all of those rates. Plaintiff questions several aspects of Dr. Eisfeldt's methodology and argues that, even when compared to other affiliated sweeps programs, RASP rates are materially below Defendant's comparators. Pl. Opp. at 20–21.

There are differences[16] between the products Plaintiff wants to use as comparators and RASP that a jury might (or might not) find to be material, and a jury may reject Plaintiff's arguments why Dr. Eisfeldt's analysis is faulty. The problem for Defendant is that the appropriateness of the various possible comparators and the validity *vel non* of Dr. Eisfeldt's analysis are all questions of fact that must be decided by a jury.

In sum, Plaintiff has raised genuinely disputed facts about the reasonableness of RASP rates. The question of what are the appropriate benchmarks against which to assess the reasonableness of RASP rates and how the rates Defendant paid really compare are questions

---

[16] Dr. Palia proffered the interest rates paid on OSAs and MMDAs as a benchmark, contending that those rates "are a reliable indicator of the competitive FDIC-insured rates that were available," Palia Report ¶ 97, and that investment products and deposit accounts are not so "fundamentally different" from RASP that they cannot be compared, Palia Rebuttal Report ¶ 30. Defendant disputes that OSAs, MMDAs, and its own PDs are comparable products and point to a number of differences. *See* 56.1 Stmt. ¶¶ 13–14.

that a jury must decide. Defendant's motion as to Plaintiff's reasonable rate claim is, therefore, denied.

### 2) Plaintiff's Statement Link Claim

Plaintiff's statement link claim alleges breach of the implied covenant of good faith and fair dealing and violation of the Massachusetts Consumer Protection Law ("MCPL"). The covenant of good faith and fair dealing is implied in every contract and provides that neither party can do anything that will destroy or impair the other party's right to receive "the fruits of the contract." *Robert & Ardis James Found. v. Meyers*, 48 N.E. 3d 442, 450 (Mass. 2016) (citation omitted). The plaintiff bears the burden of proving "a lack of good faith," which can be inferred from the totality of the circumstances. *Id.* (citation omitted). The MCPL prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce," Mass. Gen. Laws ch. 93A, § 2(a), but it does not itself "provide standards for determining what constitutes an unfair or deceptive act," *Hiam v. HomeAway.com, Inc.*, 267 F. Supp. 3d 338, 347 (D. Mass. 2017) (citing *Boyle v. Int'l Truck & Engine Corp.*, No. 01-10039, 2002 WL 823810, at *6 (D. Mass. Apr. 23, 2002)). To find a Chapter 93A violation, courts examine: "1) whether the practice falls within the penumbra of common-law, statutory, or other established concepts of unfairness; 2) whether it is immoral, unethical, oppressive, or unscrupulous; and 3) whether it causes substantial injury to consumers. . . ." *Id.* at 347–48 (citing *PMP Assocs., Inc. v. Globe Newspaper Co.*, 321 N.E. 2d 915, 917 (Mass. 1975)).

Plaintiff's Statement Link Claim is premised on the fact that had her accounts been statement-linked, she would have received RASP rates at tier 2 or 3 instead of the lower rate she received at tier 1. Pl. Opp. at 22. Because only a very small percentage of online-linked retirement account holders have their accounts statement-linked, Plaintiff contends that the fact finder could infer that Defendant fails adequately to advise customers of their ability to earn a

higher interest rate by statement-linking. Pl. Opp. at 21–22. Plaintiff takes issue with the fact that the only disclosure on how to statement link accounts is in the Traditional IRA Disclosure and the Roth IRA Disclosure, which direct customers to call Defendant to enroll in the service. *Id*. at 22. Defendant does not affirmatively tell customers that online-linked accounts are not necessarily statement–linked. *Id.* Despite the low enrollment numbers, Defendant has not changed its business model either to auto-enroll customers into statement-linking or to make customers who have not enrolled aware that they could earn a higher interest rate if they enroll in the service. *Id.* Plaintiff asserts that Defendant's disclosures are insufficient and misleading and constitute "unfair" conduct that violates the MCPL. *Id.* at 24 (citing *Kelley v. CVS Pharmacy, Inc.*, No. 98-0897, 2007 WL 2781163, at *7 (Mass. Super. Aug. 24, 2007); *Cooper v. Charter Commc'ns Ents. I, LLC*, 760 F.3d 103, 111 (1st Cir. 2014)).

Plaintiff has failed to adduce a shred of evidence that Defendant's failure affirmatively to notify her that her accounts were not statement-linked or that Defendant's failure automatically to enroll her and other customers in the statement-link service shows "a lack of good faith" or is "unfair or deceptive." A description of the statement-link service appears on pages 3, 43–44 of the Traditional IRA Disclosure, Ex. B, and on pages 34, and 39–40 of the Roth IRA Disclosure, Ex. C. The Traditional IRA Disclosure advises customers that:

> Your interest rate generally will correspond with your Asset Tier as determined by the value of assets in your eligible Retirement Plan Account(s), Deposit Account(s) and accounts linked through the Merrill Lynch Statement Link service. Ex. B at 38.
>
> You may elect to enroll in the Merrill Lynch Statement Link service ("Statement Link service"). This service allows certain types of accounts to be "linked" for various purposes, including (1) to receive statements for all linked accounts in a single package and (2) to establish your Asset Tier (defined below) for the Retirement Asset Savings Program ("RASP"). *Id.* at 43.
>
> [Y]our interest rate will correspond with your Asset Tier as determined by the value of assets in your account or accounts linked through the Statement Link

15

> service. Generally, deposits of clients in higher Asset Tiers will receive higher interest rates than deposits of clients in lower Asset Tiers. *Id.*
>
> If your accounts are not linked on the Valuation Date, then the assets in each Retirement Plan Account will be valued individually to determine the Asset Tier for that account. *Id.* For more information on enrolling in this service, please call your Financial Advisor or (800) MERRILL. *Id.* at 44.

Similarly, the Roth IRA Disclosure advises clients that:

> For [sic] RASP interest rates will be tiered based upon your relationship with Merrill Lynch as determined by the value of assets in your eligible Retirement Plan Account(s), Deposit Account(s) and accounts linked through the Merrill Lynch Statement Link service. For these tiered Deposit Accounts, deposits of clients in higher Asset Tiers (as defined below) generally will receive higher interest rates than deposits of clients in lower Asset Tiers. Ex. C at 34.
>
> You may elect to enroll in the Merrill Lynch Statement Link service ("Statement Link service"). This service allows certain types of accounts to be "linked" for various purposes, including (1) to receive statements for all linked accounts in a single package and (2) to establish your Asset Tier (defined below) for the Retirement Asset Savings Program ("RASP"). *Id.* at 39.
>
> For more information on enrolling in this service, please call your Financial Advisor or (800) MERRILL. *Id.* at 40.

Plaintiff purports to dispute Defendant's assertion that both disclosures make clear that enrollment in the Statement Link Service is not automatic, claiming that the disclosures do not explicitly state that enrollment is not automatic and that the disclosures "make it difficult to determine whether or how to Statement Link [an] account." 56.1 Stmt. ¶ 61(a)–(b). No reasonable juror would so conclude.

Both disclosures clearly advise customers that that they "*may elect* to enroll in the Merrill Lynch Statement Link service," which necessarily implies that enrollment is not automatic. Moreover, both provide customers with a telephone number to call to receive information on how to enroll, again making clear that enrollment is not automatic. Although Plaintiff signed the Traditional IRA Disclosure, the Roth IRA Disclosure, and the Client Relationship Agreement when she opened her accounts, *id.* ¶ 65, during discovery she admitted that she never read any of

them during the account-opening process or thereafter, *id.* ¶ 67; Ex. I (Valelly Tr.) at 98:15–24, Dkt. 272–9.  She consented to the Disclosures and Client Relationship Agreement but rationalizes her failure to read them by stating that they were too long and cumbersome.  56.1 Stmt. ¶ 69(b).  When Plaintiff opened her accounts, she did not ask for any investment advice, *id.* ¶ 66; nor did she ever call Defendant to enroll in the Statement Link Service or to inquire how to enroll, *id.* ¶ 71.  In short, Defendant clearly and unambiguously notified her that she needed to take affirmative steps to statement-link her accounts.[17]  Defendant did not breach the covenant of good faith and fair dealing or violate the MCPL by not automatically enrolling Plaintiff in statement-linking.

Plaintiff asserts that given the low enrollment numbers of customers that have online–linked accounts that are not statement–linked, Defendant's failure to take "corrective action" and automatically enroll customers in this service demonstrates bad faith or a breach of the covenant of good faith and fair dealing.  Pl. Opp. at 22–23.  The Court disagrees.

Defendant's 30(b)(6) witness testified that there are legitimate reasons why a customer may not elect to statement-link their accounts, including privacy concerns with linking certain accounts.  *See* Ex. L (Hill Tr.) at 34:24–35:21, Dkt. 272–12.  Plaintiff attempts to create a dispute of fact by pointing to the testimony of another employee of Defendant, who, when asked why a consumer whose accounts are online–linked but not statement–linked would want that, responded, "I can't really think of a reason.  Maybe they just don't care about how the statements come to them."  Ex. 24 (Greenberg Tr.) at 137: 6–13, Dkt. 283–24.  The testimony of one

---

[17] On July 24, 2018, an "Investment Consultant" on Defendant's Client Relationship Team emailed Plaintiff indicating that his role is "to help customers learn more about the capabilities of Merrill Edge."  Ex. S, Dkt. 272–19.  The email offered to review the tools and resources available to her.  *Id.*  On March 8, 2019, Joseph Chang, a Merrill Lynch Vice President, emailed Plaintiff strongly recommending that she make an appointment with a Merrill Lynch employee to make sure she was not missing any earning potential opportunities associated with her Merrill accounts.  56.1 Stmt. ¶ 70(b); Ex. T at 7, Dkt. 272–20.  Plaintiff did not take advantage of either offer.  Ex. I (Valelly Tr.) at 57:12–14.

employee who cannot think of a reason not to statement-link does not "disprove" the testimony of a different employee who provided reasons why a person might elect not to enroll in that service.

The evidence clearly shows that Defendant disclosed to Plaintiff that she could enroll in the Statement Link service and advised her how to do so; Plaintiff did not read the disclosures. When Defendant's representatives reached out to Plaintiff to provide advice, she ignored those opportunities. The fact that only a small subset of customers are enrolled in a highly beneficial service does not prove that Defendant engaged in an "unfair or deceptive" practice or that Defendant "lacks good faith." It may prove that Defendant is not a customer-friendly brokerage house, but a lack of customer-friendliness is not proof of bad faith or deceptive conduct. Plaintiff may have preferred for Defendant to have a system of automatically enrolling new customers in the Statement Link service, but neither contract law nor the MCPL requires it to do so. Because there is no evidence that Defendant violated the MCPL or that its fully disclosed process for enrolling in the Statement Link service violates the covenant of good faith and fair dealing, Defendant is entitled to summary judgment on this claim.

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is DENIED in part and GRANTED in part.

In light of the denial of summary judgment regarding Plaintiff's reasonable rate claim, the next step is a motion for class certification. The parties are ordered to meet and confer and agree on a schedule. By no later than August 8, 2025, the parties must submit a joint letter with either the proposed schedule or each party's proposal if they cannot agree.

If, at any time, the parties want a settlement conference with Magistrate Judge Wang, they may submit a joint letter requesting a referral.

As noted above, *supra* note 1, this Opinion and Order will be filed under seal. By no later than August 1, 2025, Defendant must show cause why any portion of this Opinion & Order should remain under seal and submit a version of this opinion with its proposed redactions. The Court cautions Defendant to recognize that the Court's preliminary view is that all facts disclosed in this opinion comprise "judicial documents" as that term is used in *Lugosch* such that the presumption of public access applies. *See Lugosch*, 435 F.3d at 119.

The Clerk of Court is respectfully directed to file this Opinion and Order under seal, with viewing restricted to the parties and the Court, and to terminate the open motions at docket 267, 278, 286, and 291.

**SO ORDERED.**

Date: July 23, 2025
New York, New York

_____
VALERIE CAPRONI
United States District Judge